**JONATHAN SACK**
**SACK & SACK, LLP**
*Attorneys for Plaintiff, Michael Karsch*
70 East 55th Street, 10th Floor
New York, NY 10022
Tel.: (212) 702-9000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL KARSCH,<br><br>                              Plaintiff,<br><br><br>                    v.<br><br><br>BLINK HEALTH LTD. (f/k/a CHAIKEN HOLDINGS LLC and VITAL MATTERS LLC), GEOFFREY CHAIKEN and MATTHEW CHAIKEN,<br><br>                              Defendants. | No.: 17-cv-_____ ( ) ( )<br><br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff, Michael Karsch ("*Karsch*" or "*Plaintiff*"), by and through his undersigned attorneys, Sack & Sack, LLP, alleges, based on his own knowledge as to matters involving himself and on information and belief as to all other matters, for his Complaint against Defendants Blink Health Ltd. (f/k/a Chaiken Holdings LLC and/or Vital Matters LLC) ("*Blink*" or "*Blink Health*"), and brothers Geoffrey Chaiken, individually, and Matthew Chaiken, individually (collectively, "*the Chaikens*"), as follows:

## NATURE OF THE ACTION

1.      The allegations in the Complaint detail how the Chaiken brothers, in *Ponzi-scheme like fashion*, engaged in a systemic bait-and-switch by fraudulently inducing the solicitation of investment capital and the goodwill of investors in order to *pump up* the valuation of their then-startup, Blink Health, only to dump those initial investors for new, different investors to bring in capital at a higher per share valuation, thereby unjustly enriching the Chaiken brothers at the expense of the initial investors.

2.      Specifically, Plaintiff Michael Karsch brings this suit to recover damages stemming from a calculated, fraudulent scheme cooked up by brothers Geoffrey (or "*Geoff*") and Matthew Chaiken to induce Karsch to invest one million ($1,000,000) dollars in their then-startup company, Defendant Blink Health, in exchange for an ownership equity stake in the company at its incubator stage and at the ground floor of its value, when such investments are riskiest, and the rewards are greatest.

3.      Unbeknownst to Karsch at the time, however, despite their obligations as fiduciaries to Karsch and their obligations to disclose all materials facts, the Chaikens' sole purpose for fraudulently inducing Karsch to invest in Blink was to use his one million ($1,000,000) dollar seed money venture capital investment to drive up the per-share value while scheming to fraudulently re-sell Karsch's contractually owed equity shares to other high-profile venture capital investors like 8VC, at a much higher premium.

4.      The Chaikens' fraudulent scheme was intended to deprive Karsch of the benefit of his bargain, which is ownership of no less than five (5%) percent of Blink Health's equity.

5.      Blink Health's most recent ninety million ($90,000,000) dollar fund raise for fifteen (15%) percent of the equity in Blink Health pegs the value of the company, at six hundred million ($600,000,000) dollars.

6.      Given Blink Health's most recent stated six hundred million ($600,000,000) dollar valuation, Karsch's initial one million ($1,000,000) dollar venture capital investment is currently valued at more than thirty million ($30,000,000) dollars.

7.      The gravamen of this complaint, is putting Karsch back where he would be "but for" the wrongful taking of his bargained for equity ownership stake in Blink Health.

8.      To perpetrate their fraud, the Chaikens drafted and entered into multiple agreements and side-letters with Karsch confirming their false promises of preferred equity shares (loosely referred to as Series A Preferred Shares (and better)) in exchange for Karsch's critical early-stage one million ($1,000,000) dollar anchor bridge financing in the formative stages of Blink's creation, without which Blink would never have been able to grow, develop, and reap the success it has enjoyed to date.

9.      The clear and unambiguous terms of the agreements (Exhibit A) that the Chaikens entered into with Karsch (but had no intention of ever honoring) provided that Karsch would invest much-needed anchor financing of one million ($1,000,000) dollars that would automatically convert into most favorably-priced equity shares in Blink's ownership equal to **not-less-than five (5%) percent** of the equity in the company upon the occurrences of certain financial hurdles or automatic trigger events.

10.     In early July, 2014, at the time the Chaikens presented the agreements to Karsch, the Chaikens represented to Karsch that Blink had a then-valuation of *no more than* twenty million ($20,000,000) dollars, thus using the "carrot" of the then-favorable two ($2.00) dollar

price per share valuation in order to secure Karsch's critical and much needed financing as reflected in the agreements.

11.     Notably, the "side letter" (Exhibit B) referred to Karsch as an investor, Karsch's investment in Chaiken Holdings, LLC as **EQUITY** and in the event of any discrepancies in the language and interpretation of the meaning of the various documents, the side letter would govern.  Moreover, the July 10, 2014 side letter provides for the investor, Karsch, the option to convert his Series A Preferred Shares to any other, better share class issued to the Chaikens. There is no reference conferring the Chaikens the ability to pre-pay the investor note and simply avoid having to issue any equity to Karsch.

12.     Karsch was Blink's *first* significant seven figure outside venture capital investor.

13.     In early July, 2014, at the time the agreements were entered into, the Chaikens had no intention of ever honoring the express provisions of their deal with Karsch.

14.     Instead, in breach of well-grounded covenants of good faith and fair dealing, the Chaikens knowingly defrauded and deceived Karsch into believing he was making a venture capital "bridge financing" which would convert into equity ownership in Blink Health of not less than five (5%) percent.

15.     Karsch would also be entitled to participate in future fund raise activities in order to either maintain or increase his percentage of equity ownership in Blink Health.  Karsch has been denied those participation rights as well.

16.      In actuality, the Chaikens used Karsch's seed capital to build upon the valuation of their venture, only to then re-sell Karsch's equity behind his back to other venture capitalists, who were not willing to take the risks that Karsch did.

4

17.     The replacement investors subsequently bought in to Blink Health after there was a proof of the concept of its business model.

18.     Once deemed a viable company, the Chaikens resold Karsch's investment to the replacement investors at the newly inflated share price.

19.     Thus, over the course of the months immediately following Karsch's one million ($1,000,000) dollar investment in Blink Health, as the value of the company increased *exponentially* due to Karsch's early venture capital investment and bold leap-of-faith in Blink, the **no-less-than five (5%) percent** equity ownership stake that was promised to Karsch in exchange for his then-much-needed one million ($1,000,000) dollars was at the time, worth at least ten times (10 X) as much upon the date it automatically converted to equity.

20.     Driven by pure unadulterated greed, despite their obligations as fiduciaries to Karsch and their obligations to disclose all material facts, the Chaikens acted deliberately and with fraudulent purpose to avoid honoring Blink's end of the deal with Karsch by plotting to hide from Karsch certain financial transactions which automatically triggered the conversion of Karsch's financing into Blink equity per the parties' express, written agreements.

21.     In an attempt to cover up their fraud, after Karsch's equity automatically converted, the Chaikens lined up alternate (and on more favorable terms for the Chaikens) financing of Karsch's one million ($1,000,000) dollar venture capital investment, and then attempted to refund Karsch's one million ($1,000,000) dollars to Karsch in breach of the parties' agreements.

22.     With the benefit of time, the Chaikens sought to now simply undo the transaction, which they then referred to as a pre-payment of a loan without penalty of conversion to equity.

23.     The no pre-payment penalty the Defendants rely upon to undo Karsch's early-stage venture capital investment while failing to convert it to equity ownership in Blink is not a contractual basis to deny Karsch the now unconditional right to convert his bridge financing investment into an ownership stake in the equity of Blink Health.

24.     Indeed, if the investment was for debt, they why wouldn't the Chaikens simply borrow from a commercial bank?  Because there being no assets of the fledgling startup idea, it is common sense to understand that Karsch's risky venture capital investment was for equity, not for merely a best case scenario of return of the principal and a six (6%) percent interest factor on the money he provided to the company in its critical incubation stage.

25.     In addition, in letter communications from the Chaikens, their position is now that the conditions for automatic conversion of Karsch's equity never occurred.

26.     As will be demonstrated herein, the conditions for conversion (either automatic or by Karsch's voluntary election) of Karsch's bridge financing into Blink Health equity did indeed occur.

27.     All this sleight-of-hand financial chicanery was implemented just so the Chaikens would not have to live up to the deal they struck with Karsch to induce his investment in their unknown venture in the first instance.

28.     As the Chaikens tell it, Karsch made a one million ($1,000,000) dollar *loan* to Blink with the staid upside of a six (6%) percent per year interest rate, which they merely re-paid even though the agreements are devoid of any cash re-payment terms.

29.     Said by the Chaikens another way, Karsch made a venture capital, highly risky investment in an unproven startup, for the maximum upside of a six percent return; or, in an

alternative scenario, the venture flops and Karsch gets zero for his one million ($1,000,000) dollar unsecured debt.

30.     It is common knowledge that, because of the high risk of early stage venture capital investments made at the first fund raise or even before (like the Karsch investment described herein), the bargain for the courageous investor is high reward with a large equity ownership stake in the venture.

31.     Karsch's convertible bridge financing note was indeed not a loan with merely a six (6%) percent return, but a risky venture capital investment for equity in Blink Health.

32.     The Chaikens' position is contrary to basic principles of venture capitalism. According to the Chaikens, Karsch owned one hundred (100%) percent of the downside risk of failure of his one million ($1,000,000) dollar investment and yet Karsch only enjoyed a best-case scenario of merely six (6%) percent return on his investment.

33.     The Chaikens' is a preposterous position, belied by the written documents and factual record, and as will be abundantly clear, evinces the Chaikens' mal-intent and scheme to defraud Karsch.

34.     Defendants' fraudulent scheme is particularly egregious because, in May 2015, at the time the Chaikens attempted to unlawfully unwind Karsch's investment by merely forcing the return to Karsch of his one million ($1,000,000) dollars plus then accrued interest of an additional fifty-two thousand ($52,000) dollars, Blink Health had **already**, by operation of the parties' express, written agreements, automatically converted Karsch's investment into an equity ownership stake of no less than five (5%) percent of Blink Health.

35.     Despite immediate and multiple written and verbal demands by Karsch and his attorneys (Exhibit C), the Chaikens and Blink deliberately and fraudulently refused, and continue

to refuse, to issue Karsch his accrued due and owing equity ownership in Blink Health in a bad faith breach of the parties' agreement.

36.     Therefore, Defendants unlawfully deprived Karsch of his earned, due and owing equity ownership stake in Blink Health, using fraudulent means to obviate the express terms of the parties' agreement and the conditions and privileges of Karsch's investment while unjustly enriching themselves.

37.     Plaintiff believes that further discovery will reveal that Defendants' actions are a practice and pattern of the Chaikens that was also occurring with other investors who were promised (and entered into agreements ensuring) equity in Blink.

38.     As a result of Defendants' deceit and manipulation, Karsch is entitled to, at minimum, no less than five (5%) percent equity ownership in Blink Health, currently worth at least $30,000,000.

39.     As recently as April 12, 2017, Blink Health announced that it had raised ninety ($90,000,000) million, for fifteen (15%) percent of Blink's equity was sold to these investors in its most recent round of financing.  This latest round of financing was led by 8VC, formerly Formation 8, a technology investment fund founded by American entrepreneur and venture capital investor Joe Lonsdale.

40.     This most recent round of fund raising brings Blink Health's total financings to one hundred sixty five million ($165,000,000) dollars, the first million dollars of which was from Karsch.

41.     By bringing this suit, Karsch seeks to recover that which he bargained for: the immediate conversion of his one million ($1,000,000) dollar investment plus the accrued interest thereon into the appropriate percentage ownership of Blink Health equity which he is rightfully

owed and entitled to under the terms of the parties' agreements at the then capitalization value of Blink upon which the conversion would have been calculated.

42.     Karsch asserts that the conversion should have been calculated at a date and upon a valuation established not later than May, 2015.


## JURISDICTION AND VENUE

43.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims alleging violations of federal securities laws. This Court has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to Plaintiff's federal claims and arise from a common nucleus of operative facts, and thus form part of the same case or controversy under Article III of the United States Constitution.

44.     This Court has personal jurisdiction over Defendant Blink Health because its principal place of business is located in the State of New York, and over the individual Defendants because they are residents of the State of New York.  Additionally, each of the Defendants knowingly committed acts in New York that form the basis of the action, directed or conspired with others to commit acts in New York, and purposely availed themselves of the privileges of doing business in New York as set forth herein.

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and Section 27 of the Exchange Act because the events giving rise to the claims – including the preparation and dissemination of materially false and misleading information – occurred in substantial part in this District, and because the parties have consented to this District.

## THE PARTIES

46.     Plaintiff Michael Karsch is an investor in the public securities market and a resident of the State of New York.

47.     Defendant Blink Health, Ltd., formerly known as Chaiken Holdings, LLC and Vital Matters, LLC, is a limited liability company recently re-organized under the laws of Bermuda (for US tax avoidance purposes) with its principal place of business at 375 West Broadway, New York, New York. [1]

48.     Defendant Geoffrey Chaiken is a co-founder of Blink Health, along with his brother Defendant Matthew Chaiken, and served as Blink Health's Chairman and CEO at all relevant times.   He is a resident of the County, City and State of New York.

49.     Defendant Matthew Chaiken is a co-founder of Blink Health, along with his brother Geoffrey Chaiken, and served as President and COO of Blink Health at all relevant times.  He is a resident of the County, City and State of New York.

---

[1] Prior to becoming known as Blink Health, the company had several names, including Chaiken Holdings LLC and Vital Matters LLC (the company, and all its iterations, is herein referred to as "*Blink Health*").

## FACTUAL BACKGROUND

### THE CHAIKENS: BRIEFLY

50.     Brothers Geoffrey and Matthew Chaiken portray themselves as savvy, "street-smart" entrepreneurs with Ivy-League pedigrees and "extensive" business experience in the technology and pharmaceutical sectors.

51.     In reality, and as the events described herein demonstrate, the Chaikens are nothing more than young, well-connected, over-privileged boiler-room con men who seek to systemically enrich themselves at the expense of innocent, unsuspecting friends, family, employees and investors, and as demonstrated, will rip off, lie to, profit from and deceive even their own father and mother.

52.     Indeed, in just the last six (6) months, at least two (2) other lawsuits have been filed against the Chaikens alleging similar, and oftentimes overlapping, factual allegations detailing the unlawful Ponzi-like schemes of the Chaikens and their fledgling *front*, Blink Health.

53.     A *New York Post* article dated November 2, 2016 entitled, "**Generic Viagra Peddler Accused of Stiffing Business Partners**" recounts allegations filed in this very Court describing how the Chaikens defrauded Blink's own CFO as well as their penchant for spying on business partners, vendors, and employees. (Exhibit D)

54.     The Chaiken brothers are consistent in their systemic efforts to defraud.

**BLINK: THE GENESIS OF A FRAUD**

55.     In early Summer 2013, defendant Geoffrey Chaiken, together with his younger brother, defendant Matthew Chaiken, set off to create a company in the pharmaceutical technology space.

56.     At the time, Geoff Chaiken admittedly knew *nothing* about the healthcare technology space, let alone the prescription data/medical business, except that it could be a profitable investment and business concept.

57.     Thus, the Chaikens decided they could make money in a company in the pharmaceutical space by building on the ideas and efforts of others and they resolved to fund the company entirely with other peoples' money in much the same way.

58.     The Chaikens plotted.  Under the guise that initial venture capital seed money would serve as capital for developing the business and would be in consideration of ownership and equity in the venture, the Chaiken brothers merely used the investment and initial seed money to establish a bogus and wildly over-inflated value in Blink so the Chaikens could resell the equity to others at a higher price on the backs of the duped seed capital investors.

59.     Recycling initial investors' old money for new, replacement investor's money is commonly referred to as a Ponzi scheme.

60.     Indeed, from the beginning, the Chaikens' plan was to dupe the early-stage seed venture capital investors, Karsch included, and never intended to convert the original venture investment money for equity ownership in the business.

61.     The fraud is rooted in the manner in which the Chaikens used written contracts and "side letters" to create a false sense of comfort and security cloaked in the garb of

"partnership" with the early-stage venture capital investor, Karsch included, while never intending to honor one sentence of any written agreement the Chaiken brothers entered in to.

62.     Thus, in July 2013, knowing nothing of the pharmaceutical marketing business, Geoff Chaiken desperately sought the assistance of a family member, cousin Spencer Falk, to "tutor" him on the pharmaceutical marketing business.

63.     Falk is a seasoned and well-connected professional in the health care marketing space.

64.     Evidence of Geoff Chaiken's illiteracy is clearly illustrated in his July 15, 2013 email to Falk[2]:

**Geoffrey Chaiken**

From: **Geoffrey Chaiken** <gchaiken@gmail.com>
Date: Mon, Jul 15, 2013 at 10:54 AM
Subject: Following up on company idea
To: Spencer Falk <spencer@thefalkgroup.com>

Spencer:

I hope your doing well and had fun Birthday party for the boys.
I've been doing some more work on this pharmaceutical marketing idea and was interested in following up with you and your friend. Specifically, I am trying to understand as much as possible about how prescription data is generated, anonymized and sold to pharmaceutical companies. Your colleague, who we spoke to at your office, seems like he has a very good understanding of how this works. Do you think he might be willing to meet with us to give a quick crash course and answer some questions? I'm pretty wide open this week.

best,
Geoff

p.s. Meeting with Rick Webb tonight to move things forward

65.     The "colleague" referred to by Chaiken in his email to Falk is Brian Burk, whom Falk introduced to Chaiken in Falk's office.

_____

[2] Screenshots of all emails referenced in this Complaint are provided in their original format in Exhibit M.

66.     Over the course of the next month (during July 2013), Geoff Chaiken continued to leech information and seek Falk's know-how, industry contacts, guidance and advice concerning the business of pharmaceutical marketing, which eventually led to the business plan that is now Blink Health.

67.     During that Summer 2013, Geoff Chaiken sought every opportunity to *pick Falk's brain*, capitalize on his contacts, and glom onto his ideas; as well as the ideas of anyone Geoff Chaiken could coax into meeting.

68.     As seen in the July 15th 2013 email above, Geoff Chaiken eagerly sought his cousin, Spencer Falk to introduce him to Brian Burk, a key player in the pharmaceutical business[3].

69.     In other instances, Geoff Chaiken expended efforts, by any means, to obtain proprietary information from competing pharmaceutical companies – *e.g.*, Zitter Health Insights, as illustrated in the following August 2013 email:

*Please see email on the following page*

---

[3] Brian Burk is the EVP of Business Development for Medispend.  According to the Medispend website, Burk has a diverse background in the healthcare industry. Most recently, Brian successfully sold the healthcare technology company that he founded which focused in ePrescribing and Pharmacy systems. Prior to that, Brian's background included leading the sales and marketing practice for the company which provided the compliance training system used by the FDA OIG, ran a medical communications company, led strategy and business development at one of the largest healthcare informatics companies and worked in sales, marketing and operations for big pharma.

**Geoffrey Chaiken**

From: **Geoffrey Chaiken** <gchaiken@gmail.com>
Date: Mon, Aug 5, 2013 at 10:22 AM
Subject: Getting together
To: Spencer Falk <spencer@thefalkgroup.com>

Spencer:
I hope you are doing well. I've been continuing to research the co-pay refund industry and refining the idea. I've also enlisted the help of my brother, which has been great. I was wondering if you know the folks at Zitter Health Insights and/or have a way to get access to a copy of their Co-Pay offset monitor report http://zitter.com/insights-we-offer/co-pay-offset-monitor/ on the cheap. I was also wondering if you would be willing to set up a meeting with Brian Burk in person where we walk him through the idea and see if he wants to get involved as a member of the team. I've also put together a standard NDA that I would like everyone who is potentially going to join the team to sign. Hopefully its not an issue for Brian.
best,
Geoff

70.     In further examples that Geoff and his brother built their "idea" for the business model behind Blink Health on the ideas of others, Geoff emailed Burk in August 2013 seeking intelligence that he and his brother would later market to unwitting investors like Karsch as if it were their own brainchild:

*Please see email on the following page*

**Geoffrey Chaiken**

From: **Geoffrey Chaiken** <gchaiken@gmail.com>
8/18/13
To: Brian, Matthew, me

Brian:

I hope you had a nice weekend. It was great meeting and sharing the initial vision for CoupRx with you. As I mentioned during our discussion, we are looking to recruit someone who will be responsible for collecting the relevant data from drug store, PBMs, insurance companies etc. to make CoupRx work. Based on our conversation it seems like you might be very well positioned to help in this department. If you are still interested in getting involved in this venture, it would be very helpful to me if you could provide a brief write up of how you think you can help CoupRx collect the data we need to fulfill our goals. Specifically, I would like to know…

1. How you would plan to get the drug history data for CoupRx members.
   a. What data sources you would go to
   b. How you would deal with HIPAA compliant positive identification that would allow us to get patient level data
   b. How you would structure deals (upfront costs vs ongoing costs)
   c. How much of your time would this require and what other financial resources we would need to put agreements in place with data sources
   d. How long would it take to put these data agreements in place
   c. Relevant experience doing this type of work with specific examples
   d. Any references that have worked with you on doing these types of business deals

2. How you would plan to get pricing information to provide GoodRx pricing like functionality to CoupRx members
   a. I think you mentioned that you were working with a company in this space already. Do you think working with CoupRx would be a conflict of interest?

3. Are there any other companies that you are working with that are operating in the pharmaceutical coupon space or mobile app space currently?
   a. Would your involvement with CoupRx present a conflict or potential conflict of interest with these companies?

4. Any other areas in the project where you think you are well positioned to add value with examples of relevant experience.

Thanks again. I look forward to hearing your thoughts and connecting with you soon.

best,

Geoff

71.     Also during this time, Geoff Chaiken continued to pester his cousin Spencer Falk to set up introductions and meetings between the Chaikens and other long-time relationships and clients belonging to Falk, including, among others, senior managers at Johnson & Johnson, Pfizer, BI, Oksuka, and Merk.

72.     By August 2013, *albeit on the backs of others*, the Chaikens created a startup company in the healthcare technology space that soon would become Blink Health; a concept intended to enable consumers to save up to 90% on generic drugs via its website and phone app.

### THE CHAIKENS TARGET WELL-KNOWN INVESTOR MICHAEL KARSCH TO INDUCE HIM TO INVEST IN THEIR STARTUP COMPANY

73.     By spring of 2014, with the birth of Blink Health, the Chaikens now sought to involve big-name, well-known venture capital investors to attract attention to their fledgling company and create a cache of credibility.

74.     It was during this time that the Chaikens tracked down well-known investor Michael Karsch in order to solicit seed capital for Blink.

75.     At the time, Michael Karsch had been an investor in the public securities market and the owner of various businesses, including Juice Press.

76.     A graduate of Tufts with a Harvard M.B.A., Karsch has extensive experience in both investment banking and private equity:

    a.  From 1995 to 1998, Karsch was one of four investment professionals at Chieftain Capital Management.

    b.  In 2001, after a successful run at Soros Fund Management as a Managing Director, Karsch founded Karsch Capital Management, a hedge fund that has managed billions of dollars over its decade-long tenure.

    c.  During its 13-year run, Karsch's fund had an average annual return of 7.5% (compared with 3% total for the S&P 500).

    d.  In 2012, Karsch retired from the hedge fund business to pursue various entrepreneurial ventures.

e. By the end of 2012, Karsch was the majority investor in the currently successful Juice Press – a Manhattan based seller of cold-pressed and organic juices. Juice Press currently boasts 66 stores spanning across the Northeast and an enterprise valuation of over $100 million.

77.     From the first time the Chaikens sought out Karsch, the Chaikens admitted to Karsch that they targeted him because of the significant early-stage venture capital funding that Karsch historically was able and willing to provide and because of Karsch's entrepreneurial acumen, his financial success as a prominent investor, his extensive rolodex of successful investors and his respected reputation within the investment community.

78.     Though the Chaikens made it explicitly clear that they intended to use the goodwill that came with Karsch's *brand* to attract and incentivize other brand-name investors to open up their checkbooks to the Chaikens' business dream, in actuality, the Chaikens used the goodwill of others to make misrepresentations to Karsch in order to induce him into investing the critically significant one million ($1,000,000) dollar venture capital funding into their fledgling startup.

79.     The Chaikens induced the capital of other investors to Blink Health by representing to them that Karsch was joining in the early venture capital investment round of financing.

**THE CHAIKENS HATCH THEIR FRAUDULENT SCHEME**

80.     In sum, the Chaikens' scheme was to induce Karsch, a well-known successful venture capitalist, into providing seed capital into their then-fledgling pharmaceutical startup under the false pretense that such seed money would be automatically converted into preferred equity shares at a twenty (20%) percent discount to the then conversion price (loosely referred to

as *Series A Preferred Shares*) upon the occurrence of certain financial milestones or automatic "triggers." The conversion discount refers to the discount from the price per share price paid by investors in the VC Series A that is used to calculate the number of shares of Series A issued upon conversion of the note into Series A.

81.     In this instance, the conversion discount was 20% and assuming the price of the VC Series A was $2.00 per share, then each $1.60 of note would convert into one share of Series A.  In this instance, as is common in structuring venture capital investments, the purpose of the conversion discount is to give the investor (Karsch) an appropriate return for investing in the company (Blink Health) before the VC Series A round.

82.     With convertible debt, the intent of the investment was for Blink to issue the seed investor, Karsch, a promissory note, for the investment amount, that contains a conversion feature. The conversion feature is the mechanism by which the debt (the promissory note) will convert to equity (new shares for the investor) upon various future events either automatically or at the investor's option.  A convertible note is short-term debt that converts into equity.  In the context of a seed financing, the debt typically automatically converts into shares of preferred stock upon the closing of a Series A round of financing. In other words, investors loan money to a startup as its first round of funding; and then rather than get their money back with interest, the investors receive shares of preferred stock as part of the startup's initial preferred stock financing, based on the terms of the note.

83.     At all times it was expressly understood that Karsch was making an investment, not a loan.

84.     This arrangement, structured as a "convertible note," was memorialized in a series of documents entered into between the Chaikens and Karsch (and purportedly others).[4]

85.     In reality, the Chaikens' sole intention in their dealings with Karsch was to induce him into providing a substantial unsecured "loan" to an unknown startup with no assets and no revenues, and, in turn, use that money to build a business to attract venture capital investments from other investors, at a much higher valuation and price per share.

86.     The fraudulent, bad-faith intentions of the Chaikens concerning the promises made to Karsch were hidden behind the mirage of terms, conditions, promises, and representations set forth in the set of investment agreements presented to Karsch for the funding of his one million ($1,000,000) dollar venture capital investment.

87.     In furtherance of their fraud, in early July 2014, the Chaikens drafted a set of agreements and side-letters to provide *cosmetics* for their false promises of the highest level of preferred equity available at Blink.

---

[4] A **convertible note** is a form of short-term **debt** that converts into equity, typically in conjunction with a future financing round; in effect, the investor would be loaning money to a **startup** and instead of a return in the form of principal plus interest, the investor would receive equity in the company. Convertible notes are essentially loans that are pre-determined and set to convert into equity once contractually defined thresholds are met, such as the closing of a Series A round of financing when a real valuation is set.  New venture and startup companies (like Blink Health) often use convertible notes to raise initial seed capital because they do not require a valuation of the company during the company's infancy, when its value (and potential success) cannot be easily assessed given that it has no sales and no profits.  The downside of default on the investment, secured and protected by the value of the intellectual property of the venture, is contrasted by the potential upside of conversion of the note into equity in a successful venture, where the upside rewards the early investor, believer, and most important, risk-taker – in this instance, Karsch. The common use of the convertible note in early stage venture capital investments is well reasoned; In the event of the business' failure, the loan can be written off.  In the event of success, the convertible note is turned into equity in the venture, which is the reward commensurate to the risk.

88.     Supposedly, this preferred equity was to be provided to Karsch in exchange for bridge financing in the early stages of Blink's existence, without which Blink would never have been able to grow, develop or otherwise get off the ground.

89.     The deal the Chaikens presented to Karsch by way of the agreements was that, upon the occurrences of certain financial milestones or automatic "triggers" during Blink's fundraising efforts, Karsch's much-needed anchor financing of one million ($1,000,000) dollars plus the then imputed, accrued interest would automatically convert into the highest level of preferred equity available at Blink equal to **not less than five (5%) percent** of the equity ownership in the company, a conversion that the Chaikens represented to Karsch (both verbally and in writing) was at a twenty (20%) percent discount from all other shareholders.

**THE CHAIKENS MAKE MANY PURPOSEFUL AND CALCULATED MISREPRESENTATIONS TO ORCHESTRATE THEIR SCHEME**

90.     The Chaikens pulled out all the stops to induce Karsch to commit the first real significant venture capital investment in Blink in what was dubbed the "*Bridge 1 Financing*."

91.     As beneficiaries of Karsch's investment, Defendants, particularly the Chaikens, each owed a fiduciary duty to Karsch regarding his investment in Blink.  This fiduciary duty includes a duty to disclose all material facts to Karsch regarding the use, and status, of his investment in Blink.

**1. FALSE PROMISES OF A STRATEGIC PARTNERSHIP**

92.     The Chaikens knew that, historically, Karsch's business model was to provide risky early-stage seed capital to promising startups in exchange for ground floor, large sized equity interests.

93.     Thus, in order to entice Karsch's financial interest in Blink, the Chaikens represented to Karsch that his early, risky and significant involvement in Blink would provide

him with  "owner" status – a concept the Chaikens knew fit within Karsch's own business model and would thus be of interest to Karsch.

94.     The phrase the Chaikens communicated to Karsch was "forming a strategic partnership."   The Chaikens were fully aware that, based upon their representations and assurances, Karsch viewed himself, and his financial and strategic involvement in Blink, as a long-term equity holder and owner.

95.     To build upon their own false representation of "forming a strategic partnership" with Karsch, at the time the Chaiken provided Karsch with the Blink investment documents, the Chaikens also presented to Karsch a separate side letter intended to mislead Karsch into believing he was being provided with "ownership" status separately from all other seed investors (the "*Superior Shares Agreement*").

96.     Specifically, the Superior Shares Agreement, which the Chaikens represented was not presented to any other seed investors, was intended to mislead Karsch into believing that he was the only "strategic partner" receiving "Superior Shares."

97.     The Superior Shares Agreement provided that, should the company create a new class of shares for its founders, Geoffrey and Matthew Chaiken, Karsch too, would be provided with the same superior voting rights and other perquisites as the Chaikens.

98.     Consequently, Karsch reasonably believed—as Defendants fraudulently intended—that the Chaikens would treat Karsch equally and fairly because the agreements required that, as a superior shareholder, Karsch would be treated *pari passu* with the Chaikens.

99.     Indeed, to ensure that Karsch was completely faked out and deceived into believing he was purchasing Superior Shares with his one million ($1,000,000) dollar investment, the Chaikens included language in the Superior Shares Agreement which provided

that the agreement superseded any other document that conflicted with the written representation by the Chaikens that Karsch was going to receive, *at worst*, Series A Shares in exchange for his one million ($1,000,000) dollar investment and *at best*, Superior Shares along with the founders, Chaikens themselves.

100.    The Superior Shares Agreement, which was among the most significant inducements for Karsch's investment in Blink, confirms two clear representations: (1) that the purpose of the agreements the Chaikens entered into with Karsch was to "provide for the Investor Note to convert into the Series A Shares of the Company"; and (2) that in the event that the company "creates a new class of shares to be issued to Geoffrey Chaiken or reclassifies shares currently held by Geoffrey Chaiken to shares having superior voting rights on a per share basis to the Company's Series A Preferred Shares ("*Superior Shares*"), Investors [Karsch] shall have the option to exchange the Series A Preferred Shares issued or issuable upon conversion of the Investor Note for such Superior Shares at the time such Superior Shares are first issued."

### 2. FALSE ASSURANCES OF *ANTI-DILUTION* SOLIDIFIED THE CHAIKENS' FRAUDULENT GUARANTEE OF OWNERSHIP STATUS

101.    In furtherance of the Chaikens' promises that Karsch was to be considered—and, thus, treated—as the Chaikens' partner and co-owner in Blink, Karsch negotiated an inclusion in the equity agreements that the Chaikens would be prohibited from issuing any class of shares that would ostensibly dilute Karsch's promise of *not less* than five (5%) percent equity ownership in Blink (*i.e.*, *anti-dilution protection*).

102.    The Chaikens' agreement to provide Karsch this additional anti-dilution protection, which is typically granted to highly-valued early stage venture capital investors, confirms that the Chaikens sought to do whatever was necessary to convince Karsch that he was

a strategic partner and thus, his bridge financing note's one million ($1,000,000) dollar consideration was solely intended to be converted into Blink equity.

103.     Of course, with regard to the anti-dilution protection, the Chaikens were happy to agree to increase Karsch's protection by $1.2 million (from six million ($6,000,000) dollars to seven million two hundred thousand ($7,200,000) dollars) and make anti-dilution protection a condition to any investment Karsch would make in Blink.

104.     The notion of anti-dilution protection arose in late June 2014 when the Chaikens sought to recruit Samarjit ("*Sam*") Marwaha, a Director and former Senior Partner of McKinsey & Company, as Blink's CEO.

105.     At that time, Geoff Chaiken told Karsch, **"I am recruiting Sam Marwaha away from McKinsey Health Care Consulting to come on board and help turn this venture into a real going concern."**

106.     In anticipation of bringing on Marwaha by incentivizing him with Blink equity, Geoff Chaiken wrote to Karsch that he had increased Karsch's anti-dilution protection by $1.2 million (from $6 million to $7.2 million) because **"I am contemplating Sam's [Marwaha's] investment would come as a bridge with a discount to the Series A and he would get the same terms as the Series A holders."**

107.     Increasing Karsch's anti-dilution protection specifically in response to the issuance of shares to Sam Marwaha confirmed to Karsch that Marwaha was going to be sold *and issued* Series A shares and that, as a strategic partner in Blink, Karsch would enjoy at least the same ownership status as Marwaha or better.

108.     As it turns out, in late August 2014, a little over a month after Karsch funded his investment, and purposefully unbeknownst to Karsch, Marwaha invested $500,000 in Blink on significantly improved terms compared with Karsch's July 2014 financing just a month earlier and at the same time, Blink Health issued shares to Marwaha.

109.     At the time of his investment and share issuance, Marwaha's investment was based upon a valuation priced at $1.20 per share, equaling 4% of the company, which equals a $12.5 million valuation.

110.     This is problematic since, one month prior, the Chaikens were selling an investment to Karsch at a $25 million valuation, though Karsch specifically funded his investment based upon the representations made by the Chaikens of a valuation of **"no worse than $20 million valuation"**.

111.     The reasoning behind Karsch's insistence that his investment be based upon a valuation of "no worse than $20 million valuation" was because of the high valuation the Chaikens were placing upon the unproven business idea with no sales and only an unproven concept.

112.     Karsch informed the Chaikens that if they were able to demonstrate that other savvy investors were willing to pay the valuation they were representing to Karsch, he would as well.

113.     However, as further detailed herein, the Chaikens opted to tell Karsch nothing and make overt efforts to hide from Karsch any information concerning subsequent investors.

**3.** **FRAUDULENTLY MISREPRESENTING THE INVOLVEMENT OF TOP-TIER INDUSTRY PROFESSIONALS**

114.     In furtherance of the Chaikens' scheme to get Karsch excited about investing in Blink and forming a "strategic partnership," the Chaikens falsely misrepresented the involvement of top leaders of the pharmaceutical/healthcare industry in Blink's business.

115.     For example, on July 2, 2014, at 12:59PM, just over a week before Karsch funded his investment, Geoff Chaiken emailed Karsch a PowerPoint presentation entitled, "**Smart RX Bridge Financing Summary 6/25/14**" (the "*Presentation*") (Exhibit E).

116.     The Presentation, prepared by the Chaikens for the specific purpose of misleading potential investors in order to induce them to give capital to the Chaikens, contains detailed information of Blink's purported then-Board members, all luminaries in their respective fields of health care and pharmaceutical management.

117.     Amongst the names of sector leaders were the former CEO of Pfizer and the Former Head of McKinsey Healthcare Consulting practice and famed author of Creative Destruction.

118.     As it turns out, the contents of the PowerPoint Presentation were materially false and misleading in many respects.

119.     Most noteworthy of the misrepresentations was the identity of people who supposedly made up the current (as of July 2014) roster of Blink's team board members.

120.     For example, the Chaikens misrepresented to Karsch that Blink's co-Vice Chairman was Jeffrey Kindler, a former Chairman and CEO of Pfizer. *This was completely false.*

121.     The PowerPoint Presentation also included the following bios, which also are rife with inaccuracies and purposeful errors intended to mislead:

**Jeffrey Kindler – Co-Vice Chairman**

Kindler is also a venture partner at Lux Capital. Kindler was formerly the Chairman and Chief Executive Officer of Pfizer, the world's largest research-based biopharmaceutical company, which he joined in January 2002 and from which he retired in December 2010. He joined Pfizer as Executive Vice President and General Counsel and, prior to his appointment as CEO in July 2006, he served as a Vice Chairman of the Company. Kindler earned his BA in 1977 from Tufts University summa cum laude and his JD in 1980 from Harvard magna cum laude, where he was an editor of the Harvard Law Review. He previously served as Chairman of PhRMA (Pharmaceutical Researchers and Manufacturers of America) and of the U.S.-Japan Business Council and as a member of the President's Export Council, the Shanghai Mayor's Business Advisory Council, the Business Council, and the Business Roundtable. He has also previously served as a member of the boards of the Federal Reserve Bank of New York, Ronald McDonald House Charities, Catalyst, the United Way of New York City, the Legal Aid Society of New York, and Lincoln Center.

**Richard Foster, Ph.D. – Co-Vice Chairman**

Mr. Foster is also a venture partner with Lux Capital. Mr. Foster was with McKinsey & Company for 30 years. While at McKinsey, he served as a Senior Partner and Director for 22 years and retired from the company in 2004. Mr. Foster co-founded the firm's high technology practice in the late '70s, the chemicals practice in the early '80s, the healthcare practice in the late '80s, and the private equity practice in the '90s. He also led McKinsey's worldwide knowledge development from 1995 to 1998. He served over fifty leading global companies primarily in healthcare, electronics, and chemicals as well as a number of nonprofit institutions. Mr. Foster's research interests are in the relationships between capital formation, innovation, and regulation. Mr. Foster has written two best-selling business books: Innovation: The Attacker's Advantage (1986) and Creative Destruction (2001), that focus specifically on the relationships between technological change, innovation and capital formation, and destruction. In 1999-2000, he led the Study Group for the Council on Foreign Relations on Innovation and Economic Power which led to the publication of, Technological Innovation and Economic Performance (Steil, Victor, and Nelson, editors, Princeton University Press, 2001). Mr. Foster was elected a Fellow of the American Academy of Arts and Sciences and the President's Circle of the National Academies. He is a member of the Policy and Global Affairs Committee of the National Research Council, National Academies. Mr. Foster is also a member of the board of directors of: Athenahealth (Chairman, Governance Committee); Trust Company of the West, a wholly owned subsidiary of Société Général (Audit Committee); Memorial Sloan Kettering Cancer Center (Executive and Finance Committees); Yale School of Medicine Dean's Advisory Board; W. M. Keck Foundation (Executive Committee); Council of Foreign Relations (Nominating and Membership Committees); Council for Aid to Education (Chairman, Strategy Committee); and a member of the Chambers Street Executive Network of Goldman Sachs. Mr. Foster was Director of the Santa Fe Institute from 1996 until 2004. Mr. Foster received his B.S., M.S., and Ph.D. from Yale University in Engineering and Applied Science.

**Spencer Falk: VP Enterprise Sales**

Spencer is a 35 year veteran of the pharmaceutical industry with a focus on sales and marketing. He is currently CEO of The Falk Group, a healthcare marketing and medical education firm serving the pharmaceutical industry. Falk Group clients included Boehringer Ingelheim, Pfizer, Gilead, Novartis, Auxillium, J&J, Jazz and

many others. Before the Falk Group, Spencer was CEO, Bates Healthworld North America, a division of The Healthworld Corporation. Prior to this position, Spencer founded and ran Falk Communications, a full service healthcare communications company specializing in medical education. From 1989-1999 Spencer grew Falk Communications to a 75-person agency with revenues of over $25 million. Prior to Falk Communications, Spencer rose through the ranks at Pfizer from 1979-1986. After a successful sales career and later as a senior member of Pfizer's Marketing Department he handled several of Pfizer's strategically critical anti-infective products. He joined Forest Laboratories in 1986 as a senior Marketing Director responsible for directing the company's portfolio of analgesic products.  Spencer holds a BA in Biology and Business Administration from Rutgers University and an MBA from New York University.  He is currently a member of the Young Presidents' Organization.

122.     None of the individuals listed on Blink's purported roster in the PowerPoint, which was purposefully shown to Karsch just days before he funded his investment, were on Blink's Board at the time or at any time subsequently thereafter.

123.     The PowerPoint Presentation prepared by the Chaikens and presented to Karsch was knowingly false in many material respects.

### **4. FALSELY IDENTIFYING CO-SEED TOP-TIER VENTURE CAPITAL INVESTORS TO FRAUDULENTLY PROVIDE KARSCH A FALSE SENSE OF INVESTMENT COMFORT**

124.     Among other fraudulent cosmetics of Karsch's investment agreements was the identification of the other "co-seed" (Bridge 1 Financing) investors who were brazenly listed by name by the Chaikens in the schedules of the final versions of the investment agreements which were  delivered to Karsch immediately prior to Karsch funding his one million ($1,000,000) dollar venture capital investment.

125.     Defendants intentionally misrepresented to Karsch that other prominent venture capitalist co-investors (i) would be participating along with Karsch in this early stage Bridge 1 Financing; (ii) were also providing seed capital in exchange for preferred equity; and (iii) were being provided identical agreements to Karsch (other than the Superior Shares Agreement and anti-dilution protection).

126.     For example, the Chaikens falsely represented to Karsch, both verbally and in writing as part of the agreements, that American entrepreneur and investor Joe Lonsdale's prominent Silicon Valley venture capital firm, Formation 8 Partners (which is identified in the final schedules), was providing a Bridge 1 Financing of $150,000.  *Karsch later learned this to be false.*

127.     Even after the agreements were executed and Karsch funded his investment, the Chaikens persisted in their falsehood.

128.     On July 19, 2014, Geoff Chaiken wrote to Karsch informing him that Blink would be receiving money from Formation 8 pursuant to the agreements:

---

**Geoffrey Chaiken**

From: **Geoffrey Chaiken** <gchaiken@gmail.com>
Date: Sat, Jul 19, 2014 at 9:32 PM
Subject: SmartRx update
To: Michael Karsch <m.karsch@kcmcllc.com>, Matthew Plotkin <m.plotkin@kcmcllc.com>, Matthew Chaiken <matthew.chaiken@gmail.com>

Michael - We closed on 1.35MM of the bridge yesterday. I also spoke to Moran Bar Katchova [sic] yesterday who said he could wire his 150 with joe [Lonsdale] early this week. I also spoke to him on Thursday to answer some questions from his lawyer. We have substantial demand from the existing investors and more and could expand the bridge if we wanted. I will keep you up to date on the 150 from formation 8 as we move to a close with them this week.

Best,

Geoff

Sent from my iPhone

---

129.     The Chaikens further misrepresented to Karsch that Sean Glass and Peter Glass, respected and experienced entrepreneurs and successful venture capitalists in the healthcare space, were participating in this critical first round of financing at $25,000 apiece.  Karsch later learned that this, too, was completely false.

130.     Because of the track record and importance of these other well-known venture capitalist investors (*i.e.*, Messrs. Glass and Formation 8 Partners), Karsch was purposefully led to believe by the Chaikens that he, together with the other *ground-floor* risk takers and successful venture capitalists, were participating in a "strategic partnership" in this critical first round of financing for this nascent company, which had yet to have a single customer or a single dollar of revenue, much less a working web-site.

131.     Defendants persisted in these misrepresentations even after the agreements were executed.   Soon after Karsch wired his one million ($1,000,000) dollar investment to Defendants, Geoffrey Chaiken informed him that Defendants would be receiving money from Formation 8 Partners shortly for the Notes it was supposed to purchase according to Schedule 1.

132.     The representation by Geoff Chaiken to Karsch that **"we move to a close with [Formation 8] this week"** was a knowingly and complete falsehood.

133.     Not only was Karsch the only investor to fund on July 10, 2014 as confirmed in Geoff's July 19th email, but contrary to the Chaikens' representations in the agreements, *none* of the investors listed Schedule 1 participated in the Bridge 1 Financing, whatsoever, except for Karsch.

134.     Ultimately, Karsch later learned that Defendants' purposeful inclusion of the three prominent investors in the agreements was a sham.

135.     The Chaikens had no intention to sell these investors the same convertible notes that were sold to Karsch.

136.     Instead, the Chaikens always intended to have these top-tier, sophisticated investors participate in a different round of financing under different, truly more favorable terms for the Chaikens once the company's valuation increased.

137.    Lonsdale's Formation 8 would only invest later on, when the concept was proven, and there would be less risk of failure.

138.    It was all part of Chaikens' plan to later defraud Karsch out of his not-less-than 5% valuable equity ownership stake in Blink Health.

139.    To the extent other investors participated in the Bridge 1 Financing, they were purchased by non-professional investors who lacked the stature of the Glasses and Formation 8 Partners.

140.    Unbeknownst to Karsch, the remaining $500,000 raised in the Bridge 1 Financing was actually funded from the following group of barely accredited investors composed of the Chaikens' friends and family:

| Investor Name | Amount Invested |
|---|---|
| Moran Bar-Kochva | $100,000 |
| Adam Haggiag | $10,000 |
| Josh Udashkin | $25,000 |
| Ed Gordon | $10,000 |
| Henry Davis | $10,000 |
| John Jonas | $50,000 |
| Peter Glass | $25,000 |
| Sean Glass | $25,000 |
| Ron Eppen | $10,000 |
| Smart RX Investment Co. LLC | $125,000 |
| Charles A Jacoby Holdings | $110,000 |
| *Total* | *$500,000* |

141.    Indeed, Formation 8 Partners did ultimately make a subsequent and substantial investment in Blink in a later round, *after* the proof of the Blink concept was developed and the risk of Blink's business model was ameliorated on the bank-roll of Karsch's risky early stage one million ($1,000,000) dollar venture capital investment.

142.    As it turns out, to date, Formation 8's progeny, 8VC, is currently Blink's lead investor.

143.    As recently as April 12, 2017, Blink announced that it has raised a $90 million Series B led by 8VC, bringing its total financing to $165 million.

144.    Though the prominent Formation 8 Partners was identified in the schedule of Karsch's agreement as an investor in Karsch's round of financing, it unfairly received more favorable treatment than Karsch.

145.    Upon information and belief, this is because Lonsdale conspired with the Chaikens or because the Chaikens used Formation 8 as an unwitting pawn in their fraudulent scheme and despite contractual guarantees that Karsch would be treated equally.

146.    The Chaikens' only purpose in falsely identifying to Karsch that top-tier investors Sean P. Glass, Peter Glass, and Formation 8 Partners (as well as others, including, but not limited to, LUX) were participating with Karsch in the Bridge 1 Financing was solely to provide Karsch with a false sense of security and comfort that he, together with these other seasoned and successful venture capitalist seed investors, were endeavoring identical risk-rewards under identical terms under identical valuations.

147.    However, the Chaiken's true intentions were later revealed when these and other seed investors would be offered back-door deals for the issuance of Series A shares in subsequent rounds of financing behind Karsch's back and without his knowledge.

148.    Upon information and belief, in order to prevent Karsch from reaching out to those seed investors identified in the schedules (whereby he would learn that they were not at all participating in the Bridge 1 Financing), the Chaikens purposefully skewed the deal (2/3 of the Bridge 1 Financing) and the side-deal terms in Karsch's favor to the purported detriment of the other seed investors with the "guise" of ownership status, so that it was almost certain that Karsch would not be discussing his dealings with the other, smaller seed investors.

149.     This scheme was perfect for the Chaikens because if Karsch would later discover that the other "seeds" were investing in subsequent rounds of financing, he would reasonably assume that his supposed Bridge 1 co-investors were only being cautious early on and that the less-favorable participation terms subsequently offered to these seeds at later stage "further investment" rounds were completely understandable.

150.     The Chaikens never intended to issue Karsch any equity ownership.

151.     The Chaikens intended to "rent" Karsch's money, only to drive up the value of the company to justify higher price per share value to the "other seeds" in the subsequent financing rounds.

152.     Furthermore, in order to induce the other seed investors – Sean Glass, Peter Glass and Formation 8 – to invest in their fledgling company, the Chaikens touted Karsch's one million ($1,000,000) dollar venture capital commitment "all alone" in the first rounds to give these seed investors a false sense of Blink's establishment and cash on hand.

**THE CHAIKENS LIE ABOUT VALUATION TO MANIPULATE
THE INTAKE OF CAPITAL IN EXCHANGE OF THE DISTRIBUTION OF EQUITY**

153.     The Chaikens made *multiple* other fraudulent misrepresentations to *multiple* individuals concerning *multiple* aspects of the company, including *multiple* variations of the company's valuation.

154.     For example, in July 2014, at the time Karsch funded his investment, the Chaikens represented to Karsch that Blink had a valuation of *no worse* than twenty million ($20,000,000) dollars, thus using the "carrot" of the then favorable two ($2.00) dollar price per share valuation. (At the time, no investor would accept such a small return in exchange for investing in an unproven startup company, so the intrinsic value of the bridge notes was based on their potential conversion value to equity ownership in Blink.)

155.     Karsch's "no worse than $20 million dollar" valuation is compared to the valuation that the Chaikens represented to cousin Spencer Falk at precisely the exact same time frame.

156.     Specifically, on July 9, 2014, at 1:58PM, <u>one</u> day before Karsch's investment closed at a valuation of *no more than $20,000,000*, Geoff Chaiken emailed cousin Spencer Falk, granting Falk 1% of contrived, so-called "*Founders Shares*," which, at the time, Chaiken valued at $250,000, thereby assigning Blink a valuation of $25,000,000, a significant difference to the representations made to Karsch:

---

**Geoffrey Chaiken**
_____

On Wed, Jul 9, 2014 at 1:58PM, Geoffrey Chaiken <gchaiken@gmail.com> wrote:

Thought about what you said last night. Think you should get 1pt in founders shares fully vested which is same as Brian. We will work with Sam to figure out best compensation system for sales and marketing that you think is worth your while. Priced the company today 1pt is worth $250K which theoretically you could sell tomorrow to our investors who are eager for more stock.

Geoff

---

157.     With an utter Madoff con-man confidence, Geoff Chaiken knew his boast was false.  On July 9, 2014, as demonstrated, there were no other **"investors who are eager for more stock."**

### THE CHAIKENS PUT THE FRAUD IN PLAY

158.     By July 10, 2014, the Chaikens' lawyer had completed drafting the agreements governing Karsch's venture capital investment in Blink (the "*agreements*").

159.     Indeed, the agreements confirmed the Chaikens' false representation to Karsch that his capital was to fund his future equity in Blink and, in turn, Karsch's intention to receive equity ownership in Blink for his capital:

The Company desires to issue and sell and the Purchasers desire to purchase up to an aggregate $1,500,000 in convertible promissory notes in the respective principal amounts set forth therein and on <u>Schedule 1</u> hereto, such convertible promissory notes to be in the form and on the terms attached hereto as <u>Exhibit A</u> (the "Notes"), which may be convertible on the terms stated therein into the Company's Series A Preferred Shares, (the "Series A Preferred Shares").

The Notes and the shares of Series A Preferred Shares issued upon the conversion of the Notes (an including any common shares issuable upon conversion of such Series A Preferred Shares) are sometimes collectively referred to herein as the "<u>Securities</u>."

160.     Until its final conversion, Karsch's one million ($1,000,000) dollar investment in Blink accrued simple interest at a rate of 6% per annum, thereby increasing Karsch's equity at a pro-rata, dollar-for-dollar, rate inclusive of accrued interest until the date of conversion to equity to be calculated as $1,000,000 + accrued interest as the numerator divided by $20,000,000 (or less) as the denominator.

161.     Assuming Blink's valuation in May, 2015 of $20,000,000, the percentage of equity ownership Karsch's investment of one million ($1,000,000) dollars plus accrued interest of $52,000 converted in to would be $1,052,000 divided by $20,000,000 equals 5.26% equity ownership in Blink.

162.     The agreements were rife with the pivots the Chaikens put in place to trick Karsch into believing he was making an investment in exchange for owner's equity.

163.     Among those pivots were the following:

(i)      convertible note falsely identifying prominent Bridge 1 co-investors such as Formation 8;

(ii)     Side Agreement that provided Karsch with Supreme Shares;

(iii)    anti-dilution provisions to protect Karsch's owner-founder status; and

(iv)     equity, as opposed to security or guarantees, in place of his investment.

164.    Once the agreements were drafted, the Chaikens placed significant time pressures on Karsch to wire his money immediately, feigning panic that several experienced and potential executives were awaiting offers of employment from the company, and that if the company was unable to secure these talented professionals by funding their salaries via this critically needed funding, the entire Blink Health venture would implode.

165.    Thus, on the afternoon of July 10, 2014, the Chaikens forwarded to Karsch the final version of the agreements that purported to encapsulate the parties' agreements concerning Karsch's equity in Blink.

166.    Specifically, Geoffrey Chaiken sent Karsch the following email at 2:27PM on July 10, 2014 with five accompanying attachments (Exhibit F):



167.    The text of this email reads:

Michael:
Attached is an updated a) Note Purchase Agreement to account for the anti-dilution protection that you requested, as well as b) a side letter addressing the share class option you would like. I increased the anti dilution protection to 7.2MM vs the 6MM we discussed, but I made it inclusive of this bridge and any other bridge we may do in the future. We are closing the bridge today on $1.2MM.  The reason is that I am contemplating Sam's investment would come as a bridge with a discount to the series A, and he would get the same terms as the series A holders. If Sam invests $2MM in the company through this type of vehicle, it would essentially be part of the series A and would decrease the amount of additional money we would raise from outside investors.

I have also re-attached the
c. Form of Bridge Note
d. Purchaser Questionnaire
e. Wire instructions
for your convenience. Let me know if you have any questions.
best,
Geoff

168.    Within the hour of receiving the final agreements from the Chaikens on July 10, 2014, Karsch confirmed his agreement to the "strategic partnership" he formed with the Chaikens that is Blink Health.

169.    Specifically, at 3:01PM, Karsch sent an email with the subject, **"I have approved the current documents and ready to wire and sign thank you!"** (Exhibit G) to which Geoffrey Chaiken responded two minutes later in the following email:  (Exhibit H)

---------- Forwarded message ----------

From: **Geoffrey Chaiken** <gchaiken@gmail.com>
Date: Thu, Jul 10, 2014 at 3:03 PM
Subject: Re: I have approved the current documents and ready to wire and sign thank you !
To: Michael Karsch <m.karsch@kcmcllc.com>
Cc: John Larre <john@juicepress.com>, John Larre <jlarre@karschcapital.com>, Matt and Amanda Plotkin<m.plotkin@kcmcllc.com>, Matthew Chaiken <matthew.chaiken@gmail.com>

Thank you everyone! We re all very excited about our partnership.
Sent from my iPhone

170.     The attachments in the final versions of the agreements sent to Karsch on July 10th included the following schedule, though it later became known to Karsch that his was the *only* investment to be funded on July 10, 2014, an hour before Karsch's $1,000,000 wire transfer, making both the following schedule, and the statement in the Chaikens' 2:27PM email – "*We are closing the bridge today on $1.2MM*" –complete fabrications:  (See, Exhibits A and F)

| Purchasers | Principal |
|---|---|
| [Michael Karsch] | $1,000,000 |
| [Sean P. Glass] | $25,000 |
| [Peter Glass] | $25,000 |
| [Formation 8 Partners] | $150,000 |
| **TOTAL** | **$1,200,000** |

171.     Since none of the persons listed on the above schedule, other than Karsch, funded on July 10, 2014, the other Bridge 1 Financers were obviously and purposefully hidden from Karsch.

172.     Moreover, it is alleged upon information and belief, that the other Bridge 1 financers (described *supra* as "barely accredited investors, namely … friends and family") did not fund their respective investments until a date much later than July 10, 2014.

173.     This house of cards built by the Chaikens is further complicated by the July 19th email from Geoff Chaiken to Karsch representing that:  (Exhibit I)

> Michael - We closed on 1.35MM of the bridge yesterday. I also spoke to Moran Bar Katchova [sic] yesterday who said he could wire his 150 with joe [Lonsdale] early this week. I also spoke to him on Thursday to answer some questions from his lawyer. We have substantial demand from the existing investors and more and could expand the bridge if we wanted. I will keep you up to date on the 150 from formation 8 as we move to a close with them this week.

174.     Geoff's representation in his July 19th email that Blink closed on a $1.35 million portion of the bridge is at odds with his July 10th email that Blink was "closing the bridge today [July 10, 2014] on $1.2 million."

175.     Indeed, Chaiken knew this representation to Karsch was false and he made it in furtherance of the fraud he intended to perpetrate upon Karsch in order to avoid providing Karsch his contractual equity in Blink.

176.     At no point in time since the Chaikens first met Karsch did they ever intend to provide Karsch with any equity ownership whatsoever, in Blink.

177.     For this reason, the fact that the Chaikens negotiated with Karsch to invest one million ($1,000,000) dollars when no one else would, enhances the egregiousness of their ultimate fraud.

KARSCH CONTRIBUTES TO THE SUCCESS OF BLINK HEALTH

178.     Immediately following Karsch's funding of his investment, the Chaikens did treat Karsch like the owner and "strategic partner" they *sold* him he was.

179.     Unwittingly, Karsch sought to do what he best knew how to assist the Chaikens in furthering the business plan of Blink.

180.     Immediately following Karsch's funding of his one million ($1,000,000) dollar venture capital investment, the "strategic partner" Karsch expended significant efforts to develop and grow Blink Health into a viable commercial enterprise.

181.     For example, Karsch provided Blink with rent-free prime commercial office space in his offices at 110 East 59th Street, New York, New York, and free of charge, so that the Chaikens could more effectively grow and develop their business and run it with greater resources.

182.     Karsch also provided temporary housing in his apartment for a Blink Health employee (who ended up trashing the place) and permitted the use of his office for Blink Health executives – free of charge.

183.     The employee, Blink's first computer programmer who was from California, needed to look for an apartment in New York, so the Chaikens asked Karsch if the employee and his girlfriend could stay in Karsch's home office located at the ground floor of Karsch's home at 146 Central Park West in New York City.

184.     Though Karsch was apprehensive, the Chaikens told Karsch that they wanted to be prudent with the startup's cash, so Karsch relented.  After a week's stay, following complaints from Karsch's cleaning help, Karsch inspected the premises and found nearly forty glass beer bottles all over the small office. Many were empty and there was no regard for caring for Karsch's premises.

185.     Karsch called the Chaikens and complained about the employee's lack of respect towards another's property. Matt's response was, **"This guy is going to make you so much fucking money, he is going to buy you your next apartment!"**

186.     In addition, during a time when the Chaikens were desperate to develop a brand for their new e-commerce venture that would become Blink, in accordance with the Chaikens' representations that he would be treated like a true partner, Karsch reached out to several potential investors to seek additional capital for Blink Health.

187.     Most significantly, Karsch introduced the Chaikens to Chris Burch ("*Burch*"), Founder and CEO of Creative Capital, a New York based venture capital investment firm and eventual venture capital investor in Blink.

### CHRIS BURCH

188.     Burch, who co-founded Tory Burch, a prominent, hugely successful and highly regarded women's fashion company, is a successful and experienced venture capitalist with a particular expertise in brand management.

189.    After Karsch reached out to Burch to recruit his potential involvement in Blink, Burch spent significant time consulting with Karsch, the Chaikens, and Blink's then-CEO, Marwaha, to develop a better name and brand for the venture.

190.    Following their initial meeting, Karsch followed up with Burch by emailing him:

**"The Vital Now team thought the meeting was great today and left feeling that your insights, relationships, and experiences could prove tremendously valuable to the future of the venture.  We would be thrilled if we could figure out a deal that made everyone feel great."** (Exhibit J)

191.    In the weeks and months following Karsch's introduction of Burch to the Chaikens and Blink, Burch became an integral venture capital investor in Blink.

192.    Between September and December 2014, Burch invested $250,000, making him the largest investor in Blink's Bridge 2 financing, which totaled $1.5 million.

193.    Then, in the next round of financing between December 2014 and February 2015, Burch invested another $2 million, again making him the largest investor of this round which, together with twenty other smaller investors, totaled three million ($3,000,000) dollars.

194.    At this time, the total round's $3 million investment equaled five (5%) percent of the equity in Blink Health, given its then sixty million ($60,000,000) dollar value and capitalization.

195.    Indeed, the Chaikens' ability to secure financing from Burch is an example of the significant value of Karsch's strategic partner status, introductions, relationships, and goodwill.

196.    Karsch did not receive anything for soliciting Mr. Burch's participation in the venture.

197.     When Karsch suggested he'd be entitled to a finder's or placement fee, Geoffrey Chaiken disingenuously responded, **"I don't value introductions but you can count on the value of your Blink investment."**

### THE CHAIKENS TRIGGER KARSCH'S CONVERSION BEHIND HIS BACK AS THEY INTENSIFY THEIR SCHEME TO DECEIVE AND DEFRAUD KARSCH

198.     In the immediate months following his significant investment in Blink, Karsch's risky faith in the fledgling startup seemingly proved fortuitous as the valuation of the company increased exponentially and money, for which the Chaikens once had to beg and scrape, was being thrown at them by interested venture capitalists.

199.     Over the nine-month period following July 2014, Karsch's one million ($1,000,000) dollar investment, as well as his brand, contacts, and goodwill, gave Blink financial life, legitimacy and time to solidify the business as a going concern.

200.     With Karsch's seed investment, the Chaikens created exponential value in the company.

201.     With the intention of capitalizing on Blink's exponential value, and by re-selling Karsch's now valuable not-less-than-five-percent (5%) equity ownership stake in Blink to other willing investors for a greater valuation than Karsch's $2.00 per share, the Chaikens, in bad faith, sought to fraudulently deprive Karsch of his equity ownership stake in Blink.

202.     As deceptively planned from the start, by Q1 2015, the Chaikens understood that the (*at least*) 5% equity stake that was fraudulently promised to Karsch in exchange for his then much-needed $1,000,000 was worth ten (10 X) times as much.

203.     The Chaikens conspired to now induce new willing investors and 8VC, whom the Chaikens secretly had kept waiting in the wings to purchase shares at significantly higher price points than Karsch's conversion value.

204.    Of course, without Karsch's initial seed money, the Chaikens would never have been able to build any value in the company, which is why, among many other reasons, Karsch was entitled to the not less than five (5%) percent equity stake promised to him. By the same token, had the Blink venture gone bust, it was Karsch who was going to be left holding the bag, bearing the brunt of a significant loss, trading equity in a valueless company for the modest price of $1,000,000.  But that didn't happen.

205.    Driven by pure unadulterated greed, the Chaikens ramped up their fraud to secretly re-sell and issue Series A Shares in Blink behind Karsch's back so that he would never learn that the Chaikens triggered the automatic conversation of Karsch's equity.

206.    To do so, the Chaikens began excluding Karsch from the company's information flow, its finances, and its business plans.

207.    The Chaikens dubiously referred to their future fund raising as "debt" and thus, excludable from a calculation to automatically trigger Karsch's conversion.

208.    Instead of providing Karsch with information related to the company's financing rounds, and timely converting his principal into equity as required by the agreements, the Chaikens engaged in a deliberate freeze-out.

209.    By excluding Karsch from critical meetings and denying him access to key financial and business information and data, the Chaikens were able to ensure the success of their scheme to defraud Karsch by improperly reversing his investment and eliminating him from Blink.

210.    Karsch attempted to learn of the various transactions that were being negotiated and closed from his inside connections at Blink, to no avail.

211.    The Chaikens refused to share any of that closely guarded information with

Karsch.

212.    By early 2015, Karsch's concern grew so great that he requested that the Chaikens provide *at least some* transparency regarding the operations of Blink Health, including its finances and fund raising efforts.

213.    The Chaikens adamantly refused all of his requests, in express violation of the parties' agreement.

214.    Instead of sitting down and being transparent with Karsch, the Chaikens spent their time pounding the pavement, securing investors for the Series A financing, and to take out Karsch with a replacement investor on more favorable terms.

215.    Indeed, the rising value of the company sparked the interest of eager and willing, *albeit smaller*, investors who were solicited by the Chaikens and were induced with the same or similar promises of equity stakes in Blink Health (*i.e.*, Series A preferred shares) in exchange for early capital financing.

216.    On multiple occasions the Chaikens assured Karsch that his investment would be converted in to equity in no time as they took meeting after meeting with potential investors, most of whom became Series A Shareholders in Blink.

217.    Despite the multiple clear, unambiguous, written and verbal representations, intentions, confirmations and promises to the contrary, the Chaikens never intended to permit Karsch to convert his Convertible Bridge Financing 1 note into the equity which was contemplated and memorialized in their agreements.

218.    Accordingly, the Chaikens breached their respective fiduciary duty to Karsch by, inter alia, failing to disclose all material facts to Karsch regarding the use, and status, of his investment in Blink and by placing their interests ahead of Karsch's interests.

**THE CHAIKENS ATTEMPT TO FRAUDULENTLY AND
UNLAWFULLY UNWIND KARSCH'S SEED INVESTMENT IN BLINK**

219.     In May 2015, having plotted to hide from Karsch certain transactions that successfully procured Series A Financing at a significantly higher per-share price than that promised to Karsch which that actually triggered the conversion of Karsch's financing into equity per the parties' agreements, the Chaikens fraudulently attempted to unilaterally and surreptitiously unwind Karsch's investment and return Karsch's venture capital investment without conversion to equity and over Karsch's objection.

220.     To execute their fraud, the Chaikens used the fourth round of Bridge financing to fund Blink by fraudulently buying out one of their largest shareholders, Karsch, at a steep discount.

221.     To do so, the Chaikens lined up and executed documents with Blink's Board Member and investor Tom Tryforos, whose one million-dollar investment in the fourth bridge with a $75 million market capitalization was specifically used to unwind Karsch's investment.

222.     Consequently, in May 2015, Tryforos, a Blink Health Board member and the only participant in this round of financing, funded $1.5 million to Blink Health in exchange of Series A preferred shares, $1 million of which was used to pay back Karsch over Karsch's objection.

223.     Thomas Tryforos is the General Partner of Prescott Investors, Inc. and sits on the Board of Directors of Credit Acceptance Corporation (NASDAQ: CACC), a publicly traded company with a $4.3 billion dollar market capitalization.

224.     The acceptance of Tryforos' money, who as a Board member breached his fiduciary duty of care and loyalty to Blink shareholders, triggered the automatic conversion under Karsch's one million ($1,000,000) dollar convertible note.

225.     Tryforos' one million ($1,000,000) dollar investment in the company was for no

other purpose than to refund and pay back Karsch and fraudulently unwind Karsch's Blink investment.

226.     Tryforos put the money into Blink Health's account, and the money was moved from Blink Health into a Chaiken Holdings LLC account to be wired back to Karsch.

227.     On or about May 19, 2015, in order to cosmetically perpetrate the fraud upon Karsch by making him believe that all "Bridge 1" investors' investments were being treated the same and unwound without any equity conversion, and so that his suspicions would not be aroused, the Chaikens embarked on a scheme to create the illusion that all investor money from the "Karsch round" (that of some thirteen other "family and friend investors," some of whom were Blink employees), plus the accrued interest on those convertible notes, was being unwound and returned.

228.     Unbeknownst to Karsch, however, each of these other investors was contacted by the Chaikens and Blink agents working at the Chaikens' direction, promising to make them whole thereby issuing them stock options in a few month at a pre-set price, thus restoring their equity stake in Blink at the original price contemplated as if their Bridge 1 financing were converted into equity.  Except for Karsch.

229.     Many, if not all, of these other Bridge 1 investors were told by the Chaikens that, **"While I'm giving you back your money, I'm going to make you whole and give you additional shares to make up for the higher valuation so that you'll wind up with the same increased value of your original investment as if it were converted in May, 2015."**

230.     At least three such investors recall the conversation clearly, whereby the Chaikens offered a reason for redeeming and then re-offered stock options in place that were made *legit* to the investors in September 2015.

231.     Specifically, Messrs. Udashkin, Haggiag and Davis were each told by Geoff Chaiken that, **"We need to pay you back because we have a problem investor whose outsized equity needs to be taken back by the company."**

232.     Pressed further, Geoffrey Chaiken responded, **"Michael Karsch is a problem investor; he asks too many questions; he's a bad guy and we don't want him owning 6% of the company.[5] We don't know why he should be making so much money off of our efforts, so we are paying everyone back from that financing round but you're going to get to come in to the next round of financing and we're going to give you options to make you whole on what you would have had."[6]**

233.     By the very next day, May, 20, 2015, after all of the Bridge 1 investors (except for Karsch, of course) were contacted by the Chaikens and assured that their Series A Shares were "safe and sound," the Chaikens attempted to fraudulently wire Karsch's investment, brazenly stating its bad faith breach in a letter to Karsch:

---

[5] Chaiken also admitted to the company's then-CFO, Eugene Kakaulin ("*Kakaulin*"), that he did not want to include Karsch in any investment in the company, confirming Chaiken's bad-faith motive.

[6] Only Josh Udashkin declined to finalize the investment in Blink's Series A Shares.

> **Upon payment of the amount set forth opposite your name on Schedule A hereto, all obligations of the Company to pay principal and accrued interest under your Note and all other covenants and agreements set forth in your Note and the related Convertible Demand Promissory Note Purchase Agreement dated as of July10, 2014-July 18, 2014, will be satisfied in full.  Upon payment of the amounts set forth herein and on Schedule A, the outstanding principal amount of your Note together with the accrued and unpaid interest thereon shall be paid in full and shall cease to be convertible into the Company's Series A Preferred Shares or any other equity.**

(See, Exhibit K).

234.     Defendants' fraudulent scheme is particularly egregious because, at the time that Defendants communicated to Karsch that they sought to unwind his investment and pay him back in full, Karsch's one million ($1,000,000) dollar investment had already automatically converted, resulting in Karsch's entitlement to an ownership stake of at least five percent (5%) of Blink Health's equity.

235.     Although Defendants attempted to defraud Karsch into believing that in May 2015 he did not yet have equity in Blink Health, in reality and by operation of the automatic trigger mechanism in the documents, Karsch's equity rights were triggered long before Defendants attempted to wrongfully undo Karsch's investment.

236.     Accordingly, the Chaikens had to devise a mechanism to trick Karsch into confirming in writing a waiver of his desire to unwind the investment; and they did not disappoint.

237.     Together with the May 20th letter the Chaikens sent to Karsch informing him of the fraudulent unwind of his venture capital investment was a request that Karsch sign an attached form that confirms "Karsch's desire" to have Blink return his one million ($1,000,000) dollar investment.  (See, Exhibit K)

238.    Blink did not actually require Karsch's signature in order to effectuate the attempted, albeit fraudulent, return of his venture capital investment; rather, Blink sought to secure Karsch's signature for future proof and to trick him into agreeing to Blink's fraudulent return of Karsch's capital, thereby waiving his rights to convert his one million ($1,000,000) dollar venture capital investment into Series A Shares.

239.    Not only did Karsch refuse to sign any document acknowledging Blink's bait-and-switch, but Karsch wholly *objected* to Defendants' efforts to repay him his investment and fraudulently deprive him of his contractually earned equity in this company.

240.    Illustrative of the sham of requiring Karsch to "complete the wire transfer information" to effectuate the wiring of his capital, Blink attempted several times to wire Karsch's money back to him, even though he never signed the consent document or agreed to this transaction in any other manner whatsoever.  (See, Exhibit L)

241.    Blink was so adamant about ensuring Karsch be returned his money in their mistaken belief that doing so would absolve them of their contractual obligations, that Blink then promptly closed the bank account used to wire Karsch his funds so that attempts by Karsch to refuse the money would be thwarted.

242.    Two days later, Karsch sent a letter to Defendants rejecting their attempt to divest Karsch of his investment and demanded immediate conversion of his contractual equity.  (See, Exhibit C)

243.    Then, on June 16, 2015, Karsch's counsel sent a letter response in which he challenged Defendants' contractual right to prepay the Notes under these circumstances and stated that Defendants are "attempt[ing] to deprive Michael Karsch of his bargained for equity position in [Blink Health] by the proffer of the principal amount, plus six percent (6%) simple

interest, of a $1,000,000 seed capital investment that Michael Karsch made to Vital [Blink Health] in July, 2014."

244.    Defendants' scienter is clear because this elaborate and complex scheme involving hiding the triggers of Karsch's equity conversion could not have occurred without the actual knowledge and participation of the Chaikens, who knew they were fiduciaries of Karsch, and their knowledge of the scheming behind Karsch's back to prevent the lawful conversion of his equity in Blink.

### THE CHAIKENS' CONSISENT WEB OF FRAUD WIDENS

### *Spencer Falk*

245.    Just weeks after the Chaikens attempted to defraud Karsch out of his Blink equity, on July 13, 2015, consistent with the pattern of lies and deceptions launched upon Karsch, Geoff Chaiken emailed his cousin, Spencer Falk to unilaterally express his automatic demand to repurchase Spencer Falk's 1% "Founder's Incentive Shares" in Blink, falsely stating that "the Board" was repurchasing his share under the terms of the company's operating agreement.

246.    There was no such Board directive, because there was no such right conferred upon the so-called Board to force the repurchase of Falk's vested 1% ownership stake in Blink Health.

247.    Falk balked, asserting that he was never a signatory to any "operating agreement".

248.    Then, in protest, the next day, July 14, 2015, Falk demanded in the following email that cousin Geoff Chaiken provide him with the audited appraisal and valuation which Falk was told was conducted by top accounting firm Deloitte, US, formerly Deloitte & Touche ("*D&T*"):

**Spencer Falk**

---

**Spencer Falk** <spencer@thefalkgroup.com>                                        7/14/15
to Geoffrey

Geoff,

Please send the D&T appraisal when complete. Also, can you tell me how much money is loaned to
the company and the nature of the notes?

Spence

249.    In response, knowing there was no such Deloitte and Touch appraisal, a
presumably nervous Geoff Chaiken sent Falk the following email telling him that an explanation
will be forthcoming from Blink's then-general counsel:

**Geoffrey Chaiken**

---

**Geoffrey Chaiken** <gchaiken@vital.co>                                        7/14/15
to me, Charles

Spencer:

Charles will compose a letter explaining the company's decision to repurchase your incentive stock
units and how we arrived at a valuation for the shares. You should expect this by the end of the day
tomorrow

best,

Geoff

250.     Indeed, shortly thereafter, Falk received the following letter from Blink's then-general counsel representing to Falk that D&T's analysis of Blink was currently worth (in July 2015) "below $4.5 million at this time":

> Similar to other human capital based organizations, the company is constantly managing its shareholder base to ensure that equity is primarily held by the current employees of the firm. The Company elects to repurchase your incentive shares under Section 7.2 of the Company's Limited Liability Company Agreement.  While the Members have not made a formal determination of fair market value, the Company has engaged Deloitte to value the company as part of a statutory migration from Delaware to Bermuda. Deloitte's analysis suggests a valuation of the whole company below $4.5 Million at this time. In the spirit of good faith, the Company is prepared to pay you $100,000 to repurchase your incentive shares, which we believe represents significantly more than the fair market value of those shares.  If you wish to proceed with this, let me know by the close of business on July 21, 2015.
>
> Sincerely yours,
>
> Charles A. Jacoby
> General Counsel

251.     Though, according to Blink's general counsel's letter, Blink was, "in the spirit of good faith," prepared to pay Falk $100,000 to repurchase his 1% in Founders Incentive Shares (pegging the capitalization of Blink at merely $10 million), at the same time, it was publicly reported elsewhere that Blink had recently issued shares to Board member Tryforos and others at a valuation of $125 million:

> "In an interview earlier this year, Blink Health founder and CEO Geoffrey Chaiken told The Wall Street Journal that his company was valued at about **$125 million in mid-2015** and was about to close a new round at a valuation of about **$250 million.**"

252.     At the time, Chaiken felt he could falsely represent a fair market value of the shares at a value that had been set back in August of 2014 despite the then impending financing

and significantly higher valuation, because, as cousin Geoff Chaiken stated, "**Falk needs cash and he will take my buyout without any questions or fuss.**"

253.     On August 5, 2015, Falk ultimately relented in reliance of and based upon the fraudulent misrepresentations made by the Chaikens as to valuation, signed a separation agreement forgoing his significant stake in the company in exchange for a $150,000 cash payment, $50,000 of which was for consulting services rendered and $100,000 was for the repurchase of Falk's one (1%) percent equity ownership in Blink Health.

254.     At the time, Blink purposely failed to disclose to Falk that the company had already buttoned up their Series A financing that valued the company *and* Falk's equity at a twenty-five fold (25x) multiple of the amount that Falk unwittingly accepted to receive.

255.     Indeed, internally, c-suite members expressed to Chaiken a fiduciary obligation to tell Falk of the contemplated investments at significantly higher values, which suggestions were ignored.

256.     Today, Falk's equity ownership stake is worth six million ($6,000,000), a whopping sixty (60 X) times what Chaiken paid for it.

257.     The deception perpetrated upon cousin Falk is consistent with Defendants' effort to deprive Karsch of the benefit of the bargain Falk (and others) struck with the Chaikens when he "tutored" the illiterate Geoff Chaiken.

### *Dr. Barry Chaiken*

258.     Even more shocking, the greedy Chaiken brothers scammed and re-traded their own *father*, an accomplished physician in New York City, in the same manner they had to Karsch and cousin Falk and others.

259.     Around the time of the Series A financing, Geoff Chaiken issued incentive shares to his parents under different terms than he had originally discussed, which is also in breach of his agreements with Karsch.

260.     Chaiken's father, Dr. Barry G. Chaiken, M.D. expressed his disappointment with Geoff's lack of integrity and in-fighting with his brother Matthew over his equity which was relatively small compared to Geoffrey's.

261.     Specifically, on August 23-24, 2015, Geoff Chaiken and his father, Dr. Barry G. Chaiken, M.D. had the following text message exchange[7]:

*Please see image on the following page*

_____

[7] The term "Marinus" used in this text exchange is a reference to Marinus Pharmaceuticals, Inc., which is a biopharmaceutical company that engages in the development of neuropsychiatric therapeutics.

8/23/15, 4:07 PM

What's up? I'll have incentive stock agreement to you today. We are giving you 200K of stock. Goal will be that it's enough for you to retire on in next few years. So we need to grow the company by 50 times. Which i think is reasonable. You should probably put in a trust for yourself.

8/24/15, 2:43 AM

Geoff this text is scary and disturbing for multiple reasons. First, I offered and wanted to invest by buying out Spencer's one percent for $200,000 and you said it was not necessary because you and Matt we're going to give Mom and I a "couple percent " for free. I said "thank you." It is disturbing  to be told one thing by a child and then another explained by an extremely presumptuous evaluation of the merits of quote a "gift," especially because I was ready, willing, and able to buy Spencer's share. 2) mom and I have never hesitated in investing in you. Our investment in Marinus was simply an investment in you that to quote Mom, "we have to make this investment because it is an investment in Geoffrey even if you are doubtful it is a reasonable

Investment." I accepted that logic. 2) as someone who not only introduced you but sold you to Tom Lehrman, Bill Ackman, and  Stanley Arkin, I find it strange you would deny me the opportunity to buy Spencer's one percent. 3) as a parent it is concerning that if this is your approach to us, your treatment of other people in life and business suggests a future no loving parent wants for their child. We love you and want you to be happy, prosperous, and healthy. Thank you for the gift, but I cannot accept it because I feel it represents a weakness in character of you that I find unsettling and perhaps reflects a failure of me as a parent. Love. Dad

262.     What's even more incredible than the contents of the Chaikens' father's indictment of his son, Geoffrey Chaiken, is the fact that at this time, while Geoff Chaiken was jamming the redemption of Spencer Falk's one (1%) percent Equity stake at a discount valuation

of $10,000,000, he was also simultaneously marking up the value of Blink to his own father at twice that amount, $20,000,000 in order to only have to give his parents half of the amount of equity he had repurchased from Falk only days before!

263.     Until now, Chaiken's father Barry did not know of this scheme when he wrote the indictment of his son Geoffrey.

264.     Thus, while attempting to appear generous, Geoffrey Chaiken is actually "gifting" his parents $200,000 worth of equity in Blink Health at a valuation of $125,000,000, resulting in a net skim or profit to the Geoffrey Chaiken of over 9 times the number of shares he is "gifting" to his parents!

265.     But the Chaikens' greed was viral, as they spread their fraud from investors like Karsch, cousin Falk, and their own Dad to their top employees, including their former CEO, Sam Marwaha.

### *Sam Marwaha*

266.     Consistent with Geoffrey Chaiken's serial efforts to deceive Karsch, Chaiken has a documented history of deceiving others with unfulfilled promises of equity in his nascent venture.

267.     After duping Karsch, the Chaikens pulled a similar bait-and-switch on their own CEO, Marwaha.

268.     In late August 2014, Sam Marwaha invested $500,000 on significantly improved terms over Karsch's July, 2014 financing just a month earlier.

269.     Marwaha's valuation was priced at $1.20 per share equaling 4% of the company at a $12.5 million valuation, while the Chaikens were selling an investment to Karsch at a $25 million valuation (at a 20% discount, hence $20,000,000) who specifically funded his investment

based upon the representations made by the Chaikens of a valuation of "no worse than 20 million valuation".

270.     When Karsch pressed for an answer to the concerns raised that Karsch's side letter entitled Karsch to the most favored terms of any future investments, Geoff Chaiken lied to Karsch, stating that Marwaha's investment "didn't count" because he was also an employee. Karsch was not told the details of Marwaha's investment.

271.     Chaikens reasoning made no sense whatsoever.

272.     Marwaha's status as an employee is of no consequence as he was an investor just like Karsch and that his investment, and the issuance of shares to Marwaha, contributed to the triggers that converted Karsch's equity per the agreements.

273.     In fact, at the time the Chaikens presented to Karsch the final agreements to complete the inducement of Karsch funding of his $1,000,000 investment, Geoff Chaiken represented in writing to Karsch that Marwaha's investment would be part of the Series A and be included towards effectuating the triggers that converted Karsch's equity:  (See, Exhibit F)

> I increased the anti dilution protection to 7.2MM vs the 6MM we discussed, but I made it inclusive of this bridge and any other bridge we may do in the future. We are closing the bridge today on $1.2MM.  **The reason is that I am contemplating Sam's investment would come as a bridge with a discount to the series A, and he would get the same terms as the series A holders. If Sam invests $2MM in the company through this type of vehicle, it would essentially be part of the series A and would decrease the amount of *additional money* we would raise from outside investors.**

274.     If Marwaha's investment would be counted as a trigger for the automatic conversion of Karsch's Convertible Note, Karsch's conversion would be equal to the sum of $1,005,000 divided by $12,500,000 = 8.04% equity of Blink Health.

275.     Ultimately, Marwaha too was also fleeced by the Chaikens' fast and loose *valuation shell game*.

276.     On June 22, 2016, Geoff Chaiken persuaded Marwaha to sell 192,901 incentive shares for $3.80 per share, failing to disclose that the company was then simultaneously re-selling the same shares to investors at $16.25 per share.

277.     In a meeting prior to the Marwaha buyback, on June 15, 2016, Blink's then-CFO, Eugene Kakaulin objected to the Chaikens' planned price deception as had been perpetuated on cousin Spencer Falk and expressed concerns that, considering Marwaha was a former partner, it was inappropriate and a violation of securities laws to hide such important and material information from him while repurchasing Marwaha's shares for a fraction of their then actual value.

278.     Chaiken countered and informed Kakaulin that incentive shares were not as valuable as Series A-2 preferred shares because they did not have as many rights.  He also quoted an independent firm's analysis of fair market value, performed in December 2015, two financings ago, which assigned $2.38 per share value to common and incentive shares.

279.     Chaiken has an answer for everything; Chaiken smirked and stated to Kakaulin, **"Sam's loss is our gain."**

280.     Tellingly, in an email to investors on June 22, 2016, after Marwaha agreed to a repurchase at a low-ball price, Geoff Chaiken said the following: **"Essentially, purchasing these unites [*sic*] now, allows us to increase the size of the ISU pool by 100bp for $500,000. If we did not do this, and needed to increase the size of the option pool by 100bp after the Series A-2, it would cost the existing shareholders ~$3.3MM in economic value."**

281.     Since the Chaikens owned the majority of Blink's shares, they would be the biggest beneficiaries of repurchasing Marwaha's shares for well below the then fair market value of the Blink Health equity.

### *Eugene Kakaulin*

282.     Not coincidentally, the Chaikens made nearly the same promises to senior-level executives in order to induce them into joining Blink, one of which has already successfully brought claims against the company in alleging those promises to the fraudulent.

283.     In a complaint filed in the matter of Kakaulin v. Blink Health, et, al., filed in the District Court of the Southern District of New York (16 cv-08476 GHW), Blink's former CFO alleges that he received a contractual commitment from Geoffrey Chaiken that, when it came to the sale of shares, he would be fairly treated, on the same terms as the Chaikens, "especially since [Geoffrey] Chaiken constantly dangled Blink's potential equity value in front of Kakaulin as the driving force to incentivize Kakaulin to join Blink."

284.     The specifics of the Chaikens' fraud upon Kakaulin and the bait-and-switch are not coincidentally similar to the allegations alleged by Karsch.

285.     Prior to becoming Blink's first Chief Financial Officer, Kakaulin, a graduate from The Wharton School at the University of Pennsylvania who also holds an MBA from Harvard Business School, held various finance and operating roles in the Financial Services and Technology industries.

286.     In 2013, Geoffrey Chaiken, who attended Harvard with Kakaulin, reached out to Kakaulin to discuss "an entrepreneurial venture he was starting".

287.    Chaiken indicated that he would be interested in getting Kakaulin involved in a capacity whereby Kakaulin's investment and operational acumen and experience could be leveraged.

288.    For the next several months, between September 2013 and late Summer 2014, Chaiken and Kakaulin met several times to discuss Chaiken's new venture's business plan that would eventually become Blink Health.

289.    During August and September 2015, Kakaulin consulted with Blink to legitimize the Series "A" financings the Chaikens had previously completed, raising additional funds on Karsch's original seed investment totaling a $35 million Series A financing.

290.    During his consulting stint with Blink in late Summer 2015, Geoff Chaiken began discussing terms for Kakaulin to join Blink as a full-time employee.

291.    Kakaulin was skeptical about taking a chance by joining an unproven startup enterprise and sought to be incentivized and compensated with an equity stake in the company.

292.    Geoffrey Chaiken assured Kakaulin that the incentive shares he would be issued as compensation would be highly liquid given the investor demand and even a small ownership percentage could be highly valuable when the business is worth "billions."  Geoff assured Kakaulin, **"Just by copying Script Relief's cash card business, we'll be worth a billion dollars. Your shares will be worth tens of millions."**

293.    During contract negotiations over Kakaulin's Employment Agreement, Chaiken explained to Kakaulin that during the "Series A" financing, both he and his brother and co-founder, Matthew, were able to sell $4.5 million worth of their own common shares of Blink to third party investors by issuing a certain amount of "Series A" preferred shares to investors in

exchange for capital to the Company, which is then used to purchase the same amount of common shares from Geoffrey and Matthew Chaiken.

294.    Though the mechanism for selling common shares to third parties seemed to be somewhat over-complicated, Kakaulin was more surprised that the Chaikens would sell equity during the infancy of their "startup," which action could spark investor skepticism.   Indeed, Kakaulin asked Chaiken for a reason why, if he was so "bullish" on the company's prospects for future success, he would be selling an ownership stake.  Chaiken responded, **"I need to buy a house in the Hamptons. Banks want to see cash, not stock."**

295.    Kakaulin, insisting that he be treated as a partner with the Chaikens in respect to the ability to sell shares, insisted that his contract include *Tag Along* rights that would give Kakaulin the option to join the Chaikens in share sales similar to the one Chaiken described took place during the Series A financing.

296.    The Chaikens had no problem with promising Kakaulin these same rights, and to even provide them in writing. The Chaikens knew that, like they did with Karsch, they will just retrade the deal they made Kakaulin when the time was right.  And the Chaikens would do so with the same calculated machinations they implemented with Karsch.

297.    Accordingly, Kakaulin's employment agreement, which provided that Kakaulin would serve as Blink's Chief Financial Officer and Vice President, also promised to (i) pay Kakaulin a base salary ($225,000 in 2015 and $250,000 in 2016); plus (ii) grant Kakaulin an equity stake in the company by issuing to Kakaulin 231,482 shares on September 28, 2015 (and an additional 57,712 shares on December 1, 2015) ( Kakaulin's "*Incentive Shares*").

298.    Similar to the false promises the Chaikens provided in Karsch's side-letter, Kakaulin's agreement included the following contractual commitment from Blink that he would

61

be treated fairly and on the same terms as the Chaikens when it came to the sale of shares, such as the sales consummated by the Chaikens during the Series A financing; especially since Geoff Chaiken constantly dangled Blink's potential equity value in front of Kakaulin as the driving force to incentivize Kakaulin to join Blink in the first place:

> *Tag-Along Right.* In the event Geoffrey Chaiken, Matthew Chaiken or their respective Affiliates (the "Founders") determine to sell any of their Common Shares of the Company to a third party, excluding transfers for estate planning purposes, the Company shall notify you of such sale and describe the terms and conditions thereof including the price per share (the "Share Price") at which the Chaikens intend to sell Common Shares. You shall have the right to include a portion of your vested Incentive Shares (the "Vested Shares") in such sale on the terms and conditions set forth herein. The number of Vested Shares that you may include in the sale shall equal up to the number Common Shares that the Chaikens intend to sell. You shall notify the Company and the Chaikens in writing of the number of Vested Shares that you elect to include in the sale (such shares, the "Tag-Along Shares"). At such time as the Chaikens sell Common Shares to the Purchaser, (i) the Company shall purchase the Tag-Along  Shares from you at a price per share equal to the Share Price *less* $1.20 (representing the amount set forth in the first sentence of Section 3 of your Incentive Share Agreement(s)) (such aggregate amount, the "Tag-Along Share Amount") and, at the same time, (ii) the Company shall issue and sell to the third party (at a price per share equal to the Share Price) a number of Common Shares equal to the Tag-Along Share Amount divided by the Share Price.

299.    During Kakaulin's tenure at Blink, he added significant and real value to Blink's personnel, customers, revenues and capital.

300.    During the months of May and June 2016, the Chaikens embarked upon efforts to obtain additional capital by offering its Series A-2 preferred shares to outside investors.  he the last two weeks of June 2016, the Chaikens determined that in this round of financing, Blink would raise approximately $30 million in capital from investors such as 8VC, Burch Creative

Capital, Stillwater, management of Royalty Pharma and Bill Doyle, amongst others[8].

301.     During these first weeks of Series A-2 financing transaction, Kakaulin's role was limited to a supporting role with responsibility for due diligence and the offering documentation.

302.     Once there was sufficient investor interest in the Series A-2 financing, Chaiken determined that part of the proceeds, up to $6 million, would be used to facilitate the repurchase of a portion of the Chaikens' common shares of the Company in the same manner as was done in the Series A financing; through the issuance of preferred shares to third party investors and then repurchasing commons shares from selling shareholders.  This would be the second event in a 12-month period that Geoffrey Chaiken and Matthew Chaiken determined to sell any of their common shares of the company to a third party.  Chaiken's stated reason for his desire to sell his shares was, **"I lost half of my money on Valeant stock."**

303.     Since the Chaiken brothers had just sold $4.5 million of their shares less than nine months prior, this second sale was a very sensitive issue and there was concern that such sale would be viewed with skepticism amongst Blink's existing and prospective investors and employees.

304.     Knowing he was contractually obligated to include Kakaulin in the repurchase transaction, Geoff Chaiken made deliberate efforts to keep Kakaulin (and other shareholders with tag along rights) from learning that he once again sought to sell common shares in the company together with his brother, Matthew.  Indeed, Chaiken entered into negotiations with new investors to facilitate the repurchase of his common shares.

---

[8] Bill Doyle, a healthcare industry veteran, joined Blink as an advisor in May 2016 and, upon the Series A-2 closing, joined Blink's Board of Directors.

305.     Just as they had done with Karsch, despite the clear and unequivocal contractual obligations by the Chaikens to include Kakaulin in the selling of common shares, they failed to notify Kakaulin of the opportunity to tag along, as was required pursuant to the terms of their written agreement.

306.     The Chaikens' negotiations with investors to sell the Founder's common shares without providing proper notice confirms their deliberate desire to exclude Kakaulin in breach of their agreement.

307.     By July 1, 2016, the Chaikens determined to sell a portion of their common shares of the Company to a third party, just as they had done during the Series A financing.  Some investors began wiring their money to Blink to acquire preferred shares, with some proceeds to be used for buying common shares from the Chaikens.

308.     Kakaulin feared that the Chaikens were going forward with the repurchase without notifying him of any sale, or the terms and conditions of such sale as it was required to do pursuant to their agreement.  By securing these transactions without providing Kakaulin with a participation notice, the Chaikens were putting their personal interests ahead of the contractual rights they negotiated with Kakaulin.

309.     On July 1, 2016, Kakaulin met with the Chaikens, at which time he notified Geoff Chaiken that he too, would like to participate in the repurchase by exercising his contractual tag along rights and sell $1 million of his vested common shares.

310.     Though Kakaulin at the time was not required to provide (or even have) a reason for exercising his tag along rights under his agreement with the Chaikens, there were several factors motivating Kakaulin's desire to participate in the sale of his common shares with the Chaikens.

311.     For one, Kakaulin had a reasonable belief that the Chaikens' inappropriate, unlawful, and unethical behavior on behalf of the Company amounted to securities laws violations.

312.     In addition, Chaiken's actions over the course of Kakaulin's tenure with Blink thus far were becoming less predictable and more vicious with no business motivation, but merely sown out of greed and a thirst for control.

313.     Kakaulin feared that Chaiken may retaliate against him for his outspoken objections of Chaiken's practices by making up a "cause" event as a pretext to obliterate Kakaulin's incentive shares.

314.     In the days before Kakaulin met with Chaiken, the Chaikens schemed to unilaterally reduce the value of Company shares held by multiple current and former employees.

315.     In addition, the Chaikens directed Blink to commission a legal and accounting review to restructure incentive shares in such a way as to require each terminated employee to purchase his or her shares immediately after leaving the Company, thereby incurring a large cash outflow and tax bill.  Prior to this change, as in common practice, an employee who left Blink would still get the upside of Blink stock price appreciation without incurring a significant expense upon termination.

316.     In addition, Chaiken frequently discussed repurchasing former employees' incentive shares for "fair market value".  If implemented, such a repurchase would effectively strip former employees, upon termination, of most of the value of their equity, since the Chaikens take the position that the "fair market value" of incentive shares, due to their lack of voting and liquidation rights, is only worth one third (1/3) of the share price in the last prior financing.

317.     Upon joining Blink, all new employees, including Kakaulin, are led to believe that their incentive share value is the same as the last share price, and not one-third of that price.

318.     Kakaulin objected and complained to the Chaikens that these after-the-fact bait-and-switch tactics were inappropriate and potentially fraudulent, given that most employees joined Blink in part because they were induced to believe that their share value would increase dramatically.

319.     For example, one newly hired Blink employee was told by the Chaikens that he was receiving $150,000 worth of shares, which could be calculated by taking the number of his incentive shares and multiplying by Preferred Share price.   This happened on numerous occasions.

320.     Chaiken rebuffed Kakaulin's reasonable concerns, saying to Kakaulin, **"Engineers are idiots. They don't understand business. And they don't care about equity. All they care about is cash comp."**

321.     These were only the most recent examples of such underhanded tactics and securities laws violation that Kakaulin witnessed firsthand and complained about.

322.     One employee, for example, was terminated weeks before his one-year anniversary, at which point his incentive shares would have vested for the first year. When Kakaulin suggested that the employee's shares should vest for 11 months, Geoffrey Chaiken refused, saying the employee was not that good and was not worth his shares.

323.     In another example, in May 2016, Chaiken stripped a member of the founding team – early investor and Blink's General Counsel, who was also Chaiken's "best friend" – of most of his equity in the Company.

324.     Kakaulin expressed concern to Chaiken that Chaiken would renege on a deal with a senior employee at the company, who continued to play a vital role in the company focused on legal, regulatory, compliance, administrative and HR tasks.

325.     Chaiken's justification to Kakaulin was: **"He has too much equity. We can get someone more experienced for a lot less equity now."**

326.     Having witnessed those and other instances in which the Chaiken brothers, on behalf of Defendant Blink, and without Board approval, reduced or threatened to reduce the number of shares held by investors and employees or strip them of their shares altogether, Kakaulin, in the face of the Chaikens' threats of termination, ultimately had no confidence that he would be able to save his job and preserve the value of his shares.  Kakaulin expressed his contractual right to sell only a portion of his shares (just under 25%), and a majority of his vested shares, as Tag Along in the Series A-2 financing.

327.     Even after the Tag Along sale, Kakaulin would still remain the largest employee shareholder of the Company.  Kakaulin never expressed any desire or intention of leaving the Company as he believed that the company would be a unicorn[9], a huge success at some point.

328.     It is important to note that, unlike Series A and Series A-2 investors' shares, Kakaulin's Incentive Shares had no voting rights, no liquidation preference and no transfer rights aside from the Tag-Along Right.  As a result, his failure to tag along in the Chaikens' sale of their common shares would likely have erased most of his share value.  Moreover, the chance that he would be able to exercise his Tag-Along Right in the future would be much smaller

---

[9] In financial lexicon, a unicorn refers to a private company valued at more than $1 billion.

because the Chaikens would have already sold $10.5 million of their shares in connection with the Series A and Series A-2 financings, and their desire and ability to orchestrate future repurchases would likely have been limited for the next several years.

329.    In response to Kakaulin asserting his contractual rights and desire to Tag Along with the Chaikens in the sale of common shares, Chaiken replied, **"Yes, you have the right, but I didn't realize you wanted to sell. We would have to tell the investors about it. Let me talk to Matt."**

330.    Kakaulin was concerned by Chaiken's response, as it seemed that Chaiken was considering excluding Kakaulin from the Tag Along, despite the terms of his agreement with Blink.

331.    After talking to his brother, Geoff informed Kakaulin that despite the terms of the written contract entered into less than nine months earlier, Kakaulin was prohibited from tagging along because the Chaikens unilaterally decided that investors would become frightened that the CFO was selling and, consequently, would never give money to the company again.

332.    Kakaulin protested, stating Blink and its investors would be indifferent if some of the proceeds would be shared with Kakaulin and other selling shareholders. The true motivation behind the Chaikens' desire to prevent Kakaulin from exercising his contractual right to Tag Along was their unwillingness to share with anyone the $6 million of proceeds from the third party sale of their common shares.

333.    The exercise of Kakaulin's Tag Along Rights on July 1st or after would not jeopardize or otherwise negatively affect the Series A-2 financing. Whether investors would have been concerned about Kakaulin's exercise of his Tag-Along Right is pure speculation.

334.     Rather than abide by the clear, plain, unequivocal material terms negotiated in their agreement, the Chaikens threatened retaliation against Kakaulin by explicitly and repeatedly telling him, **"If you exercise your contract right to sell, we'll fire you for cause."**

335.     From July 1, 2016 through July 29, 2016, the Company never discussed the situation with Kakaulin to determine how to assuage any conceivable concern that investors might have.

336.     Not surprisingly, on July 29, 2016, (a day before another $100,000 shares were to vest), the Chaikens terminated Kakaulin's employment with Blink "for cause."

337.     In Chaiken fashion, in order to deprive Kakaulin of all of his vested and unvested shares, then worth approximately $4.7 million, the Chaikens manufactured reasons for deeming Kakaulin's termination to be for "cause" without any good-faith basis.

338.     On August 4, 2016, Blink sent Kakaulin a letter explaining his termination.  The letter contained fabricated reasons for deeming Kakaulin's termination to be for "cause." Mainly, Blink said that Kakaulin's decision to exercise his Tag-Along Right on July 1, 2016 was **"willful misconduct in the performance of [his] duties to the Company"** and represented **"material dishonesty with respect to the Company."**  Kakaulin alleged that the contents of the letter were pretext to Blink's unlawful retaliation against Kakaulin.

339.     In the same letter, several paragraphs after stating that Kakaulin was terminated because he expressed his desire to exercise the Tag-Along Right, Blink preposterously claimed that Kakaulin did not have Tag-Along Rights because in the Series A-2 financing, the Chaikens did not sell their shares directly to third party investors but indirectly through the Company, which they baselessly claim is not a "third-party."

340.     This same fraudulent logic is used by the Chaikens' to incredulously allege that Karsch's mechanism of conversion did not automatically trigger.

341.     In actuality, the repurchase of the Chaikens' shares in Series A-2 financing was absolutely a third party sale that was affected by third-party investors, as contemplated by the Tag Along provision in the Employment Agreement.  For one, the Chaikens knew they could not possibly raise capital from outside investors in the early stages of the company by issuing mere common shares in exchange for their investment, thus – in a form of *share laundering* - the company would *repurchase* the exact requisite number of *common* shares from the Chaikens (and Tag Along Right Holders) and then issue to the third party the same exact number of preferred Series A-2 Shares.

342.     This is the process by which the Chaikens sold their common shares to third parties in the Series A financing, and thus, this is the process contemplated by the Tag Along Rights when included in the Employment Agreement.  Further confirmation that the Series A-2 share issuance was a third party sale of common shares by the Chaikens is the fact that had their been no issuance of preferred shares in the Series A-2 financing, the company would never have repurchased the précised number of common shares from the Chaikens.

343.     The only transfer of shares that is not considered a transfer of common shares to a third party is when shares are transferred automatically through an estate (i.e. by death of a shareholder).  This exception is specifically noted in the language of the contractual Tag Along Rights provision set forth in the Employment Agreement.[10].   Finally, until Kakaulin's

_____

[10] The concept of "third party" comes from Kakaulin's agreement with the Chaikens where it was introduced to ensure that Tag-Along Right is not triggered by "transfers for estate planning purposes".  Thus, the provision states, "In the event Geoffrey Chaiken, Matthew Chaiken or their respective Affiliates

termination, the Chaikens had never claimed that they would be selling shares to anyone other than a "third party".

344.     Kakaulin's contract and Tag Along was negotiated with the intent of a repurchase in mind and the repurchase of the Chaikens' common shares by way of the Series A-2 financing is a transfer that Kakaulin was contractually entitled to participate in by way of his Tag Along Rights similar to the Series A shares issued to the multiple dozens Bridge financers, except for Karsch.

345.     In one amazing admission, on August 5, 2016, Alice Lloyd George, Geoff Chaiken's girlfriend who is a venture capitalist, and also a Blink investor, texted Kakaulin:

> You worked so hard
> so early for this company
> You were critical and then they backstabbed you
> I hated watching
> ...
> I hope you win
> Geoff was a horrible person
> ....
> He said many awful things including "every woman at this company wants to fuck me"
> Insane
> You don't even know the half of it
> ...
> It's just frustrating to see people get away with bad behavior

346.     The Chaiken's fraud upon Karsch is consistent; lies and shortcuts undertaken by the Chaikens to greedily enrich themselves at the expense of others and even the US government.

### *Flouting US Tax Laws & Other Financial Manipulations*

347.     For example, in 2015, Blink chose to re-incorporate itself in Bermuda.

---

(the "*Founders*") determine to sell any of their Common Shares of the Company to a third party, *excluding transfers for estate planning purposes,* the Company shall notify you of such sale and describe the terms and conditions thereof including the price per share…"

348.     This decision was motivated by one driving objective: to avoid paying most of its future U.S. taxes. Blink has no business connection to Bermuda.

349.     Although Blink is technically creating a paper trail to foster the appearance of being a Bermuda-based entity, Blink had previously conducted and presently conducts all of its business, negotiates all of its key contracts, and makes all of its key decisions in the U.S., thereby violating the spirit of U.S. tax laws.

350.     On multiple occasions, immediately before contract signing, Chaiken or the company's general counsel would fly outside of the U.S. to merely sign a key contract.

351.     When Blink's then-CFO, Eugene Kakaulin, protested that such behavior was a sham and inappropriate, Chaiken countered, **"The statute of limitation for tax is only three years.  In three years we will be up and running in Bermuda."**

352.     In other efforts to sidestep proper tax reporting, prior to filing the 2014 tax returns, Geoff Chaiken had the company issue him a guaranty of the first bridge note so that he and his brother could establish a tax basis and take 2014 company losses against his and Matt's income from their then respective hedge fund jobs.

353.     These documents were prepared by Blink's General Counsel, Geoff Parnass, at the direction of Geoff Chaiken.

354.     While these documents were prepared in May 2015, they were purposefully back-dated to July 18, 2014, just after Karsch made the first outside investment in Blink.

355.     In another example, during the September 2015 financing, Geoff Chaiken and his brother sold $4.5 million worth of their common shares of Blink to third party investors by issuing a certain amount of "Series A" preferred shares to investors in exchange for capital to the

company, which was then used to purchase the same amount of common shares from Geoff and Matthew.

356.     Shortly thereafter, Chaiken arranged for this sale proceeds to be "loaned" back to the company so as to reestablish a higher cost basis for tax reasons and which loans would allow Chaiken to take 2015 losses against the $4.5 million worth of shares he sold during the Series A round of financing.

357.     Under the firm's accountant's (Deloitte's) initial analysis, these losses would have gone to all the investors, but Chaiken demanded of Deloitte that he and his brother Matt take the paper losses. The loans were made, and the accountants changed the IRS Form K-1's so that losses would first go to Geoffrey and Matthew Chaiken.

358.     In addition to exposing the company to tax liability and other legal compliance risks, selling equity during a period of time in a company's infancy, when the company is trying to get others to purchase equity, could spark investor skepticism and risk imploding all efforts to continue raising financing for Blink.

359.     At the time, then-CFO Kakaulin asked Chaiken for a reason why, if he was so "bullish" on the company's prospects for future success, he would be selling an ownership stake. Chaiken responded, **"I need to buy a house in the Hamptons. Banks want to see cash, not stock."**

360.     The Chaikens even manipulated the company's balance sheet with the dual purpose of creating the appearance of a stronger cash balance while gaining an important personal tax benefit.  Chaiken did that by providing the company with a $4.8 million "loan" in December 2015.

361.     The cash loan Chaiken provided to Blink was needless, as the company just raised money; the transaction's sole purpose inflated the company's cash balance and allowed the Chaiken brothers to take advantage of losses generated by the company and to offset their personal income in 2015, which was primarily from the sale of equity in Blink.

362.     The cash provided by the "loans" could not be used for operating purposes and required quarterly interest expense payments to the Chaikens, even though Defendant Blink did not need to borrow money at that time.

363.     Unlike Karsch's bridge financing convertible note, the Chaiken loan had no provision to turn into Blink equity.

364.     When CFO Kakaulin raised concerns in January 2016 about this shady arrangement, Chaiken falsely represented that the Blink Board approved this transaction and was comfortable with the set-up.

365.     Specifically, Geoff Chaiken said, **"Tom [Tryforos] [Blink Health Board member whom Chaiken described as his mentor] had concerns, but I got him comfortable and he's completely fine with this."**

366.     Kakaulin advised Chaiken that this financing needed to be disclosed to all investors.  Chaiken became visibly angry and dismissed Kakaulin, stating, **"They got the upside and now, they don't need to know about my tax planning."**

367.     Other financial manipulations included the representation of revenue numbers to increase investor interest.

368.     For example, Chaiken was set on showing as high a revenue number as possible. He thus chose to use a very aggressive revenue recognition technique, recognizing the gross

value of each purchase, including the portion of the purchase that Blink would have to pay to MedImpact and the pharmacy.

369.     This methodology significantly inflated the revenues. While the method could be used, Deloitte, expected auditor of Blink, had concerns about using such an unorthodox accounting methodology.

370.     Kakaulin shared those concerns with Chaiken. Chaiken insisted on using the inflated numbers while failing to warn prospective investors that, in the future, the revenue recognition methodology might have to be changed.

371.     Between February and June 2016, Chaiken insisted on revising the budget frequently and upwards, especially during fundraising efforts.

372.     While budgets always include a fair amount of optimism, Chaiken's approach was especially aggressive.

373.     Specifically, instead of evaluating what was realistic, Chaiken insisted the company revise projections to justify a particular valuation or what the investor was hoping to see.

374.     This resulted in unrealistically high revenues in the budget, including revenue lines from opportunities that could not be reasonably expected to be launched in the near future.

375.     The Chaikens' unrelenting need to manipulate those who were duped into trusting them reached as far as their violation of HIPAA privacy laws – using Blink's fiduciary relationships with its customers to illegally spy on Blink employees and investors.

376.     On multiple occasions, Matthew Chaiken tapped into Blink's customer relationship management dashboard to analyze drug purchasing history of certain customers he knew, including current employees, prospective employees and individuals whom he knows

socially.  Matthew Chaiken used such inappropriately acquired information to make management decisions.  Among Matthew Chaiken's use of illegally obtained HIPAA information:

- Matthew Chaiken once commented that a certain employee cannot be trusted because that employee's prescription for Adderall was significantly more potent than a typical dose.

- Matthew Chaiken once referred to a Blink investor as a "drug addict" because of that person's medication purchasing history.

- Matthew Chaiken once argued that a candidate for employment should not receive a job offer because of the candidate's anti-psychotic prescription.

377.     Kakaulin was stunned by this behavior and objected to the Chaikens, calling it absolutely unacceptable.  Kakaulin said, "We can't use that information!"  Matthew Chaiken replied, **"We are a data-driven company and we'll use everything we have to build a great business."**

### KARSCH IS CONTRACTUALLY ENTITLED TO SERIES A SHARES

378.     To date, Karsch has been damaged by Defendants for their failure to honor Karsch' contractual entitlements to **no-less-than five percent (5%)** of Blink's equity by fraudulently returning his investment and attempting to hide the fact that both the automatic and voluntary triggers to convert his equity have been satisfied.

379.     The Chaikens sought to issue Series A Preferred Shares for a significantly greater price than the $1,000,000 Karsch paid; and thus conspired to oust Karsch from the company, in breach of the parties' agreements, under fraudulent means.

380.      The equity shares in Blink due to Karsch are subject to and governed by the securities laws of the United States.

381.     Furthermore, all subsequent capital raises and investments in Defendant Blink caused the Defendant Blink to issue equity instruments and securities, which are subject to and governed by the securities laws of the United States.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of The Exchange Act § 10(b), 15 U.S.C. § 78j *et seq.*,
and Rule 10b-5, 17 C.F.R. § 240.10b-5
(All Defendants)**

382.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

383.     During the relevant period, Defendants carried out a plan, scheme and course of conduct, which was intended to and did deceive investors, including Karsch, as alleged herein, and which caused Karsch to incur millions of dollars in losses following the implementation of the parties' scheme.

384.     In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

385.     All Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i)  employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff Michael Karsch in connection with his purchase of the Notes.

386.     All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

387.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to knowingly and/or recklessly provide materially false information about the Notes to Karsch, as specified herein.

388.     Specifically, Defendants (i) inserted a list of out-of state investors in Schedule 1 of the agreements to induce Karsch to enter into the agreements, even though they knew the list of investors was wholly false because none of the three listed investors intended to purchase the same Notes as Karsch; (ii) falsely represented that Karsch would be treated as a partner in Blink Health; (iii) falsely stated that investors in the Notes would be treated equally; and (iv) falsely promised that the Notes purchased by Karsch would be converted into equity when the company had achieved investments totaling more than $1 million—even though Defendants intended to, and did, deprive Karsch of his promised equity.

389.     Defendants also made a number of material omissions, including their failure to provide Karsch with (i) the documents promised at closing, which would have included the capital structure of the company; (ii) an accurate list of investors in the Notes; (iii) notice that Karsch's conversion rights were triggered; and (iv) the appropriate percentage ownership of Blink Health equity which he is rightfully owed and entitled to under the terms of the parties' agreements at the then-capitalization value of Blink, upon which the conversion would have been calculated.

390.     The Chaikens' primary liability and controlling person liability arises from the following facts:  (i) Geoffrey and Matthew Chaiken were high-level officers and/or directors of

Blink Health during the relevant time period, and were either members of Blink Health's management team or had control thereof; (ii) by virtue of their responsibilities and activities as senior officers and/or directors of Blink Health, the Chaikens knew which investors would place money in a particular round of financing and could control how each investment would be treated; (iii) the Chaikens had unique access to other members of Blink Health's management team, internal reports and other data and information about the affairs of the company; (iv) the Chaikens were aware – and indeed directed – the dissemination of false information (or the omission of material information) to Karsch; and (v) the Chaikens knew and/or recklessly disregarded that materially false and misleading information was being disclosed to investors, or that material information had not been disclosed.

391.    Primary liability of Blink Health arises from the following facts:  (i) Blink Health issued Notes that were meant to convert into Series A Preferred Shares either at the instruction of an investor or if a certain amount of money was raised; (ii) Blink Health was a party to the agreements entered into with Karsch, and set forth the terms of those agreements, some of which were materially false or materially misleading in light of key omissions; and (iii) Blink Health attempted to cause the Notes to be repaid even though they should have been converted into Series A Preferred Shares; and (iv) Blink Health caused the Notes to be repaid on a basis that was not pro rata and did not reflect equal treatment of all investors in the Notes, but that was instead designed to benefit some investors while harming Karsch.

392.    Defendants had actual knowledge of the misrepresentations of material facts and the material omissions set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain the veracity of such facts, even though such facts were exclusively available to them.

393.     Defendants' material misrepresentations and omissions were done knowingly or recklessly for the purpose of inducing investors to purchase Notes that they believed would convert into equity in the company, even though Defendants did not intend to Karsch to receive his bargained-for equity.

394.     Specifically, Defendants caused a list of venture capitalists to be included as Schedule 1 of the agreements that they knew were not actually investing in the Notes.

395.     Defendants used the names of these investors because they knew that the presence of such sophisticated, well-known investors would induce Karsch to invest in Blink Health on the terms set forth in the agreements without hiring an attorney or conducting further due diligence.

396.     Defendants then materially misrepresented that they were in compliance with the terms of the agreements and all securities laws, even though they knew that Schedule 1 was materially false.

397.     Of the four investors identified in Schedule 1, Defendants knew that only Michael Karsch would invest in the Notes.

398.     For the same purpose of manipulating Karsch into purchasing the Notes, Defendants also falsely represented that they would honor the automatic conversion provisions set forth in the agreements, and that they would treat all investors in the Notes equally (including by only prepaying the Notes on a pro rata basis).

399.     Defendants made these material representations to secure funding for their new startup, which at the time that they issued the Notes was desperately in need of working capital.

400.     Karsch reasonably relied on Defendants' fraudulent misrepresentations. Due to this reliance, he purchased one million ($1,000,000) dollars in Notes from Blink Health and

agreed to a payment clause that he would have not entered into if he had known that the sophisticated investors listed in Schedule 1 were not actually investing in the Notes, or that he would the Notes would not be automatically converted as promised and he would not be treated equally to other investors.

401.    Karsch has suffered damages from his reliance on Defendants' misrepresentations because he was deprived of the more than the current thirty million ($30 million) dollars in equity value that he was entitled to under the Note.

402.    Karsch would not have invested on the terms set forth in the agreements if he had been aware of the falsity of Defendants' representations.  At the time that he entered into the agreements, he was ignorant of their falsity, and believed them to be true.

403.    Had he known that the three other investors listed in Schedule 1 were not actually investing in the Notes, and were placed there solely to induce him to make an investment, he would not have invested in the Notes or would not have done so at the price and according to the terms set forth in the agreements.

404.    Similarly, had he known that the Notes would not be automatically converted as promised and that he would not be treated equally to other investors, Karsch would not have invested in the Notes or would not have done so at the price and according to the terms set forth in the agreements.

405.    Defendants' misrepresentations were the proximate cause of Plaintiff's harm because, by the time he learned that (i) the investors listed in Schedule 1 did not purchase any Notes, (ii) Defendants would not honor the automatic conversion provision of the agreements in good faith, and (iii) Defendants would not treat him equally to other investors, Defendants had

already purported to invoke the payment clause that he would not have agreed to absent the existence of Defendants' misrepresentations.

406.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in connection with the purchase of a security, including by incurring fees and expenses to enforce his rights, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t
### (Geoffrey Chaiken and Matthew Chaiken)

407.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

408.     At all relevant times, Defendants Geoffrey Chaiken and Matthew Chaiken acted as controlling persons of Blink Health within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, ownership, contractual rights, participation in and/or awareness of the company's operations, and role in creating and executing legal documents, the Chaikens had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Blink Health, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

409.     The Chaikens had access to the agreements and related documents, and had the ability to prevent the issuance of the false statements, or to cause the statements to be corrected.

410.     In particular, the Chaikens had direct and supervisory involvement in the day-to-day operations of Blink Health and are therefore presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein, and they exercised the same.

411.     As set forth above, the Chaikens violated Section 10(b) and Rule 10b-5 by their acts alleged herein, and are also liable under Section 20(a) of the Exchange Act by virtue of their positions as controlling persons.

412.     As a result of Defendants' conduct, Plaintiff has suffered damages, including through the loss of bargained-for equity in Blink Health, as well as by incurring fees and expenses to enforce their rights under the agreements, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Common Law Fraud**
**(All Defendants)**

413.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

414.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Karsch and other purchasers of Blink Health's securities, in an effort to induce Karsch to purchase the company's securities, in violation of New York law.

415.     Defendants had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain the veracity of such facts, even though such facts were exclusively available to them.

416.     Defendants' material misrepresentations were done knowingly or recklessly for the purpose of inducing investors to purchase Notes that they believed would convert into equity in the company, even though Defendants did not intend to permit certain investors to receive their bargained-for equity and would not treat those investors equally.

417.     At all relevant times, Defendants acted with the intent that Karsch rely on their false representations, and with full knowledge that Karsch would so rely.

418.     Karsch would not have invested on the terms set forth in the agreements if he had been aware of the falsity of Defendants' representations regarding the other investors, the automatic conversion provision, and the equal treatment of all investors.

419.     At the time that he entered into the agreements, he was ignorant of these statements' falsity, and believed them to be true.

420.     Defendants had a duty to disclose this information.

421.     Defendants purposefully took steps to keep this vital information from Karsch.

422.     Had Karsch known that the three other investors listed in Schedule 1 were not actually investing in the Notes, and were placed there solely to induce him to make an investment, and that the automatic conversion of his Notes would not be honored and he would not be treated equally to all other investors, Karsch would not have invested in the Notes or would not have done so at the price and according to the terms set forth in the agreements.

423.     Karsch acted in direct reliance on Defendants' representations, including but not limited to the list of investors in Schedule 1, the warranty that Defendants were in compliance with the agreements and the securities laws, the promise to automatically convert the Notes into equity when the company had received investments totaling more than one million ($1,000,000) dollars, and the statement that all investors in the Notes would be treated equally.

424.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages, including through the loss of bargained-for equity ownership in Blink Health, as well as by incurring fees and expenses to enforce his rights under the agreements, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement / Misrepresentation
### (All Defendants)

425.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

426.    In seeking to induce Karsch to invest in the Notes, Defendants made representations that were materially false, and omitted material information, including falsely representing that (i) the investors listed in Schedule 1 would purchase the Notes; (ii) Defendants were in compliance with the terms of the agreements; (iii) Defendants were in compliance with the securities laws; (iv) Defendants would honor the automatic conversion provision of the agreements; (v) Defendants would treat all investors in the Notes equally; and (vi) Karsch would be treated as a true partner in the company.

427.    These statements were each false.  In truth, none of the investors in Schedule 1 *except* for Karsch invested in the Notes, Defendants did not automatically convert the Notes into equity despite being contractually obligated to do so, Defendants did not treat all investors equally in prepaying the Notes, and Karsch was not treated like a partner.

428.    Thus, Defendants did not comply with the agreements and that they had violated US securities laws through their intentional misrepresentations and omissions.

429.    Defendants also made a number of material omissions, including in that they failed to provide Karsch with (i) the documents promised at closing, which would have included the capital structure of the company; (ii) an accurate list of investors in the Notes; and (iii) notice that his conversion rights were triggered.

430.    Defendants knew, or were reckless in failing to know, that the above statements were false at the time that they were made, or that they were omitting material information.

431.     Defendants intended that Karsch would rely on their false statements and omissions in investing in the Notes.   Karsch did, in fact, reasonably rely on these misrepresentations and omissions, to his detriment.

432.     As a result of Defendants' conduct, Plaintiff has suffered damages, including through the loss of bargained-for equity in Blink Health, as well as by incurring fees and expenses to enforce their rights under the agreements, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Contract**
**(All Defendants)**

433.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

434.     The Agreement is a binding and enforceable contract that was supported by valid consideration.

435.     Karsch performed all of his obligations under that contract.

436.     Defendants breached that contract by (i) failing to convert Karsch's Notes to Series A Preferred Shares despite having attained the fundraising threshold for automatic conversion; (ii) amending Schedule 1 to remove and/or change the investors in the Notes without written notification to Karsch; (iii) failing to treat all investors in the Notes equally; and (iv) engaging in violations of the agreements and the securities laws, contrary to the representations and warranties set forth in the agreements.

437.     As a result of Defendants' conduct, Plaintiff has suffered damages, including through the loss of bargained-for equity in Blink Health, as well as by incurring fees and expenses to enforce their rights under the agreements, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Breach of Contract – Covenant of Good Faith and Fair Dealing
### (All Defendants)

438.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

439.     The Agreement is a binding and enforceable contract that was supported by valid consideration.

440.     Karsch performed all of his obligations under that contract.

441.     Defendants breached the covenant of good faith and fair dealing inherent in the agreements by pretending to prepay all Notes on a pro rata basis, when in fact Defendants created side deals with certain noteholders (but not others) to ensure that they were made whole, thereby treating the investors in the Notes unequally.

442.     Defendants also breached the covenant of good faith and fair dealing inherent in the agreements by trying to prepay the Notes when they knew that the Notes should be subject to automatic conversion into equity.

443.     As a result of Defendants' conduct, Plaintiff has suffered damages, including through the loss of bargained-for equity in Blink Health, as well as by incurring fees and expenses to enforce their rights under the agreements, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (All Defendants)

444.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

445.     Defendants have benefitted, and continue to benefit, from their retention of the Series A Preferred Shares that should have been given to Karsch upon the automatic conversion

of his Notes.  Defendants also benefit from the one million ($1,000,000) dollar investment made by Karsch, along with Karsch's fundraising efforts and donation of his office and home to aid the development of Blink Health, all of which were made in reliance on Defendants' false statements.

446.    Defendants have made and retained these benefits at the expense of Karsch.

447.    Defendants' retention of these benefits is unjust because Defendants received them through their deliberate misrepresentations and omissions.

448.    As a result of Defendants' conduct, Plaintiff has suffered damages, in an amount to be proven at trial.  Equity and good conscience require restitution because Defendants received benefits for which Plaintiff was not adequately compensated.

**EIGHTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(All Defendants)**

449.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

450.    Karsch put his trust and confidence in the Chaikens by placing his assets under their supervision and thus, the Chaikens owed to Karsch a fiduciary duty

451.    As alleged herein, the Chaikens, by reason of their positions as officers and directors of Blink, and because of their ability to control the business and corporate affairs of Blink, owed to Blink, its investors, employees and shareholders fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Blink in a fair, just, honest, and equitable manner.

452.    The Chaikens breached their fiduciary duties and took advantage of their position of trust and confidence in a number of ways detailed in this Complaint.

453.     Among other things, the Chaikens advanced their own interests at the expense of the Karsch's interests.

454.     The Chaikens also concealed from, or failed to disclose to, Karsch material facts to Karsch's detriment.

455.     As a direct and proximate result of the Chaikens' respective breaches of their fiduciary obligations, Plaintiff has sustained significant damages, as alleged herein.

### NINTH CAUSE OF ACTION
**Fraudulent Concealment**
**(Against The Chaikens)**

456.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

457.     The Chaikens, including in their written and oral communications with Karsch and otherwise, concealed facts from Karsch that they were required to disclose by virtue of the fiduciary duty they owed and by virtue of the statements and other representations they made concerning investments.

458.     The Chaikens concealed from Karsch certain financial transactions, which automatically triggered the conversion of Karsch's financing into Blink equity per the parties' express, written agreement.

459.     Karsch would have received his equity had he not been deceived.

460.     It was therefore necessary for the Chaikens to conceal certain facts in order for the Chaikens to complete their fraud.

461.     The Chaikens purposefully created the façade of "strategic partnership".

462.     Karsch relied upon and acted upon the Chaikens' representations and concealment of facts and was harmed as a result.

## TENTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against The Chaikens)

463.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

464.     As set forth above, the Chaikens owed Karsch a fiduciary duty, and, as a result, were obligated to disclose material facts to Karsch. In the alternative, and at a minimum, The Chaikens made negligent misrepresentations to the Plaintiff.

465.     The Chaikens, while acting in the course of their business, supplied inadequate, inaccurate and incomprehensible information to Karsch with respect to his investment in Blink Health.  Moreover, the Chaikens failed to provide Karsch with material facts during the course of his investment in Blink and upon his request.

466.     The Chaikens concealed material facts from Karsch, including certain financial transactions, which automatically triggered the conversion of Karsch's financing into Blink equity per the parties' express, written agreements.  By failing to disclose all material facts to Karsch, the Chaikens failed to exercise reasonable care in the dissemination of this information to Karsch.

467.     The Chaikens owed fiduciary duties to Karsch.  Karsch was therefore justified in relying on The Chaikens' misrepresentations or omissions.

468.     As a result of his reliance, Karsch has suffered damages.

## ELEVENTH CAUSE OF ACTION
### Accounting

469.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

470.     As set forth above, the Chaikens owed a fiduciary duty to Karsch and breached that duty.

471.     Throughout the course of the professional relationship between Karsch and the Chaikens, the Chaikens did not appropriately account for transactions tat directly affected the status of his investment in Blink Health.

472.     As a result, the Chaikens prevented Karsch from understanding the nature of transactions being or discovering the Chaikens' wrongdoing.

473.     Repeatedly Karsch demanded records more accurately reflecting his account from The Chaikens.  Each time the Chaikens denied the request or have failed to provide all requested documents.

474.     As a result of the above, it is impossible for Karsch fully to understand the holdings in their accounts or the extent of the Chaikens' breach of fiduciary duty and other possible wrongdoing without a court-ordered accounting.

475.     As a result of the above, it is impossible for Karsch to fully understand the extent of the Chaikens' breach of fiduciary duty and other possible wrongdoing without a court-ordered accounting.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.   Adjudge that Defendants are liable for each cause of action stated against them;

B.   Preliminary and permanent injunctive relief;

C.   Directing specific performance with respect to issuance of the appropriate percentage ownership of Blink Health, which shall be no less than five percent (5%) of Blink Health's equity;

D.   Compensatory damages in an amount according to proof;

E.   Punitive and exemplary damages in an amount according to proof;

F.   An award of Plaintiffs' expenses, costs and attorneys' fees, pursuant to Section 10 of the Note and any other applicable law; and

G.   For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and the extent permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
          May 23, 2017

                                        Respectfully submitted,

                                        **SACK & SACK, LLP**

                                        By:      _/s/ Jonathan Sack_____
                                                 Jonathan Sack, Esq.

                                        **Attorneys for Plaintiff**
                                        **MICHAEL KARSCH**
                                        70 East 55th Street, 10th Floor
                                        New York, New York 10022
                                        Tel.: (212) 702-9000
                                        Fax: (212) 702-9702