UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   6/20/19

MICHAEL KARSCH,

                    Plaintiff,

        -against-

BLINK HEALTH LTD., et al.,

                    Defendants.

17-CV-3880 (VM) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated March 1, 2019 (Dkt. No. 109), defendants Blink Health Ltd. (Blink),

Geoffrey Chaiken, and Matthew Chaiken seek discovery sanctions against plaintiff Michael

Karsch and his counsel, Sack & Sack LLP (Sack & Sack or the Firm), up to and including the

dismissal of all of plaintiff's claims, as a remedy for what defendants characterize as a "shocking

pattern of misconduct and cavalier disregard for this Court's Orders" that "have undermined the

integrity of these proceedings and unfairly impeded Blink's ability to defend itself." Def. Mem.

(Dkt. No. 103) at 4.

In broad outline, defendants assert: (1) that Karsch and certain Karsch-affiliated persons

and entities (the Karsch Affiliates[1]) violated a series of discovery orders issued by this Court; (2)

that Karsch spoliated electronically stored evidence (ESI) when – approximately one month after

---

[1] The Karsch Affiliates include Karsch Capital Management, LP (Karsch Capital), a hedge fund
that Karsch founded in 2001 and wound down in 2013-14; Karsch Capital Management LLC
(KCMC), which appears to have been be a corporate affiliate of Karsch Capital; Juice Press LLC
(Juice Press), a health food chain acquired by Karsch in 2012; Hunter Peak Investments, LP
(Hunter Peak), an investment management firm that Karsch launched in 2015; Karsch Capital CFO
John Larre; trader Matthew Plotkin; analyst Tom Tully; administrative personnel Lisa Sherwood,
Catherine O'Hara, Brian Holmes, and Anastasia Athanasiou; and plaintiff's father (and sometime
advisor) Stephen Karsch. Each of these individuals (except for Stephen Karsch) worked for Karsch
Capital, Juice Press, KCMC, and/or Hunter Peak. All of the Karsch Affiliates are or were
represented by Sack & Sack for discovery purposes in this action, and all of the individual Karsch
Affiliates were designated custodians for purposes of plaintiff's document search and production
obligations. *See* Pl. Ltr. dated Nov. 6, 2018 (Dkt. No. 70), at 4; Declaration of Laura K. O'Boyle
dated March 1, 2019 (O'Boyle Decl.) (Dkt. No. 104), Ex. A (Pl. Resp. to Ct. Order), at 2-5.

threatening what ultimately became this lawsuit – he directed or permitted Karsch Capital to "take down and replace" its server (the Karsch Capital Server) without preserving email accounts containing relevant evidence; (3) that Sack & Sack spoliated other evidence when it lost three electronic devices (the Jacoby Devices) which it received shortly before this action was filed from its then-client (and Blink's former General Counsel) Charles Jacoby, Esq.; and (4) that both Karsch and his counsel have made multiple false statements to this Court in an effort to avoid their discovery obligations and conceal their misconduct.

For the reasons that follow, the motion will be granted in part. Although the misconduct of plaintiff and his counsel has been significant, I cannot conclude that their actions were "so outrageous as to warrant outright disposition of the case," particularly under the "stringent" standards prescribed by Fed. R. Civ. P. 37(e), which governs sanctions for spoliation of ESI. *See Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 430-32 (W.D.N.Y. 2017) (finding that defendant intentionally spoliated "critical and irreplaceable data" that would have "conclusively determined" a central factual issue in the case, but rejecting terminating sanctions in favor of less drastic remedies). Consequently, the Court will impose monetary sanctions on Karsch and his counsel sufficient to deter them from further misconduct and compensate defendants for their attorneys' fees and other expenses incurred in obtaining documents and information that should have been promptly provided or accurately reported many months earlier. In addition, because an unknown number of relevant and potentially significant documents have been permanently placed out of defendants' reach, defendants will be permitted to present evidence, at trial, concerning the destruction of the Karsch Capital Server and the loss of the Jacoby Devices, and the jury will be instructed that it may consider that evidence in evaluating the parties' credibility and determining the facts in this case.

## I.      BACKGROUND

Plaintiff Karsch, a hedge fund manager, was an early financial backer of defendant Blink, a healthcare technology startup (originally known as Chaiken Holdings LLC, and then as Vital Matters, LLC). Karsch alleges that the $1 million in "seed money" he provided on July 10, 2014, pursuant to a repayable convertible Note (the Note), entitles him to a 5% equity stake in Blink, which he never received. *See* Compl. (Dkt. No. 1) ¶¶ 2-9; O'Boyle Decl. Ex. F (fully executed Note). Blink and its co-founders – the Chaikens – assert that the Note never converted into equity (because no "event of conversion" occurred); instead, they say, the debt was lawfully repaid with 6% interest, on or about May 20, 2015, after Karsch made "repeated" oral demands for repayment in late 2014. *See* Compl. Ex. K; Amend. Ans. (Dkt. No. 24) at 1, 5, 7; *id.* ¶ 240. The May 20, 2015 repayment, according to defendants, was made pursuant to § 3 of the Note (which reads, "The Company may prepay the Notes without penalty" so long as "any prepayment [is] made pro rata among all Notes"), and satisfied all of Blink's obligations to Karsch. *See* Compl. Ex. F, at ECF page 18; Amend. Ans. at 1.

### A.      Events Leading to This Lawsuit

Karsch first threatened litigation on June 16, 2015, when his then-attorney Warren H. Colodner, Esq. sent a letter to Blink's counsel, challenging defendants' "attempt to deprive Michael Karsch of his bargained-for equity position" as "improper" and "contrary to the fundamental terms under which Michael Karsch provided seed capital to [Blink] at a crucial time in its history." O'Boyle Decl. Ex. S, at 1, 3. The Colodner letter accused defendants of securities fraud, common law fraud, breach of fiduciary duty, and breach of contract. *Id.* at 2-3. The letter concluded: "It is not too late . . . for the Chaikens to reconsider their course of action and agree to live up to their promises and resolve this situation on a fair and equitable basis. Otherwise, Michael Karsch has no alternative but to reserve all his legal rights and remedies." *Id.* at 3.

Seventeen months later, in November 2016, Karsch contacted his present counsel, Jonathan Sack, Esq. of Sack & Sack, in anticipation of litigation against Blink, *see* Pl. Priv. Log (O'Boyle Decl. Ex. N) at 1, and on May 23, 2017, plaintiff filed this action, accusing defendants of (among other things) securities fraud, various species of common law fraud, breach of fiduciary duty, and breach of contract. Compl. ¶¶ 382-475.

Litigation has been highly contentious, and written discovery, in particular, has proceeded at a snail's pace. In the two years since the Complaint was filed, neither party has taken a single deposition. The sections below recount the history of the parties' discovery efforts only insofar as that history is relevant to the pending sanctions motion.

### 1.    Destruction of the Karsch Capital Server

In early July 2015 – less than one month after plaintiff sent the Colodner letter, threatening litigation – he "took down" the Karsch Capital "email accounts/file server," which housed email accounts (ending in "@karschcapital.com") used by Karsch Affiliates Larre, Plotkin, Sherwood, and Holmes, among others – and by Karsch himself. *See* Pl. Resp. to Ct. Order at 5. The Karsch Capital Server was "replaced with the Hunter Peak (the successor entity) file/email server." *Id.*

Before sending the Karsch Capital Server "to be destroyed," *see* Pl. Amend. Resp. to Ct. Order (O'Boyle Decl. Ex. P) at 6, Hunter Peak requested that Eze Castle Integration, Inc. (ECI), an information technology services provider, back it up. Tan Decl. (O'Boyle Decl. Ex. D) ¶ 2. On or around July 10-12, 2015, ECI "extracted the data from that server and transferred the data to a network attached storage a/k/a network storage device ('NSD')," and provided that NSD to Hunter Peak. *Id.* ECI did not maintain a copy of either the NSD or the data extracted from the Karsch Capital Server, but did maintain credentials to the NSD. *Id.*; O'Boyle Decl. Ex. Q, at 1-2.

During the extraction process, ECI observed that the Karsch Capital Server "had crashed hard drives, which would result in an increased probability that some amount of the data on that

4

server had been corrupted, lost or destroyed." Tan Decl. ¶ 3. However, ECI "did not perform any analysis of whether data on that server was, in fact, corrupted, lost or destroyed, or the extent of any data corruption, loss or destruction." *Id*.

As discussed in more detail below, plaintiff did not reveal that the Karsch Capital Server had been destroyed until December 10, 2018, and thereafter made a series of inconsistent representations as to whether any backup (i) existed or (ii) could be accessed. *See* Tr. of Dec. 10, 2018 Conf. (Dec. 10 Tr.) (Dkt. No. 89) at 32:13-15; O'Boyle Decl. Ex. Q, at 2. It is now clear, however, that while a backup was made – and has been accessed – some data on the Karsch Capital Server was irretrievably corrupted, lost, or destroyed. Most significantly, the NSD does not contain any .pst files for the @karschcapital.com accounts of custodians Larre, Plotkin, and Holmes. O'Boyle Decl. Ex. R; Pl. Opp. Mem. (Dkt. No. 106) at 13 (conceding that "certain 'PST' files of the emails" are not on the NSD).[2] Two other email accounts – belonging to Larre and O'Hara – are also missing or inaccessible. Pl. Amend. Resp. to Ct. Order at 3 (Larre), 5 (O'Hara).

### 2. Karsch's Consultation with Sack & Sack

Sack & Sack began providing legal advice to Karsch regarding Blink's prepayment of the Note, "in anticipation of or related to litigation against Blink," no later than November 2, 2016. *See* Pl. Priv. Log, at 1. On that day – according to plaintiff's privilege log – Jonathan Sack of Sack & Sack emailed Karsch with "[l]egal advice re: pre-payment of note." *Id.* Karsch replied to Sack on November 12, 2016, with "[a] few thoughts," and wrote Sack twice more on November 13, 2016. *Id.* On November 14, 2016, another attorney at the Firm emailed Karsch on the subject,

---

[2] "A PST file, or personal storage table (.pst) file, is a Microsoft Outlook Data File that stores a user's Outlook data for POP3, IMAP and web-based mail accounts, including all mail folders and the items within the folders, such as emails, email attachments, to do items and appointments, contacts and more." *Personal Storage Table (PST)*, Webopedia, https://www.webopedia.com/TERM/P/personal_storage_table_pst.html (last visited June 20, 2019).

"Blink Health – Setting Up a Time to Talk." *Id.* Three days later, Sack sent another email to Karsch, copying other Sack & Sack attorneys, on the subject, "Fwd: Karsch Complaint – First Draft." *Id.* On December 14, 2016, Karsch wrote back to Sack, copying other attorneys at the Firm, on the subject, "Re: Blink Health." *Id.* Plaintiff withheld all of these emails from his document production as privileged, explaining that they contained "legal advice re: Karsch's equity in Blink" and were prepared in "anticipation of or related to litigation against Blink." *Id.*

### 3.    Sack & Sack Obtains, and Loses, the Jacoby Devices

Both before and after the filing of the present action, Sack & Sack represented other clients adverse to Blink. One of those clients was Charles Jacoby, Blink's General Counsel at the time of the events underlying the present action, who was personally involved – in his capacity as counsel for Blink – in most of those events. *See, e.g.*, Compl. Ex. K (May 20, 2015 email and letter from Jacoby to Karsch notifying plaintiff that his Note would be prepaid, at which point "all obligations of the Company . . . will be satisfied in full"). At times – in both 2014 and 2015 – Jacoby used his personal "@gmail.com" email account for communications related to plaintiff. *See, e.g.*, Compl. Ex. F; O'Boyle Decl. Exs. O-1, O-2, O-3.

At some point after the repayment of the Note, the relationship between Jacoby and the Chaikens deteriorated, and Jacoby "retained the Sack Firm to negotiate the terms of his separation from Blink." Pl. Opp. Mem. at 9. Those negotiations ended with a severance and settlement agreement (ultimately executed in early February 2017), which required Jacoby to return to Blink all Blink-owned devices in his possession. *See* Sack Subp. Resp. (O'Boyle Decl. Ex. I) at ECF page 4. Cognizant of this requirement, which was "memorialized in all drafts of the settlement agreement," *id.*, Jacoby delivered "a personal cellphone and two computers that he used at home" to Jonathan Sack on or about January 4, 2017 – two months after Sack and his colleagues began exchanging privileged emails with Michael Karsch in anticipation of litigation against Blink.

Jacoby Interrog. Ans. (O'Boyle Decl. Ex. H) at 6; *see also* Pl. Amend. Interrog. Ans. (O'Boyle Decl. Ex. K) at 3. One of the computers "was Blink's property," and Jacoby was "not certain about the other." Jacoby Interrog. Ans. at 6-7. According to Jacoby:

> The cell phone and two computers contained predominantly personal data, but they may also have included some Blink data. To comply with his obligations under his settlement agreement with Blink, while not giving Blink access to his personal documents and information, Mr. Jacoby took the following steps: (i) he transferred any Blink documents on the two computers to an external hard drive, and (ii) he replaced the two existing hard drives with new hard drives and directed Sack & Sack LLP to deliver the two computers and the external hard drive to Blink. *The two internal hard drives that were removed from the two computers and Mr. Jacoby's personal cell phone – all of which contained predominantly personal information – were then surrendered to Mr. Sack and thereafter maintained by Sack & Sack LLP.*

*Id.* (emphasis added).

On February 5, 2017 – once his settlement agreement with Blink was executed – Jacoby directed Jonathan Sack to "arrange for the return of the following devices to Blink in accordance with the Jacoby Settlement Agreement: 2 computers and an external hard drive." Sack Subp. Resp. at ECF page 4. After the return of those devices to Blink, "the remaining items deposited by Jacoby with the Sack Firm" – that is, the original hard drives from the two computers, and Jacoby's cell phone – were "surrendered to Mr. Sack" and thereafter, according to Jacoby, "maintained by Sack & Sack LLP." Sack Subp. Resp. at ECF page 5; Jacoby Interrog. Ans. at 7.

As discussed in more detail below, the Firm did not acknowledge that Jacoby left any devices in its custody until November 2018, and thereafter made a series of inconsistent representations as to what actually happened to those devices. On November 20, 2018, Jonathan Sack signed a discovery response stating that "the remaining items deposited by Jacoby with the Sack Firm, were placed in the file of Eugene Kakaulin [another former Blink employee represented by Sack & Sack] pending the final settlement and close of [Kakaulin's] case" against Blink, and

that the Kakaulin file "was closed, and moved to storage" on or around February 10, 2017. Sack

Subp. Resp. at ECF page 5. However, in court on April 8, 2019, attorney Sack stated:

> I have absolutely no independent recollection of maintaining two external hard
> drives or hard drives from a laptop. After searching my files, I have none of those
> devices. I believe that Mr. Jacoby might have taken those materials or he might
> have left them with my paralegal who he had a friendship with. I have looked
> everywhere in my office for any piece of hardware that would belong to him, as
> well as in the storage facility where I keep closed files, and I have found none of
> those devices.

April 8 Tr. at 13:2-11.

### B.    Events During This Lawsuit

After plaintiff filed this action on May 23, 2017, the Hon. Victor Marrero, United States

District Judge, received "a flurry of letter correspondence" regarding defendants' intention to

move to dismiss plaintiff's non-contractual claims pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dec.

and Order dated Jan. 11, 2018 (Dkt. No. 21), at 1-2. The district judge treated the letters as a motion

and denied it, holding that the Complaint adequately alleged "factual misrepresentations distinct

from the breach of contract claim." *Id.* at 7. Thereafter, on March 5, 2018, the district judge referred

this action to me for general pretrial management. (Dkt. No. 29.)

### 1.    Defendants' Motion to Disqualify

By letter-application dated February 16, 2018, defendants asserted that Blink's former

General Counsel, Jacoby, improperly provided Sack & Sack with privileged and confidential

documents, in violation of New York Rule of Professional Conduct (RPC) 1.9(c); that the Firm

improperly relied on those materials in drafting the Complaint in this action, in violation of RPC

8; and therefore that it should be disqualified. *See* Def. Ltr. dated Feb. 16, 2018 (Dkt. No. 25), at

4 ("[T]he Karsch complaint contains many allegations about which Karsch . . . could not possibly

have personal knowledge through legitimate means and for which Mr. Jacoby is the only

reasonably probable source."); *see also* Amend. Ans. at 10-13 (making similar allegations). In

response, Sack & Sack denied – in general terms – that it received or used "privileged information" in this action. *See*, *e.g.*, Pl. Ltr. dated Mar. 7, 2018 (Dkt. No. 32), at 2 n.1 ("[T]here is not an iota of proof supporting the contention that the Sack Firm received, let alone utilized, Defendants' privileged information which has not been identified."). However, the Firm did not address the broader question whether it obtained from Jacoby, and thereafter deployed against Blink, any "confidential" information that Jacoby was ethically obligated to safeguard for Blink's benefit.

During the initial case management conference on May 22, 2018, defendants withdrew their disqualification application and advised the Court that the parties were instead negotiating a protocol to govern the handling of any privileged or confidential materials disclosed by Jacoby to the Firm. *See* Tr. of May 22, 2018 Conf. (May 22 Tr.) (Dkt. No. 43) at 4:13-21, 20:7-24:18. I then issued a scheduling order (Dkt. No. 42) requiring the parties to complete fact discovery, including depositions, by November 9, 2018.

## 2.     The July 12, 2018 Order and the July 12, 2018 Letter

The parties were unable to agree on a protocol regarding the Jacoby material. On July 10, 2018, I held a telephone conference to review their competing proposals and consider defendants' request for Jacoby-related discovery, including a list, to be provided by Sack & Sack, of all Blink documents that it obtained from Jacoby regarding the issues underlying this action. I denied that request as unnecessarily invasive of the attorney-client privilege between Jacoby and the Firm. *See* Tr. of July 10, 2018 Tel Conf. (July 10 Tr.) (Dkt. No. 54) at 4:24-6:7; Order re Protocol and Protective Order dated July 12, 2018 (July 12 Order) (Dkt. No. 53), at 7-8. Instead, I directed Sack & Sack to answer the "preliminary" question whether it "possesses (or possessed) *any* documents that (a) fall into the five categories listed by defendants as relevant to this action and (b) were

obtained by the Firm from Jacoby." July 12 Order at 8.[3] I explained: "If the Firm represents that it never obtained documents from Jacoby concerning the five listed topics, it would serve no purpose to direct it to produce a list of such documents. If the Firm cannot or will not make that representation, I must consider how best to determine which of the documents it obtained are privileged or confidential, and how to safeguard them against further misuse." *Id.* I therefore ordered the Firm to "either (a) represent to defendants and the Court, in writing, that it did not obtain from Jacoby any documents concerning [the five listed topics] or (b) advise defendants and the Court, in writing, that it cannot or will not make such a representation." *Id.* at 9.

Later that day, the Firm submitted to chambers a letter, signed by Jonathan Sack, representing unequivocally that "*it did not obtain from Charles Jacoby, the former General Counsel of Blink Health, Ltd., any documents concerning*" Karsch's relationship with Blink and its founders, the Note, the repayment of the Note, or any of the other listed topics. Pl. Ltr. dated July 12, 2018 (July 12 Letter) (Dkt. No. 83-1), at 1 (emphasis in the original). The July 12 Letter did not mention the Firm's receipt and retention of Jacoby's cell phone and the original hard drives from his two computers. Those facts were first disclosed by Jacoby himself on September 28, 2018, in sworn interrogatory answers served on Blink in a then-pending arbitration proceeding. See Jacoby Interrog. Ans. at 4.[4]

---

[3] Those five categories were: (i) plaintiff's relationship with Blink and/or the Chaikens; (ii) the Note, including Blink's repayment of the Note; (iii) Blink's solicitation of and/or communications with investors; (iv) Blink's fundraising; and/or (v) certain allegations, made by Karsch, that Blink, Barry Chaiken, and certain Blink investors "flout[ed] US Tax Laws" and committed related misconduct. July 12 Order at 5 n.6.

[4] The arbitration, which has since been settled, involved claims by Jacoby, Kakaulin, and Hippo Technologies LLC (Hippo) against Blink, and counterclaims by Blink against its former employees. Jacoby Interrog. Ans. at 1. Hippo is a health care startup, founded by Kakaulin and Jacoby, that competes with Blink. Sack & Sack did not represent Jacoby in the Hippo arbitration.

### 3.       The November 13, 2018 Order

Once Sack & Sack assured defendants that it never obtained any relevant documents from Jacoby, the parties turned their attention to merits discovery. On September 14, 2018, at their request, I extended the deadline for the close of fact discovery to December 7, 2018. (Dkt. No. 58.) Discovery soon bogged down, however, due primarily to deficient written discovery responses and sluggish document production by plaintiff and his affiliates.

On October 29, 2018, defendants asked for a conference to address a host of "pervasive" discovery deficiencies, including "deficient and delayed document production" by Karsch and the Karsch Affiliates, as well as plaintiff's "refusal to collect documents from relevant custodians." Def. Ltr. dated Oct. 29, 2018 (Dkt. No. 63), at 1-4. Among other things, defendants complained that plaintiff had "promised to substantially complete production of documents responsive to the subpoenas [to the Karsch Affiliates] by October 26, 2018," but "blew past this deadline," and had yet to produce any documents at all from plaintiff's father Stephen Karsch. *Id*. at 3.

Two days later, defendants wrote again concerning what they had "recently learned" from Jacoby's interrogatory answers in the Hippo arbitration: that he surrendered computing devices to Sack & Sack in early 2017 and that the Firm's "possession of these devices may contradict Plaintiff's counsel's representations in their July 12, 2018 letter." Def. Ltr. dated Oct. 31, 2018 (Dkt. No. 66), at 3. Thereafter, defendants reported that Sack & Sack could "no longer locate" the two hard drives or the cellphone that Jacoby left at the Firm, *see* Def. Ltr. dated Nov. 8, 2018 (Nov. 8 Letter) (Dkt. No. 71), at 3,[5] and requested that I direct the Sack & Sack to "explain in detail the circumstances surrounding the unexplained disappearance of Mr. Jacoby's devices." *Id.* at 4.

---

[5] Blink obtained this information from attorney Stephen Feigenbaum, who represented Jacoby in the Hippo arbitration. *See* Nov. 8 Letter at 3; O'Boyle Decl. ¶ 11.

At a discovery conference on November 12, 2018, one of Jonathan Sack's partners at the Firm insisted that the representations made in the July 12 Letter "were accurate," but was unable to state what devices the Firm received from Jacoby or what became of them. *See* Tr. of Nov. 12, 2018 Conf. (Nov. 12 Tr.) (Dkt. No. 81) at 9:24-12:12. Consequently, I authorized defendants to serve supplemental discovery requests concerning Sack & Sack's receipt and retention of the Jacoby Devices. *See id.* at 13:2-23; Order dated Nov. 13, 2018 (Nov. 13 Order) (Dkt. No. 72), ¶ 1. In addition, I ordered plaintiff to produce all documents responsive to certain of defendants' requests by November 19, 2018, *see* Nov. 13 Order ¶¶ 2(d)-(e), and all responsive documents from the files of custodians Plotkin, Tully, O'Hara, Athanasiou, and Larre by November 26, 2018. *Id.* ¶¶ 3(a)-(b). I set December 3, 2018 as the deadline for plaintiff to "substantially complete" all remaining written discovery, "including the production of all non-privileged responsive documents," *id.* ¶ 4(a); extended the close of fact discovery to January 31, 2019, *id.* ¶ 8; and awarded attorneys' fees to defendants pursuant to Fed. R. Civ. P. 37(a)(5)(A). *See id.* ¶ 5.[6]

As discussed in more detail below, plaintiff failed to comply with significant portions of the November 13 Order.

### 4.    The December 11, 2018 Order

Defendants promptly served plaintiff with interrogatories, asking about the Jacoby Devices, and served Sack & Sack with a subpoena seeking the devices themselves, any copies of their contents, and any documents shedding light on what happened to them. In his initial response to the interrogatories (signed by Jonathan Sack), plaintiff denied that he had any "personal knowledge" of the Jacoby Devices and on that wholly improper basis refused to provide any

---

[6] The fee award was later set at $19,705 (Dkt. No. 84), which has been paid.

further information. *See* Def. Ltr. dated Dec. 3, 2018 (Dec. 3 Letter) (Dkt. No. 83), Ex. D.[7] In its

initial written response to the subpoena (also signed by Jonathan Sack), the Firm acknowledged

that Jacoby delivered "several electronic devices" on or about January 4, 2017, which "were

immediately placed in a drawer in [a] former paralegal's desk pending finalization of the settlement

agreement" between Jacoby and Blink. Sack Subp. Resp. at ECF page 4. Sack further confirmed

that the paralegal segregated "two (2) laptop computers and one (1) external hard drive," which

were picked up by a Blink representative on February 8, 2017. *Id.* The "remaining items,"

according to Sack, "were placed in the file of Eugene Kakaulin," which was then closed and moved

to storage. *Id.* at ECF pages 4-5. However, the Firm neither produced the remaining Jacoby

Devices nor acknowledged that it had lost them.

On December 3, 2018, defendants complained about these "evasive and incomplete"

responses and sought "severe sanctions." Dec. 3 Letter at 1. The next day, the Court *sua sponte*

extended plaintiff's time to respond to the December 3 Letter until December 11, 2018, "*on

condition that,* by the same date, plaintiff serve supplemental responses to the Interrogatories, *and*

the Firm serve supplemental written responses to, and complete its document production in

response to, the Subpoena." Order dated Dec. 4, 2018 (Dkt. No. 85), at 1-2 (emphasis in the

original).

Also on December 3, 2018, plaintiff's counsel represented to defendants, by email, that

plaintiff's document production was "substantially complete," as required by my November 13

Order. O'Boyle Decl. Ex. B. That statement proved to be considerably premature. In a joint status

---

[7] "A party clearly cannot refuse to answer interrogatories on the ground that the information sought
is solely within the knowledge of his attorney." *Hickman v. Taylor,* 329 U.S. 495, 504 (1947). *See
also* 8B Wright, Miller, & Marcus, Federal Practice and Procedure § 2177, at 82 (3d ed. 2010) ("A
party must disclose facts in its attorney's possession even though the facts have not been
transmitted to the party.") (footnotes omitted).

letter dated December 6, 2018, defendants reported that numerous categories of documents remained outstanding, including emails from the accounts of custodians Stephen Karsch, Plotkin, Tully, Athansiou, Larre, and O'Hara. Joint Ltr. dated Dec. 6, 2018 (Dkt. No. 86), at 1-3. To illustrate plaintiff's inadequate search and collection procedures, defendants attached various relevant emails sent to or from Stephen Karsch or other Karsch Affiliates that it produced from its own servers (or obtained from non-parties) and that should have been – but were not – included in plaintiff's production as well. *Id*. at 2 & Exs. E, F.

At the next discovery conference, on December 10, 2018, plaintiff disclosed – for the first time – that the Karsch Capital Server "doesn't exist," such that plaintiff was "unable to retrieve the email accounts" associated with that server. Dec. 10 Tr. at 32:13-15. Counsel was unable to state when the server had ceased to exist. *Id.* at 32:16-25. After a lengthy discussion of this and other issues – including the various deficiencies described in the December 6 joint status letter – I directed plaintiff to respond, no later than December 21, 2018, to three Court-drafted interrogatories. Order dated Dec. 11, 2018 (Dec. 11 Order) (Dkt. No. 88), ¶ 4. One interrogatory asked about litigation hold memos sent to plaintiff's custodians. *Id.* ¶ 4(a). The second asked for information concerning when and how the various custodians' email accounts were searched. *Id.* ¶ 4(b). The third asked plaintiff to identify each server containing potentially responsive information that was once in his possession but no longer existed, and for each such server instructed him to:

> (a) state when it was deleted, destroyed, or otherwise rendered inaccessible; (b) state why it was deleted, destroyed, or otherwise rendered accessible; (c) state what steps, if any, were taken to preserve its potentially discoverable contents before it was deleted, destroyed, or otherwise rendered inaccessible; and (d) identify the individuals with personal knowledge concerning these matters.

*Id.* ¶ 4(c). As to the parties' remaining discovery disputes, I directed them to continue to meet and confer, and authorized defendants to file a motion seeking discovery sanctions on January 4, 2019, if the parties were unable to resolve their differences by that date. *Id.* ¶ 3.

During the December 10 conference, I advised plaintiff to make the most of the time remaining before the motion deadline, noting that the "potential sanctions clock" had already begun to run. Dec. 10 Tr. at 56:11-19.

### 5.       The January 8, 2019 Order

On December 11, 2018, plaintiff served his amended interrogatory responses (signed by Jonathan Sack) concerning the Jacoby Devices. He reported that the Firm had retrieved the Kakaulin file from its storage facility (which turned out to be the basement of Mr. Sack's home) and found a Lacie hard drive, two Apple MacBooks, and one Apple iPhone. Pl. Amend. Interrog. Ans. at 3-4; O'Boyle Decl. Ex. J, at 1.[8] However, these devices proved to be Kakaulin's, not Jacoby's. O'Boyle Decl. Ex. J, at 1; Kakaulin Decl. (O'Boyle Decl. Ex. L) ¶¶ 2-4.

On December 21, 2018, plaintiff responded to the Court-ordered interrogatories, identifying seven email accounts that "were once within the possession of Plaintiff," that were "believed to have contained potentially discoverable evidence in this action," but that "no longer exist[ ] and/or [are] no longer accessible to plaintiff and/or his counsel/pre-discovery vendor." Pl. Resp. to Ct. Order at 5. Plaintiff listed the missing email accounts:

> lisa@karschcapital.com
> jlarre@karschcapital.com
> mkarsch@karschcapital.com
> mplotkin@karschcapital.com
> c.ohara@kcmcllc.com

---

[8] Also on December 11, 2018, Sack & Sack served its amended response to defendants' subpoena concerning the Jacoby Devices. *See* Declaration of Jonathan Sack dated March 15, 2019 (Sack Decl.) (Dkt. No. 105), Ex. E, at ECF pages 8-11. The amended response promised that the Firm would "engage Gibson Dunn to agree upon a forensic protocol to arrange for the mirror imaging of the four Devices retrieved from the Kakaulin file." Sack Decl. Ex. E, at ECF page 10.

bholmes@karschcapital.com
j.larre@kcmcllc.com

As to the Karsch Capital Server, plaintiff reported that on July 10, 2015, it was "taken down and replaced with the HunterPeak (the successor entity) file/email server." Pl. Resp. to Ct. Order at 5. Despite my directive to "state what steps, if any, were taken to preserve [the server's] potentially discoverable contents before it was deleted, destroyed, or otherwise rendered inaccessible," Dec. 11 Order ¶ 4(c), plaintiff provided no further information.[9]

On January 2, 2019 – a month after plaintiff represented, inaccurately, that his production was substantially complete – Sack & Sack reported that it had re-run the parties' agreed-upon search terms ("in an effort to address the discrepancies in previous search yields") and as a result had uncovered "approximately 40,000 new documents that Plaintiff's counsel must review." Joint Ltr. dated Jan. 2, 2019 (Dkt. No. 91), at 1. The parties jointly requested another extension of time for plaintiff to compete his belated production of documents, as well as an extension of the deadline for defendants make a sanctions motion if necessary. *Id*. at 1-2. I granted that request by order dated January 8, 2019 (Jan. 8 Order) (Dkt. No. 93), giving plaintiff until January 18, 2019 to substantially complete his "responses to defendants' written discovery requests and subpoenas," *id*. ¶ 3; directing the parties to meet and confer in an effort to resolve their remaining discovery disputes, *id*. ¶ 5; and extending the deadline for defendants to make their sanctions motion, if necessary, to January 31, 2019. *Id.* ¶ 6.

---

[9] As to the KCMC server (which apparently hosted the two "@kcmcllc.com" email accounts), plaintiff reported that he had "administrator access" to the server, but that the "list of users and their email addresses that exist and are accessible [did] not include" c.ohara@kcmcllc.com. Pl. Resp. to Ct. Order at 5-6. No further explanation was provided. The j.larre@kcmcllc.com account existed, according to plaintiff, but his e-discovery vendor was unable to access it "due to lack of backup information." *Id*. at 3. Specially, plaintiff reported, the vendor needed Mr. Larre's "back up phone number" but did not know it. *Id*.

### 6.      Events After January 8, 2019

Plaintiff's representations concerning the destruction of the Karsch Capital Server continued to evolve. On January 18, 2019, he amended his responses to the Court's interrogatories to state that the server was "sent to be destroyed by a third party" through ECI; that he had "no further information concerning its destruction, other than the information above"; and that a backup of the server existed, but plaintiff could not access it and would not pay for a forensic review:

> Plaintiff states that a back-up of the Karsch Capital Server exists on a Network Storage Device through Eze Castle Integration, but that Plaintiff is unable to access it. . . . Plaintiff further states that he consents to a third-party forensic review of the data from the Karsch Capital Server that exists on the Network Storage Device and is maintained through Eze Castle Integration, but states that he does not agree to bear the burden of any costs and/or fees associated with this forensic review.

Pl. Amend. Resp. to Ct. Order at 6.

That same day, plaintiff's counsel told defendants, by email, that his "responses to Defendants' written discovery requests is [sic] substantially complete," as required by the January 8 Order. Sack Decl. Ex. I. Once again, plaintiff's substantial completion representation proved inaccurate. One week later, at 8:14 p.m. on Friday, January 25, 2019, plaintiff emailed defendants with an update:

> Upon investigating this issue further, we are now informed that EZE Castle Integration ("ECI") has the credentials to and is able to access the Network Storage Device ("NSD"), which houses the Karsch Capital server. We are prepared to access the NSD with the help of our vendor, Ankura . . . We do not currently have an estimated cost associated with accessing and extracting the data on the NSD . . . Once Ankura extracts, downloads, and collects this data onto the platform, we will search the custodians and search terms over the agreed upon date ranges . . . We will provide you with updates as soon as you have them concerning a schedule to review and produce responsive documents, and will meet and confer with you about the same.

O'Boyle Decl. Ex. Q, at 1-2. Given this revelation, and in the expectation that plaintiff would produce additional documents, defendants wrote to the Court on Monday, January 28, 2019,

requesting another extension of time to file their motion (until "after Plaintiff produces, and Blink is able to review, documents from the Karsch Capital server"), as well as an order directing plaintiff to produce responsive documents "on an expedited basis and at his own expense." Def. Ltr. dated Jan. 28, 2019 (Dkt. No. 96), at 1, 4.

On January 30, 2019, I granted defendants' request in part, extended the deadline for defendants to file their motion to March 1, 2019, and directed plaintiff to "bear the initial costs of producing documents from the Karsch Capital server, without prejudice to his right to seek a reallocation of those costs (if he has grounds to do so) in response to defendants' motion." Order dated Jan. 30, 2019 (Jan. 30 Order) (Dkt. No. 97), at 1-2.

Production of documents from the Karsch Capital Server backup began on February 14, 2019. O'Boyle Decl. Ex. R. However, plaintiff's vendor was "unable to locate" the @karschcapital.com accounts of custodians Larre, Plotkin, and Holmes (or the @kcmcllc.com account of custodian O'Hara). *Id*. Insofar as the record reveals, plaintiff did not explain why these accounts were missing. That information comes from William Tan of ECI, who attests that when ECI backed up the server it had "crashed hard drives." Tan Decl. ¶ 3.

## C.    The Sanctions Motion

Defendants filed their sanctions motion on March 1, 2019, seeking "terminating sanctions" because Karsch's discovery misconduct "forecloses Blink's ability to mount a fair defense and obstructs the administration of justice." Def. Mem. at 1. Relying largely on the letters, emails, discovery responses and in-court statements of plaintiff and his counsel, defendants assert that the Firm willfully spoliated the Jacoby Devices, that Karsch willfully spoliated the Karsch Capital Server, that plaintiff and the Karsch Affiliates repeatedly violated this Court's discovery orders,

and that plaintiff is still withholding numerous documents that should have been produced but were not. *Id*. at 8-20.

In his March 15, 2019 opposition brief (signed by Jonathan Sack), plaintiff insists that he "has not concealed or destroyed one shred of evidence, lied to the Court, or otherwise violated any of the Orders of this Court." Pl. Opp. Mem. at 2. With regard to the Karsch Capital Server, plaintiff argues that its removal "had nothing to do with the instant litigation," *id*. at 13, and that all of the statements he made about the ESI once housed on that server (even statements that later proved to be inaccurate) were "based upon the information he knew to be truthful and accurate at the time" or upon his "then understanding." *Id*. at 12. There is no evidentiary basis for these factual assertions in the record now before the Court.[10]

With regard to the Jacoby Devices, plaintiff asserts that "Jacoby's matter was fully closed well before Mr. Karsch contacted the Sack Firm," Pl. Opp. Mem. at 3, and that the Firm had "no duty to preserve Jacoby's devices vis-à-vis Karsch" because it "had no knowledge of Karsch" at the time it received the Jacoby Devices and no "reason to believe that months later, Karsch would come knocking on its door, seeking representation." *Id*. at 8-9. Plaintiff further claims, in his brief, that Sack & Sack "arranged for the return of what it believed were all of the devices belonging to [B]link" on February 8, 2017, at which point it "had no reason to believe that any property in its possession contained any Blink information." *Id*. at 8.

---

[10] In his responses to the Court-ordered interrogatories, plaintiff attests only that the Karsch Capital Server was "taken down" on or about July 10, 2015 and "replaced with the Hunter Peak (the successor entity) file/email server." Pl. Resp. to Ct. Order at 5; Pl. Amend. Resp. to Ct. Order at 6. He has never submitted any declaration or other admissible evidence explaining *why* the server was taken down at that time. Nor has he ever explained why he initially denied the existence of any backup – and then stated that there was a backup but that he could not access it – before ultimately acknowledging that he could access it, and doing so. *See Griffin v. Sheeran*, 2019 WL 1750921, at *2 (2d Cir. Apr. 16, 2019) (quoting *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (per curiam)) ("[a]n attorney's unsworn statements in a brief are not evidence").

These statements are demonstrably false. According to plaintiff's privilege log – prepared and served by Sack & Sack – Karsch formed an attorney-client relationship with the Firm and began discussing his potential claims against Blink with Jonathan Sack and his colleagues no later than November 2, 2016. *See* Pl. Priv. Log at 1. This was two months before Sack & Sack came into possession of the Jacoby Devices on January 4, 2017. *See* Jacoby Interrog. Ans. at 6; Sack Subp. Resp. at ECF page 4; Pl. Amend. Interrog. Ans. at 3. Moreover, Jacoby never returned "all of the devices belonging to [B]link." He returned the two laptop computers – and a newly-created external hard drive containing *copies* of Blink documents found on those computers – but the computers' original hard drives (presumably containing the same documents, as well as the documents that Jacoby chose *not* to copy onto the external hard drive) were removed and left in the custody of Sack & Sack, along with Jacoby's cellphone. *See* Jacoby Interrog. Ans. at 6-7; Sack Subp. Resp. at ECF pages 4-5 (attesting that after the "two (2) laptop computers and one (1) external hard drive" were returned, "the remaining items deposited by Jacoby with the Sack Firm" were placed in Kakaulin's file at the Firm).

In their reply memorandum, filed on March 22, 2019, defendants accuse plaintiff and his counsel of "doubl[ing] down" on their "deception" by telling "brand new lies" in their opposition papers, Def. Reply Mem. (Dkt. No. 109) at 1, including the "brazen" and "knowingly false" statement that the Firm did not know Karsch, or reasonably anticipate litigation on his behalf, when it came into possession of the Jacoby Devices. *Id.*

On April 8, 2019, the Court heard oral argument on the sanctions motion. Jonathan Sack, who argued the motion, again denied that Sack & Sack was "having communications with Mr. Karsch in anticipation of litigation" when Jacoby brought his devices to the Firm on January 4, 2017. *See* April 8 Tr. at 11:2-6. When the Court pointed out that the Firm withheld earlier-dated

emails with plaintiff as privileged – expressly asserting that they were created "in anticipation of or related to litigation against Blink" – attorney Sack responded, "I believe those are emails between Mr. Karsch and his prior counsel and/or his father who is serving as his counsel." *Id*. at 11:13-17. When the Court corrected Mr. Sack on this point, directing his attention to his own November 2, 2016 email to Mr. Karsch (which was withheld with the description, "Legal advice re: pre-payment of note; Series A Financing; Karsch equity; in anticipation of or related to litigation against Blink," *see* Pl. Priv. Log at 1), plaintiff's lead counsel replied, "Your Honor, my associate is endeavoring to find that." April 8 Tr. at 11:18-12:8.[11]

The Court then asked attorney Sack about the Jacoby Devices left in the Firm's custody. In response, counsel denied any recollection of "maintaining" the two external hard drives and the cellphone that Jacoby left in the custody of Sack & Sack, *see* April 8 Tr. at 13:2-4, and acknowledged that he did not consider these devices or their contents when he represented to the Court, on July 12, 2018, that the Firm "did not obtain from Mr. Jacoby" any documents relevant to this action. *Id*. at 21:22-22:15. Sack further acknowledged that the Firm made no effort to look for the Jacoby Devices until November 2018, *see id*. at 28:19-29:5, and informed the Court that he had "no idea" what became of those devices. *Id*. at 20:7.

At one point, as noted above, Sack speculated that Jacoby "might have taken those materials or he might have left them with my paralegal who he had a friendship with." April 8 Tr. at 13:5-11. A few minutes later, he once again blamed his paralegal for the loss of evidence, stating that whatever was not returned to Blink was "kept with my paralegal in her desk." *Id*. at 19:22-23.

> THE COURT:        And now they're missing?
>
> MR. SACK:         And now they're missing, and so is she.

---

[11] The sharp contradiction between plaintiff's privilege log and the Firm's assertions to this Court in opposition to the sanctions motion remain unreconciled.

| | |
|---|---|
| THE COURT: | I see. |
| MR. SACK: | Her desk is cleaned out, she left. |
| THE COURT: | And you have no idea where they are? |
| MR. SACK: | I have no idea where they are. I have made great pains to find them, to look for them, in all of my office. In any file. In my home where I have boxes of closed files. |
| THE COURT: | And you don't know what they are. In other words, you can neither confirm nor deny Mr. Jacoby's own statements that the original hard drives from his two computers were left with your firm? |
| MR. SACK: | That's correct. |

*Id.* at 19:24-20:15.

## II.   ANALYSIS

### A.   Legal Standards

Because this action was referred to me for general pretrial management, pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(a), I have broad authority to impose discovery sanctions. Orders imposing such sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction employed disposes of a claim.'" *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017) (quoting *Seena Int'l Inc. v. One Step Up, Ltd.*, 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017). A magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the "sanction the magistrate judge actually imposes." *Id.* (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3068.2, at 383 (Thomson Reuters 2014)).

### 1.    Rule 37(b)

Fed. R. Civ. P. 37(b) governs sanctions for failure to obey a prior discovery order. If a party or a witness "fails to obey an order to provide or permit discovery," Rule 37(b)(2)(A) permits the court to "issue further just orders," including orders:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)   striking pleadings in whole or in part;

(iv)   staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part;

(vi)   rendering a default judgment against the disobedient party; or

(vii)  treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

In addition, Rule 37(b)(2)(C) requires the court to order that the disobedient party pay the "reasonable expenses, including attorney's fees" incurred by the moving party, either "instead of or in addition to" the sanctions permitted by Rule 37(b)(2)(A), unless the "failure was substantially justified or other circumstances make an award of expenses unjust."

Discovery sanctions are imposed for three purposes: "(1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the Court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 2016 WL 6705773, at *3 (S.D.N.Y. Nov. 9, 2016). Consistent with these purposes, any sanction imposed under Rule 37(b) must be "just," and its severity "must be commensurate with the non-compliance." *Joint Stock*, 2017 WL 3671036 at *21 (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007)). A court

"should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future." *Grammar v. Sharinn & Lipshie, P.C.*, 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (citing *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014)). "Ultimately, 'it is always preferable for issues to be adjudicated on the merits, rather than pursuant to discovery sanctions.'" *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 2019 WL 306450, at *4 (S.D.N.Y. Jan. 18, 2019) (quoting *Black v. Bowes*, 2006 WL 3771097, at *7 (S.D.N.Y. Dec. 21, 2006)).

### 2.    Rule 37(e)

Rule 37(e), which was significantly amended in 2015, now governs sanctions for failure to preserve ESI. "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court:

> (1)    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A)    presume that the lost information was unfavorable to the party;
>>
>> (B)    instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C)    dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As amended, therefore, Rule 37(e) requires "a three-part inquiry":

> The first is to decide if the rule applies at all – that is, if a party failed to take "reasonable steps" to preserve electronically stored information "that should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been "prejudice to another party from loss of the information," in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Lastly, the

third step to consider – regardless of prejudice to any other party – is whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation," in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Coan v. Dunne*, 2019 WL 1620412, at *6 (D. Conn. Apr. 16, 2019).

The sanctions permitted under subsection (e)(1), available upon a finding that the spoliation caused "prejudice to another party," must be limited to "measures no greater than necessary to cure the prejudice." Thus, if the only prejudice to the movant "lies in the extra time and expense that have been necessary to obtain relevant discovery from third parties," *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018), monetary sanctions may be a sufficient cure. Other sanctions permissible under subsection (e)(1) include more "serious measures," such as "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

However, to obtain the "particularly harsh" sanctions listed in subsection (e)(2) – including adverse inference instructions and terminating sanctions – the court must first find that the party to be sanctioned acted with an "intent to deprive." *Lokai Holdings*, 2018 WL 1512055, at *8. If such a finding is made, no separate showing of prejudice is required, because "the finding of intent [to deprive] . . . support[s] . . . an inference that the opposing party was prejudiced by the loss of information." *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).[12]

---

[12] "The requirement of intent, which is unique to Rule 37(e), distinguishes the destruction of electronically-stored information from alternative forms of evidence; for all other types of evidence, a movant can obtain a severe sanction, including an adverse inference instruction, upon a showing that a party engaged in only 'negligent spoliation.'" *Greene v. Bryan*, 2019 WL 181528,

"In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Lokai Holdings*, 2018 WL 1512055, at *9; *see also CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016).

### B.    Application of Standards

### 1.    The Repeated Violations of this Court's Discovery Orders by Plaintiff and the Firm Warrant Sanctions Under Rule 37(b)

The only predicates to the imposition of sanctions under Rule 37(b) are (a) a "court order directing compliance with discovery requests," and (b) "non-compliance with that order." *Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*, 2017 WL 2840279, at *9 (S.D.N.Y. June 27, 2017). Those predicates are met here.

#### a)    *The July 12 Order*

In ordinary party discovery, an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). By the same token, a false or misleading response to a court order requesting specified information must be treated as a violation of that order. Sack & Sack therefore violated this Court's July 12 Order when it represented to the Court, that same day, that the Firm "did not obtain from Charles Jacoby, the former General Counsel of Blink Health, Ltd., any documents" concerning five broad topics covering most of the issues relevant to this action. July 12 Letter at 1.[13]

---

at *3 (E.D.N.Y. Jan. 14, 2019) (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 12 (E.D.N.Y. 2018)).

[13] "Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002). The court's inherent authority is often cited as the "primary basis" for sanctions where a party or its counsel has made misrepresentations to the court. *See, e.g.*, *Jung v. Nechis*, 2009 WL 762835, at *13 (S.D.N.Y. Mar. 23, 2009) (collecting cases). In this instance, however, the false representation was made in

Eighteen months earlier, on January 4, 2017, Jacoby – then a client of the Firm – "personally delivered and relinquished to Mr. Sack" a Blink-owned laptop, a second laptop that may have been owned by Blink, and a cellphone. Jacoby Interrog. Ans. at 6; *see also* Sack Subp. Resp. at ECF page 4; O'Boyle Decl. Ex. J, at 3. These devices contained ESI dating from Jacoby's recent tenure as Blink's General Counsel, during which he was heavily involved in virtually all of the events underlying this action. Sometime between January 4 and February 8, 2017, Jacoby copied what he considered to be the "Blink documents" from the two computers onto an external hard drive, removed the computers' existing hard drives, directed Sack & Sack to deliver the two computers and the external hard drive to Blink (which it did on February 8, 2018, when a paralegal at the law firm then representing Blink picked them up), and "surrendered" the original hard drives, along with his cellphone, "to Mr. Sack," in the expectation that that the Firm would "maintain" those devices. Jacoby Interrog. Ans. at 6-7; *see also* Sack Subp. Resp. at ECF pages 4-5.

It is inconceivable, under these circumstances, that attorney Sack did not understand, when he signed the July 12 Letter, that the Firm had in fact obtained "documents" (a term that includes ESI, *see* Fed. R. Civ. P. 34(a)(1)(A)), concerning most if not all of the categories set forth in the July 12 Order. The Firm therefore failed to comply with the July 12 Order.[14]

---

response to this Court's July 12 Order, which directed Sack & Sack to answer a specific question – whether it obtained *any* relevant documents from Jacoby – as an alternative to the "more cumbersome" discovery proposed by defendants at that time (including, *inter alia*, requiring Sack & Sack to provide a list of *all* documents it received from its former client concerning the specified topics). *See* July 12 Order at 7-8. The Court therefore need not rely solely on its inherent authority to sanction Sack & Sack for its untruthful response to the July 12 Order.

[14] The Firm's contention it did not "obtain" any documents from Jacoby (and therefore that the July 12 Letter was not untruthful) because it did not "access" the contents of the devices, *see* Pl. Opp. Mem. at 10; April 8 Tr. at 22:5-17, is meritless. When Jacoby delivered the two laptops and the cellphone to Sack, he also delivered possession of the documents electronically stored on those devices. *See Moody*, 271 F. Supp. 3d at 425-26 (destruction of laptop containing ESI constituted destruction of the ESI "stored within the laptop," which was sanctionable).

b)      *The November 13 and January 18 Orders*

The Court has already found that plaintiff and the Karsch Affiliates failed to substantially complete their written discovery responses and document production by December 3, 2018, as required by ¶ 4(a) of the Court's November 13 Order. *See* Jan. 8 Order at 1. Similarly, although the Court later set a new substantial completion deadline of January 18, 2019, *see id.* ¶ 3, it is now clear that document production remained substantially *incomplete* on that date. Indeed, after initially claiming that its clients were in compliance with each of these deadlines, *see* O'Boyle Decl. Ex. B; Sack Decl. Ex. I, the Firm acknowledged that further searches were required – as a result of which many additional documents were ultimately produced – and that certain of its written discovery responses were inaccurate.

By way of example only, plaintiff acknowledged on January 2, 2019 – one month *after* the first substantial completion deadline – that "re-running the parties' search terms . . . resulted in approximately 40,000 new documents that Plaintiff's counsel must review." *See* Joint Ltr. dated Jan. 2, 2019, at 1. Those 40,000 documents did not include any from the Karsch Capital Server. Plaintiff did not acknowledge the existence of a backup for that server until January 18, 2019 (which was his second and final substantial competition deadline), *see* Pl. Amend. Resp. to Ct. Order at 6; did not access that backup until sometime after January 25, 2019, *see* O'Boyle Decl. Ex. Q; and did not begin his "rolling production" of documents from the backup until February 14, 2019. *Id.* Ex. R.[15]

---

[15] As noted above, plaintiff's amended responses to the Court-ordered interrogatories stated, inaccurately, that he was "unable to access" the NSD containing the backup. There is no evidence in the record now before the Court that plaintiff ever corrected those responses. It thus appears that he also violated the December 11 Order. *See* Fed. R. Civ. P. 37(a)(4) (an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond").

Similarly, Stephen Karsch's "@aol.com" email account (which according to plaintiff was the only email account his father used in connection with Blink and the Note, *see* Pl. Amend. Resp. to Ct. Order at 3) was not adequately searched until February 1, 2019 – two weeks *after* the second substantial completion deadline expired. That is when plaintiff's father (who by then was no longer represented by Sack & Sack, *see* Declaration of Laura K. O'Boyle dated March 22, 2019 (Dkt. No. 110) (O'Boyle Reply Decl.), Ex. A), allowed defendants' forensic consultant Stroz Friedberg to access the account. *See* Smith Decl. (O'Boyle Decl. Ex. G) ¶¶ 4-5. Using the parties' agreed-upon search parameters, Stroz Friedberg retrieved an additional 790 responsive documents. Smith Decl. ¶¶ 8-10; *see also* O'Boyle Decl. Ex. Y (examples of responsive Stephen Karsch emails first found by Stroz Friedberg).

c)    *Defendants' Selective Withholding Claim*

According to defendants, "entire categories of documents remain missing from Plaintiff's production" to this day: not only the documents contained on the Jacoby Devices and the emails that could not be retrieved from the Karsch Capital Server backup, but also "internal communications" among plaintiff and the Karsch Affiliates, during key time periods, about topics such as the prepayment of the Note (including Karsch's alleged oral demand for prepayment in late 2014) and the existence of an event of conversion. Def. Mem. at 16-18. Arguing that it is "incredible," "shocking," and "not credible" that such communications do not exist, *id.* at 17, defendants contend that plaintiff must have "selectively withheld favorable documents" in further violation of this Court's orders. *Id.* at 16.

On the present record, the Court cannot reach the same conclusion. Plaintiff's document production does contain a handful of internal communications on these topics. For example, plaintiff originally logged as privileged (but was later ordered to produce) several emails between

Michael and Stephen Karsch regarding whether, under the terms of the Note and related documents, defendants were entitled to prepay the Note in May 2015. *See* Order dated April 19, 2019 (Dkt. No. 121), at 2. Not all of those emails are favorable to plaintiff.[16] Moreover, Stephen Karsch's email account was ultimately searched by Stroz Friedberg on behalf of defendants. Thus, although defendants' suspicions are understandable, I cannot assume, merely from the absence of documents that defendants hoped or expected to see, that such documents once existed but were selectively withheld. Similarly, I am unpersuaded that plaintiff has withheld documents that were quoted in the Complaint,[17] or documents from the files of John Larre.[18]

---

[16] For example, in an email to his father dated May 22, 2015, plaintiff asserted that defendants were "manipulating the word prepayment" from the parties' agreement "to mean prepayment in cash," rather than what it "was meant to mean," which was that plaintiff's investment would be "converted into the equity that was promised." Stephen Karsch responded later the same day: "While I agree that these points are good and it was not your understanding that they could redeem for cash never the less the document says they can."

[17] By March 1, 2019, plaintiff had in fact produced a copy of every document quoted in the Complaint. *See* O'Boyle Decl. Exs. Z, AA. What is still missing from plaintiff's production are any recordings, transcripts, or notes memorializing various oral statements that the Complaint purports to quote verbatim – and in some cases at length. *See* O'Boyle Decl. Ex. Z, at 3-9. In addition, no document was produced corresponding to a table, embedded in the Complaint, listing eleven Blink investors and the amount that each invested. *See id.* at 3. Plaintiff asserts that the oral quotations and the investor table were "inputted . . . from verbal conversations that the Sack Firm had with Karsch or Eugene Kakaulin," and that the Firm does not have any notes reflecting those conversations. *See* Pl. Opp. Mem. at 15-16; O'Boyle Decl. Ex AA. I agree that it would be unusual for a lawyer to obtain such precise information from a client – especially for the purpose of drafting a pleading subject to Fed. R. Civ. P. 11 – without documenting the process in any way. However, I cannot conclude, prior to depositions, that the Firm's assertions are necessarily false.

[18] Defendants assert that plaintiff did not produce "a single document for Larre on which Michael Karsch was not copied – a red flag that Larre's custodial files were not searched." Def. Mem. at 18. Plaintiff has explained, however, that his e-discovery vendor could not access Larre's @kcmcllc.com account because it did not know Larre's "back up phone number," Pl. Amend. Resp. to Ct. Order at 3, and that Larre's @karchcapital.com email account was never recovered from the backup of the Karsch Capital Server. O'Boyle Decl. Ex. R. I am not prepared to conclude – on the present record – that Larre once possessed additional, relevant emails (which must have been sent to or from his "@juicepress.com" account, *see* Pl. Amend. Resp. to Ct. Order at 3), but that plaintiff either failed to search that account or withheld the responsive emails.

Nonetheless, Sack & Sack's misrepresentation to the Court on July 12, 2018 was inexcusable. Moreover, that misrepresentation (which the Firm has never formally corrected) significantly delayed the search for the Jacoby Devices, which did not commence until November 2018. By that time, according to the Firm, the devices could no longer be found. In addition, plaintiff and his affiliates repeatedly missed the discovery deadlines imposed by this Court – while representing, through the Firm, that they had complied with those deadlines – and repeatedly provided inaccurate or incomplete information concerning the progress and results of their discovery efforts. On this record, no finding of "selective disclosure" is required to support an award of sanctions pursuant to Fed. R. Civ. P. 37(b).

### 2.    Plaintiff's Failure to Preserve the Contents of the Karsch Capital Server Warrants Sanctions Under Rule 37(e)(1)

Karsch has, by his own admission, "lost" some of the ESI once housed on the Karsch Capital Server, including the @karschcapital.com email accounts belonging to Karsch Affiliates Larre, Plotkin, and Holmes. *See* Pl. Resp. to Ct. Order at 5-6; O'Boyle Decl. Ex. R; Pl. Amend. Resp. to Ct. Order at 5-6; *see also* Pl. Opp. Mem. at 13 (acknowledging that "certain" email files "were not on" the NSD housing the only known backup of the Karsch Capital Server).[19] All of these individuals were involved in the events underlying this action, all were designated custodians whose files were required to be searched, and all used their @karschcapital.com email accounts for at least some communications relevant to this action. *See*, *e.g*., O'Boyle Decl. Ex. T-4 (July

---

[19] Defendants contend, in their moving brief, that "although the NSD appears to contain some Karsch Capital emails from Karsch," as well as from Karsch Associates Sherwood, Holmes, and Athanasiou, "it is evident that the NSD does not include all documents and emails of these custodians." Def. Mem. at 13. Plaintiff goes on to state that only a few documents were extracted from the NSD with respect to these individuals, which was "plainly not the universe of responsive documents once contained in these email accounts." *Id*. at 14. However, these factual assertions are made only in defendants' brief and are not supported by any evidence. The facts asserted are therefore not "plain" to the Court, and cannot be the basis of any sanctions assessed.

10, 2014 email from "jlarre@karschcapital.com" to Geoffrey Chaiken transmitting Michael Karsch's "executed documents").[20] Moreover, plaintiff does not argue – and there is no evidence to suggest – that the lost ESI can be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).[21] Therefore, in order to determine "if the rule applies at all," *see Coan v. Dunne*, 2019 WL 1620412, at *6, the Court must address whether the ESI on the Karsch Capital Server "should have been preserved in the anticipation or conduct of litigation" and whether Karsch "failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e).

Before considering sanctions under Rule 37(e)(1), the Court must also determine whether defendants have been prejudiced, in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Finally, before considering whether to dismiss this action or impose other severe sanctions, the Court must determine whether Karsch acted "with the intent to deprive" defendants of the use of the spoliated ESI. Fed. R. Civ. P.

---

[20] In addition – for reasons apparently unrelated to the takedown of the Karsch Capital Server – plaintiff was unable to access the @kcmcllc.com email accounts used by Larre and by Catherine O'Hara, another designated custodian. *See* Pl. Amend. Resp. to Ct. Order at 3, 5-6.

[21] Not all emails sent to or by the destroyed or corrupted @karschcapital.com accounts are permanently lost or unrecoverable. Emails sent to or from defendants, for example, are already in their hands, and emails sent to or from any of the non-destroyed, non-corrupted accounts maintained by Karsch and his affiliates are, at least in theory, recoverable from those accounts. Similarly, emails sent to or from personal accounts maintained by the various designated custodians outside of the Karsch organization (such as Stephen Karsch's @aol.com account and Charles Jacoby's @gmail.com account) may perhaps be recoverable from those outside accounts, or by subpoena to the email providers. However, the Court recognizes that – depending on the retention policies of the providers and the electronic housekeeping practices of the individual custodians – it may not be possible, even with substantial effort and expense, to reconstruct what was once on the Karsch Capital Server from these sources. *See Coan v. Dunne*, 2019 WL 1620412, at *7 (There can be no assurance that the Trustee has received from third-party sources all of the meaningful emails that could and should have been obtained in the first instance from Dunne.") Moreover, wholly "internal" emails – that is, emails sent from one destroyed @karschcapital.com to another, or exchanged with one of the inaccessible @kcmcllc.com accounts – clearly cannot be "restored or replaced through additional discovery." Defendants have therefore met this prong of the threshold test under Rule 37(e).

37(e)(2); *see also Coan v. Dunne*, 2019 WL 1620412, at *6 ("Lastly," and "regardless of prejudice to any other party," the court must consider "whether the destroying party 'acted with the intent to deprive another party of the information's use in the litigation,' in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.").

a) <em>Obligation to Preserve</em>

"The first element of the traditional spoliation test," which is also applicable to ESI under Rule 37(e), "requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (citation and quotation marks omitted). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *accord Resnik v. Coulson*, 2019 WL 1434051, at *7 (E.D.N.Y. Mar. 30, 2019) (quoting *Rabenstein v. Sealift, Inc.*, 18 F. Supp. 3d 343, 360 (E.D.N.Y. 2014)). "The duty to preserve ESI imposed by Rule 37(e) incorporates this longstanding common law duty." *Resnik*, 2019 WL 1434051, at *7 (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendments).

Defendants contend – and plaintiff does not dispute – that Michael Karsch's duty to preserve the ESI on the Karsch Capital Server was triggered "no later than June 16, 2015," when he "sent Blink a demand letter . . . threatening legal action relating to the repayment of the Note." Def. Mem. at 14. The Court agrees. *See World Trade Centers Ass'n, Inc. v. Port Auth. of New York & New Jersey*, 2018 WL 1989616, at *4 (S.D.N.Y. Apr. 2, 2018) (plaintiff WTCA had a duty to preserve evidence relevant to its lawsuit against the Port Authority once it "sent a letter to the Port

Authority warning that should the Port Authority proceed, 'the WTCA is prepared to take all necessary steps to protect its Marks and rights under the Agreement, including but not limited to seeking judicial intervention.'"), *report and recommendation adopted sub nom. World Trade Centers Ass'n v. Port Auth. of New York & New Jersey*, 2018 WL 1989556 (S.D.N.Y. Apr. 25, 2018); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017) ("The Plaintiff had control over the evidence and an obligation to preserve it from July 9, 2012, the date that her counsel sent a demand letter to Defendants threatening litigation and requesting Plaintiff's personnel file."); *Leidig*, 2017 WL 6512353, at *8 (in defamation case, plaintiffs' duty to preserve evidence arose "at the very latest" on the date the contested article was published, because two days earlier plaintiffs' law firm had sent defendant a letter "implicitly threatening legal action against Buzzfeed in the event the Article were published"); *VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33, 43 (1st Dep't 2012) (defendant EchoStar "should have reasonably anticipated litigation as of June 20, 2007, the date it sent a letter to Voom demanding an audit and threatening termination of the [parties'] contract").

Although Karsch did not file the threatened legal action for another 23 months, the timing of the lawsuit was wholly within his control, and there is nothing in the record to suggest that his threat was not seriously intended when made. Moreover, neither party disputes that the Karsch Capital Server contained information relevant to the disputes at issue in this action, and that Karsch knew or should have known that it did. *See Telecom Int'l Am., Ltd. v. AT & T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999) ("Generally, there is no duty to preserve evidence or documents unless a party possessing the evidence has notice of its relevance."). Karsch was therefore obligated, on and after June 16, 2016, to preserve the evidence – including ESI – relevant to the claims he outlined in his demand letter, which are the same claims he is now pursuing. *See Lokai Holdings*,

34

2018 WL 1512055, at *10 (quoting *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 433 (S.D.N.Y. 2009)) (when a party is under a duty to preserve evidence pending litigation, he must "preserve what [he] knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request").

b)  *Failure to Take Reasonable Steps*

Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take "reasonable steps" to preserve it. Fed. R. Civ. P. 37(e). No such steps were taken here. No litigation hold was issued until January 14, 2017. *See* Pl. Resp. to Ct. Order at 1. The failure to implement a litigation hold by June 16, 2015 was "particularly unreasonable" in light of the fact that it was Karsch himself who threatened litigation. *Leidig,* 2017 WL 6512353, at *12; *see also Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (failure to implement a litigation hold was "inexcusable given that Sekisui is the plaintiff in this action and, as such, had full knowledge of the possibility of future litigation.").

Moreover, nothing in the record suggests that Karsch or his then-counsel even considered his preservation obligation when – a month after he sent the demand letter – the Karsch Capital Server was "take[n] down and replace[d]" with a new server belonging to a "successor entity," Hunter Peak. Pl. Resp. to Ct. Order at 5. *Cf. World Trade Centers Ass'n, Inc.*, 2018 WL 1989616, at *4 (the "instructions and procedures" given to the contractor charged with "rearranging" and "reviewing" files in connection with an office relocation were "adequate" where, among other things, "WTCA's internal counsel . . . instructed her to retain everything related to legal, the Port Authority, trademark, and contracts").

In this case, although Hunter Peak asked its IT firm ECI to create a backup of the Karsch Capital Server, the server's hard drives were already "crashed" when it was delivered to ECI, resulting in "an increased probability that some amount of data on that server had been corrupted, lost or destroyed." Tan Decl. ¶ 3. Karsch does not explain when or why the hard drives crashed. Nor does he explain why he failed to ask ECI to assess the extent of the loss, much less remedy it. *Id*.; *see Moody*, 271 F. Supp. 3d at 429 (sanctioning defendants where they "destroyed or recycled Lewandowski's laptop" without confirming that the relevant evidence it contained "had been properly uploaded to another repository").

On this record, I have no difficulty concluding that plaintiff's stewardship of the relevant ESI stored on the Karsch Capital Server was negligent at best, *see Leidig*, 2017 WL 6512353, at *10 (equating the "reasonable steps" test to "roughly a negligence standard"), and thus that he failed to take reasonable steps to preserve that ESI within the meaning of Rule 37(e).

Moreover, although ECI delivered the backup and the access credentials to Hunter Peak in July 2015, Tan Decl. ¶ 3, Karsch apparently forgot about the backup until January 18, 2019 – which is when he amended his prior disclosures to acknowledge that it existed, *see* Pl. Amend. Resp. to Ct. Order at 6 – and forgot about the access credentials until Sack & Sack called ECI a few days later. *See* Tan Decl. ¶ 5. Thus, both Karsch and his counsel violated their joint obligation to take "reasonable steps to see that sources of relevant information are located" during the course of litigation. *Martinez v. City of New York*, 2018 WL 604019, at *26 (E.D.N.Y. Jan. 24, 2018) (quoting *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004), and collecting cases). *See also Zubulake*, 229 F.R.D. at 432 ("[C]ounsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture.").

c)   *Prejudice*

Defendants assert that they have been prejudiced by the partial loss of the Karsch Capital Server because plaintiff's spoliation "deprived Blink of Plaintiff's internal communications that would expose this case to be a sham." Def. Mem. at 15. In particular, defendants contend, it is "reasonable to infer" that among the missing documents are internal emails (i) establishing that Karsch "demanded prepayment of the Note" in late 2014; (ii) establishing that Karsch understood that no event of conversion had occurred prior to Blink's prepayment of the Note on May 20, 2015; and (iii) shedding light on the negotiation and interpretation of a July 10, 2014 side letter agreement between the parties (the Side Letter) (Sack Decl. Ex. A). Def. Mem. at 23.

Plaintiff does not contest that "potentially discoverable evidence" was lost, *see* Pl. Resp. to Ct. Order at 5; Pl. Amend. Resp. to Ct. Order at 5, but denies that the missing evidence would be significant (in either quantity or quality), and vigorously objects to defendants' contention that the lost emails would be favorable to defendants, arguing that there is no basis on which this Court could conclude that "a smoking gun email between Karsch and his employees" once resided on the Karsch Capital Server but was irretrievably destroyed. Pl. Opp. Mem. at 13.

"Although Rule 37(e)(1) requires a finding of 'prejudice' in order for sanctions to issue, the Rule is unclear as to what is meant by that word." *Ungar*, 329 F.R.D. at 15. The advisory committee's notes do not offer much guidance, stating only that "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendments. Moreover, while the moving party ordinarily "has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence," *Ottoson*, 268 F. Supp. 3d at 580 (quoting *Sekisui Am. Corp.*, 945 F. Supp. 2d at 509-10), Rule 37(e)(1), as amended, "does not place a burden of proving or

disproving prejudice on one party or the other. . . . The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendments.

I have already found that the partial destruction of the Karsch Capital Server deprived defendants of relevant evidence that should have been preserved. Standing alone, that threshold finding cannot also satisfy the separate "prejudice" requirement of subsection (e)(1). "Proof of relevance does not necessarily equal proof of prejudice." *Best Payphones, Inc. v. City of New York*, 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012)), *aff'd sub nom. Best Payphones, Inc. v. Dobrin*, 2018 WL 3613020 (E.D.N.Y. July 27, 2018)).

In many cases, however, it would be unfair to require "affirmative proof as to whether the evidence would have been advantageous to the movant" as a predicate to subsection (e)(1) sanctions. *Ungar*, 329 F.R.D. at 16. "Even where the spoliator has acted with mere negligence, it is well-established that, as between a negligent party and an innocent party, the former has no right to retain the fruits of their misconduct." *Id.* (citing *Bank of Saipan v. CNG Financial Corp.*, 380 F.3d 836, 842-843 (5th Cir. 2004) and *Pohl v. McCaffrey*, 2006 WL 208710, at *5 (N.D. Ill. Jan. 25, 2006)); *see also Moody*, 271 F. Supp. 3d at 430 (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendments) ("Determining the content of the lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair.").

In this case, as in *Moody*, determining the content of the lost emails is "a difficult task," and the difficulty has been caused entirely by plaintiff. It is likely that Karsch and his employees

exchanged at least some email communications concerning the topics in which defendants are most interested, including his alleged prepayment demand in November 2014.[22] Such communications, had they been preserved, could have resolved one of the more significant factual disputes between the parties. It is also likely that internal emails once existed concerning the meaning and interpretation of the Side Letter[23] and whether an event of conversion occurred prior to Blink's repayment of the Note in May 2015.[24] I note as well that although plaintiff repeatedly characterizes defendants' assertions concerning the content of the missing emails as "pure speculation," *see* Pl. Opp. Mem. at 2, 10, 13, 14, he and his employees were in a position to submit declarations or other non-speculative *evidence* as to what they did (and did not) discuss with one

---

[22] If Karsch made such a demand – as Blink contends – it would be reasonable to expect him to have shared that information with his employees. Conversely, if no such demand was ever made, it would be reasonable to expect him to have so informed his employees, particularly when – on December 15, 2014 – Matthew Chaiken sent an email to Karsch's assistant, Sherwood (using her @karschcapital.com address) asking that Karsch send an email to Jacoby "requesting that Michael's investment in the [Blink] bridge financing be returned along with his wire instructions." O'Boyle Decl. Ex. T-1, at ECF page 5. Later that evening, Sherwood sent an email to Matthew Chaiken, from the same address, stating that "Michael is open to considering a sale of his position depending on the valuation he is offered." *Id.* at ECF page 4. This too suggests – strongly – that some internal discussion occurred concerning whether and on what terms Karsch had demanded (or would accept) a repayment of the Note. Yet it appears plaintiff has produced no documents reflecting or referencing those internal discussions.

[23] The existing record contains a handful of emails between Michael and Stephen Karsch on this topic dating from May 2015. According to defendants, however, there are no comparable internal emails dating from the summer of 2014, when the Side Letter was negotiated, drafted, and signed. *See* Def. Mem. at 17. Although it is possible that Michael Karsch never sent or received any such email, it is equally plausible that such communications once existed but are now lost.

[24] Plaintiff is correct that Karsch's contract claim will turn on whether such an event actually occurred, not whether Karsch believed it had. *See* Pl. Opp. Mem. at 13 ("All along, Blink has stated that Karsch's case is a sham because Blink was entitled to prepay the note as a matter of law, and that this case does not go beyond the four corners of Karsch's written convertible note agreement and side letter."). But Karsch also accuses defendants of fraud, alleging, among other things, that he reasonably relied on their alleged false and misleading statements. *See* Compl. ¶¶ 400, 431. This places his state of mind at issue and entitles defendants to discovery concerning what he believed and when.

another on email, but failed to do so. *Cf. Int'l Bus. Machines Corp. v. Naganayagam*, 2017 WL 5633165, at *6 (S.D.N.Y. Nov. 21, 2017) (denying sanctions where defendant took the deposition of the individual "whose emails are at the center of [its] spoliation claims" but failed to ask her whether the missing emails contained any relevant discussions).

In order to obtain curative sanctions, therefore, defendants need not establish that "a smoking gun email between Karsch and his employees" once resided on the Karsch Capital Server but was irretrievably destroyed. Pl. Opp. Mem. at 13. It is sufficient if the existing evidence plausibly "suggests" that the spoliated ESI could support the moving party's case. *Coan v. Dunne*, 2019 WL 1620412, at *7 (granting sanctions where it was "equally plausible" to believe that there were "other powerfully probative email communications" lost forever); *see also Lokai Holdings*, 2018 WL 1512055, at *12 (granting subsection (e)(1) sanctions where the existing evidence "suggests that the lost correspondence with third parties may have been valuable to Lokai in proving the elements of its claims," and that lost correspondence concerning sales "may well have been helpful to Lokai in proving the extent of its damages"); *Moody*, 271 F. Supp. 3d at 432 (quoting *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, 2017 WL 1155743, *1 (D.P.R. 2017)) ("[t]o show prejudice resulting from the spoliation [under the current version of Rule 37(e)], a party must only come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been").

Defendants have met that standard. They have come forward with "plausible, concrete suggestions as to what [the destroyed] evidence might have been," *Moody*, 271 F. Supp. 3d at 432 (internal citations omitted), while plaintiff – the only party with actual *knowledge* as to what was in those emails – has come forward with nothing but legal argument, premised almost entirely on defendants' inability to prove that which plaintiff's misconduct has prevented the Court from

determining with any certainty. "In addition, the loss of the data has required [defendants] to spend additional resources to attempt to resolve this critical factual dispute," *id*. at 430, such as deploying its own consultant to search Stephen Karsch's @aol.com account, and may also require expanded deposition discovery and/or subpoena practice in the future. *See Lokai Holdings*, 2018 WL 1512055, at *12 ("The prejudicial effect of Defendants' destruction of ESI also lies in the extra time and expense that have been necessary to obtain relevant discovery from third parties."). I therefore find that the destruction of the Karsch Capital Server has prejudiced defendants within the meaning of Rule 37(e)(1).

d)   *Intent*

The Court must next determine whether Karsch "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Such a finding is a necessary predicate to the imposition of the "particularly harsh" sanctions permitted under subsection (e)(2). *Lokai Holdings*, 2018 WL 1512055, at *8 (characterizing adverse-inference instructions as "extreme sanction[s] that should not be given lightly," and default judgments or dismissals as "even more drastic") (internal quotation marks and citations omitted). The intent standard is both stringent and specific: "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig*, 2017 WL 6512353, at *11 (holding that although plaintiff intended to "disable his websites" and delete certain email files, he did not do so for the purpose of depriving defendants of the use of the ESI in litigation and therefore could not be sanctioned under subsection (e)(2)).

It is the movant's burden to demonstrate that the spoliating party acted with the intent to deprive. *Rhoda v. Rhoda*, 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017); *Watkins v. New York City Transit Auth.*, 2018 WL 895624, at *10 (S.D.N.Y. Feb. 13, 2018). "Although Rule 37(e)(2)

41

does not specify the standard by which the "intent to deprive" must be established, it is appropriate, given the severity of the sanctions permitted under that provision of the Rule, for the intent finding to be based on clear and convincing evidence." *Lokai Holdings*, 2018 WL 1512055, at *8; *see also CAT3*, 164 F. Supp. 3d at 499 (finding that, where a party seeks "terminating sanctions" pursuant to Rule 37(e)(2), "it is appropriate to utilize the clear and convincing standard" in making a finding of intent to deprive).

Defendants have not met that burden. Defendants urge the Court to make an inference concerning intent based almost entirely on the timing of the destruction of the Karsch Capital Server, which took place only weeks after Karsch's June 16, 2015 demand letter. *See* Def. Mem. at 14-15. Plaintiff counters with the explanation that "the removal process occurred at the time [Karsch Capital Management] was transferring its data and information to its successor entity, Hunter Peak Investments L.P." Pl. Opp. Mem. at 13. Given the lack of any other evidence shedding light on Karsch's motives, plaintiff's explanation is more plausible.

First, defendants do not dispute the timeline of Karsch's re-entry into the hedge fund business with the creation of Hunter Peak in 2015, which appears consistent with publicly available information. *See Entity Search*, Delaware Department of State Division of Corporations, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited June 20, 2019) (reflecting that Hunter Peak Investments, L.P. was incorporated on March 3, 2015; *From hedge funds to juice, and back again,* CNBC, https://www.cnbc.com/2015/01/30/sch-to-relaunch-hedge-fund.html (last visited June 20, 2019) (reflecting that Karsch closed Karsch Capital Management in 2013 to focus on his Juice Press investment, only to return to the hedge fund business in 2015). Indeed, several of the custodians whose emails defendants allege to have been destroyed appear to have left Karsch Capital Management in 2014, before at least some of the events at issue in this

action. *See* LinkedIn, *John Larre,* https://www.linkedin.com/in/john-larre-97a84426 (last visited June 20, 2019); LinkedIn, *Brian Holmes*, https://www.linkedin.com/in/brian-holmes-82395022 (last visited June 20, 2019).

Second, although the Karsch Capital Server contained *some* of the emails sent and received by *some* of the witnesses in this action, it did not contain all or even most of their potentially relevant communications. For example, Karsch himself had four different email accounts during the relevant period, but ordinarily used his @kcmcllc.com account to communicate concerning the events underlying this action. *See* Compl. ¶ 128, 169; O'Boyle Decl. Exs. O-1, O-2, U-2, W-1. That account has not been lost, *see* Pl. Resp. to Ct. Order at 2, and at least some of Karsch's @karschcapital.com emails have now been retrieved. Defendants provide no explanation for why Karsch would have intentionally damaged the server containing one of his email accounts – in an unsuccessful effort to deprive defendants of those emails – while sparing his three other accounts, including the account he primarily used for communications relevant to this action. *See id.* (listing Karsch's three other email accounts and reporting the dates on which they were searched by plaintiff's e-discovery vendor).

Consequently, although Karsch failed to take reasonable steps to preserve the ESI on the Karsch Capital Server – and thereafter failed to take reasonable steps to locate and search the backup – the Court cannot conclude that he did so for the specific purpose of gaining an advantage in this litigation, and therefore cannot award sanctions pursuant to Rule 37(e)(2).

### 3. Sack & Sack's Failure to Preserve the Jacoby Devices Also Warrants Sanctions Under Rule 37(e)(1)

Just as Karsch "lost" relevant ESI on the Karsch Capital Server when he took down that server, Sack & Sack "lost" relevant ESI on the Jacoby Devices when the Firm quite literally lost the devices themselves. *See* Apr. 8 Tr. at 19:25-20:7 ("MR. SACK: And now they're missing . . .

I have no idea where they are."). Before turning to the questions of prejudice and intent, therefore, the Court must address whether the ESI on the Jacoby Devices "should have been preserved in the anticipation or conduct of litigation," whether the Firm "failed to take reasonable steps to preserve it," and whether the lost ESI can be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

a)   <em>Obligation to Preserve</em>

As explained above, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd.*, 247 F.3d at 436. The Firm's duty to preserve ESI relevant to this action arose "at the time that litigation by Karsch was reasonably anticipated." Pl. Opp. Mem. at 9. That time was no later than November 2, 2016 – the date of the first communication between Karsch and the Firm that was withheld from production on the ground that it reflected legal advice "in anticipation of or related to litigation against Blink." Pl. Priv. Log, at 1. Thus, Sack & Sack had a duty to preserve evidence relevant to that potential litigation when it received the Jacoby Devices in January 2017. *See Telecom Int'l Am., Ltd.*, 189 F.R.D. at 81 ("Once on notice, the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.").

The only remaining question, therefore, is whether the Firm was on notice that the Jacoby Devices might contain evidence relevant to this action. *Telecom Int'l Am., Ltd.*, 189 F.R.D. at 81 ("Generally, there is no duty to preserve evidence or documents unless a party possessing the evidence has notice of its relevance."). Plaintiff takes the position that it was not. *See* Pl. Opp. Mem. at 7 (denying that the Firm had a "duty to serve as Jacoby's storage facility of his personal

items following his representation that he returned to Blink all of its property."); *id.* at 8 ("Indeed, following Jacoby's obligation to return to Blink all of its information (including copies thereof) in February 2017, the Sack Firm had no reason to believe any property in its possession contained any Blink information, much less needed to be preserved when the Kakaulin case settled."); *id.* at 9 ("the Sack Firm could not have known, or reasonably known that the Jacoby devices may have contained documents relevant to the claims or defenses in this matter because the Sack Firm never accessed them."). The Court disagrees.

Attorney Sack knew that the Jacoby Devices were used by Jacoby during his time as General Counsel and contained Blink information; that is why the Firm received them in the first place. Sack also knew, from the Firm's late-2016 communications with Karsch in anticipation of his own claims against Blink, that those claims concerned his $1 million investment in Blink through the Note, the pre-payment of that Note, Blink's "Series A financing," and whether Karsch had equity in Blink. Pl. Priv. Log at 1. It is inconceivable, under these circumstances, that attorney Sack did not understand, when he received the Jacoby Devices, that they likely contained documents concerning most if not all of these issues.[25]

The Firm's arguments to the contrary are wholly unpersuasive. First, it is simply not true that Jacoby "return[ed] to Blink all of its information (including copies thereof) in February 2017."

---

[25] Indeed, Sack sent a draft complaint to Karsch on December 14, 2016, *see* Pl. Priv. Log at 1, which an attorney ordinarily does not do without interviewing the client in some detail and reviewing at least some of the key documents underlying the dispute. It is therefore probable that by December 14 – if not sooner – one or more attorneys at the Firm knew that Jacoby was involved in the preparation of the Note and related documents in 2014, *see* Compl. Ex. F (email dated July 10, 2014, from Geoffrey Chaiken, to Michael Karsch, with a copy to Jacoby, attaching drafts of the Note Purchase Agreement and related documents), and intimately involved in the prepayment of the Note in 2015. *See id*. Ex. K (email and letter dated May 20, 2015, from Jacoby to Karsch, informing him that Blink "hereby elects to prepay" plaintiff's Note, and that "all obligations of the Company" under the Note would thereby be "satisfied in full").

Pl. Opp. Mem. at 8. At best, Jacoby extracted and returned the Blink-related information on the two *laptops*, but did not extract and return anything from his *cellphone*, which "may have included some Blink data." Jacoby Interrog. Ans. at 6. That cellphone, and whatever information it contained, was left with the Firm for safekeeping. *Id*. at 6-7. Moreover, Jacoby never returned the original hard drives from the laptops – the source of whatever documents he did return to Blink. The two original hard drives were also left in care of Sack & Sack. *Id*.; *see also* Sack Subp. Resp. at ECF pages 4-5 (attesting that two laptop computers and one "external hard drive" were returned, while the "remaining items" delivered to the Firm by Jacoby were placed in storage).

Second, counsel has made a point of the fact that no one from the Firm "access[ed] any of the devices [or] any of the information and materials contained on the devices." *Id*. at ECF page 5; *see also* Pl. Amend. Interrog. Ans. at 4 ("the [Jacoby] Devices were never accessed by anyone at the Sack Firm"). It was apparently Jacoby, rather than Sack & Sack personnel, who extracted data from the laptops and placed it on the external hard drive. Thus, even if Jacoby told his lawyers that all Blink-related documents were scrubbed from all three devices,[26] the Firm could have had no independent basis for confirming that statement. The Firm therefore had every reason to believe that the Jacoby Devices that remained in its possession "contained . . . Blink information," Pl. Opp. Mem. at 8, including information relevant to this action.

b)   *Failure to Take Reasonable Steps*

As described above, once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take "reasonable steps" to preserve it. Fed. R. Civ. P. 37(e). There is no evidence that Sack & Sack took any such steps. Attorney Sack has "no independent recollection of maintaining" the Jacoby Devices that were not returned to Blink, April 8 Tr. at 13:2-4, and the

---

[26] There is no evidence, anywhere in the record, that he ever made such a representation.

Firm has no "record[s] detailing the chain of custody." Pl. Amend. Interrog. Ans. at 3. Moreover, Sack could not find the devices in the Kakaulin file (or anywhere else) and, at oral argument, was unsure as to whether they were ever placed in that file, suggesting (contrary to his written discovery responses) that Jacoby "might have taken those materials or he might have left them with my paralegal who he had a friendship with," and who is now – like the devices themselves – gone. April 8 Tr. at 13:5-11, 19:25-20:2. On this record, it would be charitable to call the Firm's handling of the Jacoby Devices "negligent."

        c)      *Whether the ESI Can be Restored or Replaced Through Additional Discovery*

The next question is whether the relevant ESI on the missing Jacoby Devices can be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Not all of the ESI on those devices was irretrievably lost. Emails sent to or from Jacoby's Blink account – or to or from another Blink account – remain available to Blink. However, defendants assert that Jacoby also "sent text messages from, and saved Blink documents locally to, the Jacoby devices." Def. Mem. at 11. Defendants also note that Jacoby "communicated about the events at issue here on his personal email," *id.*, and assert that such emails are no longer recoverable from Jacoby himself because he has "'abandoned' and no longer has access to his personal email account, cajacoby@gmail.com." O'Boyle Decl. ¶ 11.

For this last point, defendants rely on double-hearsay statements made to attorney O'Boyle by attorney Feigenbaum (counsel for Jacoby in the Hippo arbitration), presumably based on statements made to Feigenbaum by Jacoby himself. O'Boyle Decl. ¶ 11. I decline to rely on those statements to establish that Jacoby's @gmail.com emails are now permanently out of reach. *See Rezende v. Citigroup Glob. Markets Inc.*, 2011 WL 1584607, at *28 (S.D.N.Y. Mar. 11, 2011) (given "the due process concerns inherent in a case-dispositive sanctions motion," the "better

course, on this motion, would be for the Court to disregard hearsay evidence"), *report and recommendation adopted in part, rejected in part,* 2011 WL 1584603 (S.D.N.Y. Apr. 27, 2011).

I accept, however, that Jacoby's text messages likely resided only on his cellphone.[27] Since Jacoby did not extract any documents or data from his cellphone before entrusting it to the Firm, *see* Jacoby Interrog. Ans. at 6, any relevant text messages are likely gone forever, along with any other relevant ESI stored locally on that cellphone. Moreover, although Jacoby avers that he searched the laptops, and transferred any "Blink documents" found on them "to an external hard drive," which was then provided to Blink, *id.*, the Firm took no steps to confirm the integrity of Jacoby's search. Now, of course, there is now no way to ascertain whether or not Jacoby located and transferred *all* documents potentially relevant to this lawsuit from the two laptops onto the external hard drive. I therefore conclude that – at least as to text messages and locally saved documents – the requirements of Rule 37(e) are met.

### d) *Prejudice*

According to defendants, the Court may "presume" that the lost ESI from the Jacoby Devices would have been favorable to Blink because of "Sack's bad faith." Def. Mem. at 11. Under Rule 37(e)(2), however, the Court may so presume "only upon a finding that [the Firm] acted with the intent to deprive [defendants] of the information's use in [this] litigation." As discussed in Part II(B)(3)(e), *infra*, the present record does not support such a finding.

It is plausible, however, that the spoliated devices contained ESI – now lost – that would have been helpful to defendants' case. *See Coan v. Dunne*, 2019 WL 1620412, at *7; *Moody*, 271

---

[27] Some wireless carriers store their subscribers' text messages on their own servers, but typically not for long. *See*, *e.g.*, *AT&T Messages Backup & Sync*, AT&T, https://www.att.com/features/backup-sync.html (last visited June 20, 2019) (AT&T customers can have their text messages "backed up" in the AT&T cloud for "up to 90 days"). The record does not reflect what carrier Jacoby used or any other facts regarding his text messages.

F.3d at 430. Indeed, given the high degree of animosity between Jacoby and defendants in early 2017, the fact that Jacoby alone determined what documents to transfer onto the external hard drive for return to Blink "suggests" that the returned documents may not have represented the entire universe of helpful material. *See Lokai Holdings*, 2018 WL 1512055, at *12 (granting sanctions where the existing evidence "suggests" that the lost evidence "may have been valuable"). Moreover, defendants have suffered "economic prejudice" in the form of the attorneys' fees and other expenses they have incurred in discovering and proving the disappearance of the Jacoby Devices – tasks made all the more difficult by the Firm's pattern of misrepresentations, obfuscations, half-truths, and shifting stories. *See CAT3, LLC,* 164 F. Supp. 3d at 502. I therefore conclude that defendants have adequately established prejudice, within the meaning of Rule 37(e)(1), from the loss of the Jacoby Devices.

e)   *Intent*

As noted above, the "particularly harsh" sanctions permitted under Rule 37(e)(2) require clear and convincing evidence that the spoliating party acted with the "intent to actually deprive another party of evidence." *Leidig*, 2017 WL 6512353, at *11. Defendants argue that the Court can make the necessary finding, as to the Jacoby Devices, because Sack & Sack is an experienced law firm, "aware of the obligation to preserve evidence in anticipation of litigation," such that its failure to do so "confirms" it acted "with the intent to deprive Blink of the information's use." Def. Mem. at 10. Additionally, according to defendants, the Firm's "attempted cover-up" – beginning with its false representation in the July 12 letter that it obtained no relevant documents from Jacoby – "demonstrates consciousness of guilt." *Id.*

Sack & Sack counters that it cannot have had a "sufficiently culpable state of mind" because it never accessed the Jacoby Devices and did not know what was on them. Pl. Opp. Mem.

at 10. Therefore, the Firm asserts, it is a "leap of conjecture" to suggest that it lost the devices in order to deprive defendants of the use of such ESI in this case. *Id*. The Firm also claims that it worked cooperatively with counsel for defendants, meeting and conferring "at least ten [] times," and "produced the only devices it had" (which turned out to be Kakaulin's, not Jacoby's). *Id.*

Sack & Sack's handling of the Jacoby Devices fell far short of its professional and ethical obligations – not only to defendants in this action, but to Jacoby as well.[28] Nonetheless, the Court is not convinced that the Firm acted with the specific intent to deprive defendants of relevant ESI that was stored on the Jacoby Devices and not otherwise available to Blink. Its status as a law firm does not, without more, demonstrate that its failure to preserve the Jacoby Devices was intentional. Moreover, while the Firm's false representation in the July 12 Letter was inexcusable, the actual loss of the Jacoby Devices, together with the remainder of what defendants label a "cover-up," appears to be the result of gross negligence rather than a specific intent to deprive defendants in this action of relevant evidence. *See Rhoda*, 2017 WL 4712419, at *2 (litigants seeking sanctions under Rule 37(e)(2) "now have the burden of proving 'intent to deprive,' rather than ordinary or gross negligence"). The Court therefore concludes, once again, that Rule 37(e)(2) spoliation sanctions are not warranted.

### 4.    Remedy

The Court must now determine the appropriate sanctions under Rules 37(b) and 37(e).

---

[28] *See* RPC 1.15(a) ("[a] lawyer in possession of any . . . property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary"); *id*. comment [1] ("A lawyer should hold the funds and property of others using the care required of a professional fiduciary.").

a)      *Attorneys' Fees*

An award of defendants' expenses, including attorneys' fees, is clearly warranted under Rules 37(b)(2)(C) and 37(e)(1). Under Rule 37(b)(2)(C), the Court "must" award the expenses, including attorneys' fees, caused by plaintiff's failure to comply with the Court's orders, "unless the failure was substantially justified or other circumstances make an award unjust." *See also Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (characterizing an award of fees to reimburse the wronged party for its expenses caused by the failure to cooperate as the "mildest" sanction available under Rule 37). Separately, Rule 37(e)(1) authorizes an award of attorneys' fees and costs to the moving party, to the extent reasonably necessary to address any prejudice caused by the spoliation. *Lokai Holdings*, 2018 WL 1512055, at *9; *CAT3, LLC,* 164 F. Supp. 3d at 502.

Both tests are satisfied here. Had plaintiff substantially completed his document production by December 3, 2018 – as required by ¶ 4(a) of the November 13 Order – defendants would not have incurred the fees and other expenses they ultimately shouldered over the ensuing months in pursuing the remainder of the discovery to which they were entitled. Moreover, each time plaintiff represented that his production was complete, *see* O'Boyle Decl. Ex. B; Sack Decl. Ex. I, subsequent events quickly proved those representations to be inaccurate, necessitating more work by defendants' counsel and their discovery consultants.

Similarly, had plaintiff complied with the July 12 Order – by truthfully disclosing that it obtained the Jacoby Devices some six months earlier – there is a chance that the devices could have been found (perhaps in the drawer of the "paralegal who he had a friendship with," April 8 Tr. at 13:5-8, or even in the Kakaulin file) and the relevant ESI produced. Even if the devices were

51

already lost, timely disclosure of that development would have saved defendants months of legal work in late 2018 merely to pin down the fact and circumstances of the loss.

The same is true with respect to the loss of the ESI on the Karsch Capital Server. Had plaintiff disclosed the loss of the server at the outset of fact discovery (or, better yet, adequately preserved the ESI contained on that server), defendants would likely have been spared the expenses associated with prodding Karsch into locating, accessing, and – ultimately – searching the backup files on the NSD for discoverable documents.

To be sure, not every discovery-related expense – or even every expense incurred since plaintiff violated the November 13 Order – is recoverable. Under Rule 37(b)(2)(C), the award must be limited to "reasonable" expenses "caused by" plaintiff's violations of the Court orders, and under Rule 37(e)(1), it must be designed to "ameliorate[] the economic prejudice imposed on the defendants." *CAT3, LLC,* 164 F. Supp. 3d at 502. While a precise delineation of reimbursable fees and other expenses must await defendants' submission of a fee application with supporting documentation, the Court is unlikely to award expenses incurred before December 10, 2018 (when the Court advised plaintiff that the sanctions clock began to run, *see* Dec. 10 Tr. at 56:11-19), except to the extent such expenses flow directly from Sack & Sack's violation of the July 12 Order. Even after December 10, 2018, fees and costs will only be awarded for the expenses that defendants reasonably incurred as a result of plaintiff's violations of the November 13 and December 11 Orders, including the preparation and argument of the sanctions motion itself. Other legal work – such as, for example, defendants' motion concerning plaintiff's waiver of the attorney client privilege (Dkt. No. 98) – will not fall within the scope of the award.

b)    *Presentation of Evidence*

As an additional sanction, defendants will be permitted to present evidence to the jury concerning plaintiff's takedown of the Karsch Capital Server and his lawyer's loss of the Jacoby Devices, and the jury will be permitted to consider that evidence, along with all the other evidence in the case, in evaluating credibility and making its decision. Such a sanction (as distinguished from a mandatory or permissive adverse inference instruction) is permitted under Rule 37(e)(1) without any predicate finding of intent to deprive. *See* Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment (subdivision (e)(2) "does not apply to jury instructions that do not involve such an inference" and "would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision"); *Leidig*, 2017 WL 6512353, at *14 (permitting a party to "present evidence to the jury" that the opposing party lost ESI it should have preserved "after litigation was threatened and at a time when they were legally obligated to preserve" it).[29]

---

[29] *See also*, *e.g.*, *Franklin v. Howard Brown Health Ctr.*, 2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) (recommending, as a Rule 37(e)(1) sanction for the spoliation of instant messages, that the parties "be allowed to present evidence and argument to the jury regarding the defendant's destruction/failure to preserve electronic evidence in this case, and that the jury be instructed as the trial judge deems appropriate"), *report and recommendation adopted,* 2018 WL 5831995 (N.D. Ill. Nov. 7, 2018); *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *7 (N.D. Ill. Mar. 23, 2018) (recommending, as a Rule 37(e)(1) sanction, "that the parties shall be allowed to present evidence to the jury regarding the destruction of the text messages and the likely relevance of the lost information; and that the jury shall be instructed that it may consider this information when making its decision," but that "the jury shall not be given specific instructions on any presumption or inference based on the destruction of the text messages"); *Spencer v. Lunada Bay Boys*, 2017 WL 10518023, at *13 (C.D. Cal. Dec. 13, 2017) (recommending sanctions pursuant to Rule 37(e)(1) for spoliation of text messages, including that plaintiff be granted monetary sanctions and that the parties "be permitted to present evidence and argument related to the unrecoverable text messages"), *report and recommendation adopted,* 2018 WL 839862 (C.D. Cal. Feb. 12, 2018); *Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *5 (N.D. Cal. May 23, 2016) (ruling, pursuant to Rule 37(e)(1), that to the extent certain testimony is presented at trial, "Chrysler may present evidence and argument about [plaintiff's] spoliation of customer communications,"

Such a sanction is appropriate here for three principal reasons. First, it recognizes that the prejudice to defendants from the destruction of the Karsch Capital Server and the loss of the Jacoby Devices goes beyond the expenses they incurred in pursuing the missing discovery and making their sanctions motion. Although less severe than an adverse inference instruction, this type of sanction will help "rectify the evidentiary imbalance" that plaintiff and his counsel created by spoliating relevant ESI. *Linde v. Arab Bank, PLC*, 706 F.3d 92, 102 (2d Cir. 2013). Second, it provides the jury, as finder of fact, with context for that evidentiary imbalance, which is itself relevant evidence going to the parties' credibility and other factual issues. Third, it leaves the district judge free to determine the precise scope of the spoliation evidence to be permitted at trial and to craft any related jury instructions on a full evidentiary record. *See Franklin*, 2018 WL 4784668, at *7 ("Of course the evidence to be allowed and the extent of the presentation of the litigation hold are matters to be decided at trial."); *Schmalz*, 2018 WL 1704109, at *7 ("The Court leaves it to the district judge to determine the appropriate means for presenting the evidence and arguments at trial on this issue."). This flexibility is particularly important where, as here, the sanctions motion was made on a relatively thin record – at the conclusion of written discovery – before any depositions were conducted.

Accordingly, defendants will be permitted to "present evidence to the jury concerning the loss and [potential] relevance" of the ESI once contained on the Karsch Capital Server and the Jacoby Devices, and may seek a jury instruction – the exact language of which must be left to the trial judge – informing the jury "that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e) advisory committee's note to

---

and the trial judge may, if she deems it necessary, "giv[e] the jury instructions to assist in its evaluation of such evidence or argument") (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment).

2015 amendment. *See Lokai Holdings*, 2018 WL 1512055, at *17 (permitting injured party to seek a jury instruction, in a form to be approved by the district judge, as a sanction under Rule 37(e)(1)).

c)     *Greater Sanctions Are Not Warranted*

The Court has carefully considered defendants' request for more severe sanctions, including dismissal of this action, but concludes that those sanctions are neither authorized by Rule 37(e)(2) nor warranted by Rule 37(b) on the present record.

## III.   CONCLUSION

For the reasons stated above, defendants' motion for sanctions (Dkt. No. 102) is GRANTED IN PART and DENIED IN PART.

It is hereby ORDERED that plaintiff Michael Karsch and his counsel, Sack & Sack, shall pay the expenses, including attorneys' fees and out-of-pocket costs, reasonably incurred by defendants as a result of plaintiff's failure to obey this Court's discovery orders issued on July 12, 2018, November 13, 2018, and January 18, 2019, including the fees and costs reasonably incurred to obtain this Memorandum and Order. The monetary sanctions shall be imposed jointly and severally upon plaintiff and his counsel, except that Sack & Sack alone shall reimburse defendants for their expenses caused by the Firm's violation of the July 12 Order.

It is further ORDERED that defendants shall submit one or more declarations evidencing their recoverable fees and costs, as well as the allocation of those fees and costs to plaintiff and his counsel, no later than **July 11, 2019**. All sums requested must be supported by admissible evidence, including properly authenticated copies of counsel's relevant time and expense records. Plaintiff and his counsel may file a response – limited to the *amount* of defendants' recoverable fees and costs and the appropriate apportionment between plaintiff and the Firm – no later than **July 25, 2019**. There shall be no reply.

It is further ORDERED that defendants shall be permitted to present evidence to the jury concerning the loss and potential relevance of the ESI once contained on the Karsch Capital Server and the Jacoby Devices, and may also seek an instruction informing the jury that it may consider that evidence, along with all other evidence in the case, in making its decision. The precise scope of the evidence to be allowed, and the form of any jury instruction concerning that evidence, will be reserved for decision by the district judge at the time of trial.

It is further ORDERED that no later than **June 27, 2019**, the parties shall submit a proposed schedule for the remainder of fact and expert discovery. If the parties cannot agree, they shall attach (or include in the letter) their competing proposed schedules, without extended argument.

This Memorandum and Order disposes of the motion at Dkt. No. 102.

Dated: New York, New York
     June 20, 2019

          **SO ORDERED.**

          _____
          **BARBARA MOSES**
          **United States Magistrate Judge**