USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/24/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------

MICHAEL KARSCH,

                              Plaintiff,

        - against -

BLINK  HEALTH  LTD.  (f/k/a  CHAIKEN
HOLDINGS LLC and VITAL MATTERS LLC),
GEOFFREY CHAIKEN, and MATTHEW CHAIKEN,

                              Defendants.

---------------------------------------

**17 Civ. 3880 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

On  August  13,  2021,  defendants  Blink  Health  Ltd.
("Blink"),  Geoffrey  Chaiken,  and  Matthew  Chaiken  (together,
"Defendants")  moved  for  summary  judgment  in  this  action,
arguing there is no genuine dispute as to any material fact
related  to  the  claims  brought  by  plaintiff  Michael  Karsch
("Karsch").  (See  "Motion,"  Dkt.  No.  186  and  "Summary  Judgment
Brief,"  Dkt.  No.  187.)  On  October  1,  2021,  Karsch  filed  a
memorandum  of  law  in  opposition  to  Defendants'  Motion.  (See
"Opposition,"  Dkt.  No.  203.)  Defendants  subsequently  filed  a
reply  to  the  Opposition.  (See  "Reply,"  Dkt.  No.  205.)  In  prior
proceedings,  by  Order  dated  May  24,  2021,  the  Court  granted
in  part  and  denied  in  part  Defendants'  motion  requesting
dismissal  of  Karsch's  claims.  Karsch's  contract-based  claims
and  fraud  claims  survived  the  motion,  but  the  rest  of  his
claims  were  dismissed.  (See  below  Section  I.B.)

1

The Court now finds that summary judgment is appropriate as to all remaining claims. Therefore, Defendants' motion is GRANTED.

I.   **BACKGROUND**

A.   FACTUAL BACKGROUND[1]

Blink is a healthcare technology company that aims to make prescription medications more accessible to the American public by serving customers irrespective of their insurance status. Geoffrey Chaiken founded Blink in March 2014. The company was known as Chaiken Holdings LLC and Vital Matters LLC prior to taking the Blink name.

In 2014, Blink followed the familiar financing path of start-up companies and conducted "bridge" financing to raise

---

[1] The factual recitation is confined to the facts in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts (see "Blink SUMF," Dkt. No. 188) that Karsch does not adequately dispute in his counter-statement. (See "Rule 56.1 Counter-Statement," Dkt. No. 202.) Unless specifically quoted, no further citation to the Blink SUMF will be made.

The Court notes that Karsch's counter-statement contains many assertions that lack proper citation to the record or that incorporate legal arguments and irrelevant evidence into what was meant to be his statement of undisputed material facts. Such statements are improper under Local Rule 56.1 and, as a result, the Court will not consider them in its assessment of the facts of this case. See Local Rule 56.1 (requiring an opponent to include "citation to evidence which would be admissible" following any statement controverting a statement of material fact); LG Cap. Funding, LLC v. PositiveID Corp., No. 17 Civ. 1297, 2019 WL 3437973, at *2 (E.D.N.Y. July 29, 2019) ("The Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement." (internal quotations omitted)). See also Individual Practices of United States District Judge Victor Marrero Rule II.E.3 ("Local Rule 56.1 Statements . . . shall not be used for argumentation of legal issues or recitation of case law, or . . . repetition of conclusory pleadings.")

capital. Bridge financing typically involves a company selling convertible promissory notes, a debt instrument that may later convert to equity per the note's terms. Convertible promissory notes do not carry an implicit guarantee of equity, but rather the conversion to equity is conditioned on so-called "triggering events" set forth in the note. Convertible promissory notes may include prepayment terms that allow the borrowing company to repay the note's purchaser before the note converts to equity.

When Blink announced its financing initiatives, Karsch expressed interest in participating in its bridge financing (the "Bridge 1 Financing"), and on July 2, 2014, Geoffrey Chaiken sent him a draft convertible promissory note. The parties negotiated the terms of the note, the purchase agreement, and a side letter to the Note. On July 10, 2014, Karsch and Blink, then known as Chaiken Holdings LLC, signed the Convertible Demand Promissory Note Purchase Agreement ("Note Agreement"). Under the Note Agreement, Karsch purchased a one-million-dollar convertible promissory note (the "Note") from Blink. Geoffrey Chaiken signed on behalf of Chaiken Holdings LLC.

The Note stated that its "outstanding principal . . . together with the accrued and unpaid interest" would convert into Series A Preferred Shares under certain triggering

events, or it would otherwise be payable on demand. (Note, Exh. 19, Dkt. No. 192 at 1–2.) This conversion would take place either (i) "automatically upon the issuance and sale by [Blink] of Series A Preferred Shares resulting in a minimum aggregate $1,000,000 in gross proceeds to the Company, or (ii) at any time after any Series A Preferred Shares have been issued by [Blink] upon the election of [Karsch]." (Id. at 2.) The Note also contained a term stating that Blink "may prepay the Notes without penalty, but any prepayment shall be made pro rata among all Notes." (Id.)

While the Note Agreement included a merger clause, stating that the document represented the entire agreement between the parties, Karsch requested a share class option, and that request resulted in an additional agreement (the "Side Letter"). A share class option allows such option-holders to exchange their shares for another class of stock. The Side Letter stated,

> In the event that [Blink] creates a new class of shares to be issued to Geoffrey Chaiken or reclassifies shares currently held by Geoffrey Chaiken to shares having superior voting rights on a per share basis to [Blink's] Series A Preferred Shares ("Superior Shares"), [Karsch] shall have the option to exchange the Series A Preferred Shares issued or issuable upon conversion of the Investor Note for such Superior Shares at the time such Superior Shares are first issued.

(Side Letter, Exh. C., Dkt. No. 199 at 1.)

On July 10, 2014, the Side Letter was signed by Karsch and Chaiken Holdings LLC, with Geoffrey Chaiken signing for the LLC under the title "Sole Member." (See Side Letter at 2.) The Side Letter addressed potential conflicts between its terms and the terms of the Note Agreement, holding that "in the event of a conflict between the provisions of this Letter and the provisions of the Note Purchase Agreement and the Investor Note, the provisions of this Letter shall control." (Id. at 2.)

Blink sold at least a dozen convertible promissory notes during the Bridge 1 Financing, which ended in September 2014, but Karsch was the only investor with whom Blink executed a side letter or who received a share class option. Between September 2014 and September 2015, Blink continued to raise capital through subsequent rounds of bridge financing. It sold convertible promissory notes, but it never issued Series A Preferred Shares during the bridge investing. Sometime between August and October 2014, Samarjit Marwaha ("Marwaha") became Blink's chief executive officer, and in August, he made a $500,000 capital contribution in exchange for approximately 40,000 shares of common stock.

In May 2015, Blink notified some financiers, including Karsch, that Blink was electing to prepay in full all the convertible promissory notes from Karsch's round of bridge

financing (the "Prepayment Notice"). The parties dispute whether Blink notified all Bridge 1 financiers or only a portion of that group of its election to prepay the debt.

Upon receipt of the Prepayment Notice, Karsch told Blink he would not accept prepayment. Nevertheless, on May 26, 2015, Blink repaid Karsch's Note in full with interest, wiring him $1,052,602.74. The following month, Karsch, through counsel, sent Blink a letter detailing his dissatisfaction with the prepayment process, asking Blink to reconsider, and notifying the company that he otherwise reserved his legal rights and remedies. Blink, also through counsel, responded explaining that it believed it was acting well within its legal rights by prepaying Karsch's Note.

In September 2015, Blink closed its Series A financing, a type of equity-based financing by which a company issues shares purchased by investors, raising cash or capital for the company. This was the first time Blink issued Series A Preferred Shares. The Series A Preferred Shares carried certain rights, including "information rights and rights to future share issuances, protective provisions, preferential payment over common shares, and the option to convert common shares under specified terms." (Blink SUMF ¶ 70.)

Blink claims that Geoffrey Chaiken received shares with superior voting rights for the first time in 2016, after the

close of the Series A financing, but Karsch disagrees, as discussed below. It is undisputed that as of June 30, 2016, Blink's bylaws stated that Geoffrey Chaiken's common shares would be entitled to ten votes on any matter requiring or permitting a vote or approval by shareholders. Other common shares were entitled to only one vote.

B.   <u>PROCEDURAL HISTORY</u>

On May 23, 2017, Karsch filed this suit. (<u>See</u> "Complaint," Dkt. No. 1.) He alleged (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. Section 78j, and Rule 10b-5, 17 C.F.R. Section 240.10b-5; (2) the violation of Section 20(a) of the Exchange Act, 15 U.S.C. Section 78t; (3) common law fraud; (4) fraudulent inducement and misrepresentation; (5) breach of contract (the Note Agreement); (6) breach of the covenant of good faith and fair dealing inherent to the Note Agreement; (7) unjust enrichment; (8) breach of fiduciary duty; (9) fraudulent concealment; and (10) negligent misrepresentation, as well as bringing a claim for accounting.

Defendants moved for dismissal of all claims except the breach of contract claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and after numerous letters and phone conferences, the Court denied the motion. (<u>See</u> "Motion to Dismiss Decision," Dkt. No. 21.) Following the close of

discovery, on August 19, 2020, Defendants wrote to inform the Court of their intention to file a motion for summary judgment and request a pre-motion conference, as required by Rule II.A.2 of the Court's Individual Practices. (See Dkt. No. 168). Karsch responded, opposing the contemplated motion, on August 26, 2020. (See Dkt. No. 170.)

By order dated March 23, 2021, the Court denied Defendants' request in part and withheld judgment in part. (See "Show Cause Order," Dkt. No. 171.) The Court noted that it was "not inclined to grant a motion for summary judgment on Plaintiff's breach-of-contract claim because disputed material facts, such as whether any events triggering conversion based on the parties' agreement took place, remain." (Id. at 1.) However, the Court found Defendants "raised compelling arguments as to why Plaintiff's claims for violation of the covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, and breach of fiduciary duty" should be dismissed. (Id.) Further, Karsch's letter response failed to address Defendants' arguments regarding why his fraud claims should be dismissed. (Id. at 2.) The Court ordered Karsch to show cause as to why those claims should not be dismissed as a matter of law. (Id.) Karsch did so on April 2, 2021 (Dkt. No. 173), and Defendants responded on April 15. (Dkt. No. 178.)

While the parties were briefing their responses to the Show Cause Order, Defendants filed a motion for reconsideration of the Show Cause Order (Dkt. No. 174) and an accompanying memorandum of law (Dkt. No. 175), which Karsch opposed. (Dkt. No. 179.) Following contemplation of the motion for reconsideration and Karsch's brief in response to the Show Cause Order, the Court granted the motion for reconsideration by order dated May 24, 2021, allowing full briefing on Defendants' motion for summary judgment. (See "Reconsideration Order," Dkt. No. 183.) In the Reconsideration Order, the Court found that the noncontractual claims (Counts Six, Seven, Eight, Ten, and Eleven of the Complaint) were duplicative of the breach-of-contract claims, and the Court dismissed the claims as a matter of law. (Id. at 8-11.)

Defendants filed the Motion and Summary Judgment Brief on August 13, 2021. Also before the Court is the Opposition, dated September 30, 2021, and Defendants' Reply. Defendants present three primary arguments supporting the Motion. First, they argue Karsch's breach-of-contract claims fail as a matter of law because Blink prepaid his debt before any triggering events occurred. Second, they assert that the breach-of-contract claims against the Chaiken brothers in their personal capacity fail because Karsch has not

established any basis to impose personal liability. Third, they argue the fraud claims fail since Karsch has not established all requisite elements to establish liability for any of his fraud claims. In response, Karsch argues that material issues of fact remain in dispute, so summary judgment would be inappropriate on any of the remaining claims.

## II.   DISCUSSION

A.   <u>SUMMARY JUDGMENT LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 ("Rule 56") states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where, following discovery and upon motion of one party, the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court may consider all facts in the record before it. <u>Id.</u> at 323.

When a motion for summary judgment is properly supported by evidence, the party opposing a motion for summary judgment "may not rest upon mere allegations or denials -- rather, he must present sufficient probative evidence to establish a

genuine issue of material fact." <u>Horror Inc. v. Miller</u>, 15 F.4th 232, 240 (2d Cir. 2021). Evidence that is "'merely colorable,' or is not 'significantly probative'" is insufficient to defeat a motion for summary judgment. <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986)). In short, the nonmoving party's evidence must be persuasive enough that a reasonable jury could return a judgment in their favor. <u>Id.</u> at 241.

B.   <u>BREACH OF CONTRACT</u>

The Complaint alleges four ways in which Defendants breached the Note Agreement. First, Karsch argues Defendants failed to convert the Note into Series A Preferred Shares when they should have done so under the automatic conversion provision. Second, Karsch claims Defendants, without proper notification, amended Schedule 1 of his Note to change the investors listed. Third, he alleges Defendants failed to treat all investors equally. And fourth, he contends that Defendants violated the agreements and the securities laws "contrary to the representations and warranties set forth in the agreements." (Complaint ¶ 436.) However, Karsch has since abandoned the latter three arguments and now focuses on the first basis for breach, arguing that Defendants failed to convert his debt into equity despite the parties' contracts requiring conversion. (<u>See</u> Opposition at 8–12.)

### 1.   Legal Standard

Under New York law,[2] a plaintiff alleging breach of contract must show (1) the existence of an agreement, (2) performance by the plaintiff, (3) a breach of the agreement by the defendant, and (4) damages. See Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007). Here, the parties dispute only whether Karsch has satisfied the breach element.

### 2.   Analysis

Karsch's argument regarding how, exactly, Defendants breached either agreement has transformed over time. Karsch's initial argument was that his Note should have been converted to Series A Preferred Shares because Blink surpassed the threshold for automatic conversion under the Note Agreement. (See Complaint ¶ 436.) Now, Karsch says that the Side Letter controls and his option to convert his Note into Series A Preferred Shares was triggered under the terms of the Side Letter. (See Opposition at 8.) But under either formulation, his argument boils down to a question of whether Defendants were contractually obligated to convert Karsch's debt to equity and failed to do so. Thus, the pertinent question on summary judgment is whether there is any genuine dispute of

---

[2]   New York law governs the Note Agreement and accompanying Side Letter, the contracts alleged to have been breached. (See Note Agreement at 3.)

material fact about whether Defendants had an obligation to convert Karsch's debt prior to repaying the Note.

        a.   <u>The Note Agreement</u>

The Note Agreement stated that Blink would convert Karsch's debt to equity under either of two circumstances: (1) "automatically upon the issuance and sale . . . of Series A Preferred Shares resulting in a minimum aggregate $1,000,000 in gross proceeds to the Company," or (2) "at any time after any Series A Preferred Shares have been issued by the Company upon the election" of Karsch. (Note Agreement at 2.) The Court previously noted that "[t]here is no dispute that no Series A Preferred Shares were issued before Karsch was repaid his initial investment." (Reconsideration Order at 6.) Karsch maintains that there is a dispute of material fact in the Rule 56.1 Counter-Statement concerning this issue, but the record does not support that assertion.

Karsch points to Marwaha's Offer of Partnership (<u>see</u> "Offer of Partnership," Exh. M, Dkt. No. 199) as evidence that Series A Preferred Shares were issued before he was repaid. The Offer of Partnership states that Marwaha will not be paid until the earliest of several conditions, two relevant here: "(i) the closing of [Blink's] next round of financing in which it issues [Blink's] Series A Preferred Shares; (ii) closing of any other type of financings that collectively

bring the total amount raised by [Blink] since inception to $5 million or more in aggregate." (Offer of Partnership at 1.) These two conditions are collectively referred to as "the Series A Round Financing." (Id.)

Karsch reads the Series A Round Financing to mean that the satisfaction of *either* condition triggered conversion of his Note per the first triggering event, and that Blink, undisputedly, had surpassed five million dollars in funding before it repaid Karsch's debt. (See Rule 56.1 Counter-Statement ¶ 65.) That interpretation would indicate that Blink would owe Karsch equity. But the Offer of Partnership does not suggest that Blink's crossing the five-million-dollar threshold resulted in the issuance of Series A Preferred Shares, and *the issuance and sale* of those shares is the contractually enumerated triggering event.

In fact, the Offer of Partnership casts doubt on Karsch's theory. If the closing of any round of financing that helped Blink cross that fundraising threshold resulted in the issuance of Series A Preferred Shares, conditions (i) and (ii) from the Offer of Partnership would be redundant. It is well-settled that courts "must give 'effect and meaning . . . to every term of [a] contract' and strive 'to harmonize all terms.'" Spinelli v. NFL, 903 F.3d 185, 200 (2d Cir. 2018) (modifications in original) (quoting India.Com, Inc. v.

<u>Dalal</u>, 412 F.3d 315, 323 (2d Cir. 2005)). Because "interpretations that render provisions of a contract superfluous are particularly disfavored," <u>id.</u> (quotations omitted), the Court will decline to read the Offer of Partnership in the way Karsch suggests.

The Court again concludes there is no genuine dispute that Blink did not issue any Series A Preferred Shares prior to prepaying Karsch's debt. This finding means that Blink did not breach the Note Agreement's conversion provisions, as both came into effect only after the *issuance* of Series A Preferred Shares. However, that point does not necessarily establish that no breach of contract occurred with these transactions. Karsch also argues that the Side Letter preempted the Note Agreement and governed the conversion of his debt.[3] Defendants counter that the Side Letter does not independently create any conversion events, but instead it provides Karsch with a share-class option *after* his Note was

---

[3] The Court notes that Defendants argue Karsch failed to plead his Side Letter argument in the Complaint. (<u>See</u> Summary Judgment Brief at 8.) On a motion for summary judgment, a district court cannot properly consider an argument not raised in the Complaint or raised for the first time in opposition to summary judgment. <u>See</u> <u>Greenidge v. Allstate Ins. Co.</u>, 446 F.3d 356, 361 (2d Cir. 2006). Such arguments should, instead, be brought to the Court's attention through a motion to amend the complaint or in a motion for reconsideration following a grant of summary judgment. <u>See</u> <u>id.</u> But this is not a clear-cut case of waiver. The Complaint contains numerous references to the Side Letter (referring to it both as the Side Letter and the "Superior Shares Agreement" (Complaint ¶ 95)), discussing its provisions and Karsch's alleged reliance on that agreement. These allegations were sufficient to put Defendants on notice that Karsch believed the Side Letter made certain promises that Defendants failed to keep.

converted into Series A Preferred Shares under the terms of the Note Agreement. (See Summary Judgment Brief at 8-9.)

As the Court noted in the Reconsideration Order, it may be unnecessary to determine which interpretation is correct because there may not have been a conversion-triggering event under either reading of the contracts. (See Reconsideration Order at 8.) The Court has already explained that no triggering event occurred under the Note Agreement, and thus, not under Defendants' reading of the contracts. To determine whether a triggering event occurred under Karsch's theory, the Court must turn to the language of the Side Letter.

    b.    The Side Letter

Paragraph One of the Side Letter provides:

> The Note Purchase Agreement and Investor Note currently provide for the Investor Note to convert into the Series A Preferred Shares of the Company. In the event that the Company creates a new class of shares to be issued to Geoffrey Chaiken or reclassifies shares currently held by Geoffrey Chaiken to shares having superior voting rights on a per share basis to the Company's Series A Preferred Shares ("Superior Shares"), Investor shall have the option to exchange the Series A Preferred Shares issued or issuable upon conversion of the Investor Note for such Superior Shares at the time such Superior Shares are first issued.

(Side Letter at 1.) Under these terms, Karsch could exchange the Series A Preferred Shares issued or issuable upon conversion of the Note for Superior Shares in the event Blink created a new class of shares to be issued to Geoffrey

Chaiken, or if Blink reclassified shares held by Geoffrey Chaiken to shares with superior voting rights to the Series A Preferred Shares.

Karsch asserts that his option to convert his shares was triggered "(1) when [Geoffrey] Chaiken was issued common shares to begin with on March 11, 2014 and (2) when [Geoffrey Chaiken's] membership shares were reclassified into common shares." (Opposition at 9.) This first reason plainly fails to serve as a conversion-triggering event because the Side Letter is dated July 10, 2014. (See Side Letter at 1.) That Blink issued common shares to its founder three months prior to entering the Side Letter is irrelevant, as the Side Letter refers to the creation of "a *new* class of shares." (Side Letter at 1 (emphasis added).) No reasonable jury would find that the creation and issuance of common stocks in March 2014 would qualify as the creation of "a new class of shares to be issued to Geoffrey Chaiken" under the July 10 Side Letter.

Karsch similarly fails to establish any dispute of material fact regarding the occurrence of his second alleged triggering event. First, his second argument conflicts with his first: Karsch says his Note converted to equity when Geoffrey Chaiken was issued common shares in March 2014, but he also says conversion was triggered when Geoffrey Chaiken's "membership shares" were reclassified as common shares.

Karsch does not point to any evidence in the record supporting this supposed membership-to-common share conversion, nor does he provide a date when the alleged conversion occurred. So Karsch (1) concedes that common shares had been issued to Geoffrey Chaiken prior to the issuance of the Note; and (2) fails to point to any evidence in the record substantiating the claim that any other class of stock existed before Blink repaid his debt.

On the other hand, the record clearly supports a finding that Geoffrey Chaiken held only common shares with standard voting rights of one vote per share prior to Blink amending its bylaws in June 2016. (See, e.g., Response to Interrogatory 10, Exh. 26, Dkt. No. 192 at 12–13; 2015 Amended Bye-Laws, Exh. 33, Dkt. No. 192 at 3 ("Each Common Share shall be entitled to one vote on any matter required or permitted to be voted on or approved by the holders of Common Shares."); "Third Amended Bye-Laws," Exh. A, Dkt. No. 189 at 7 ("Each Common Share owned by a Founder or his Affiliates shall be entitled to ten (10) votes on any matter required or permitted to be voted on or approved by the holders of Common Shares.").)

Additionally, the record is clear that Series A Preferred Shares and common shares are different, and there is no dispute that common shares held by *anyone* prior to the

issuance of the Third Amended Bye-Laws in 2016 -- which explicitly increased the voting power of Geoffrey Chaiken's common shares -- had inferior rights to Series A Preferred Shares. (Compare 2015 Amended Bye-Laws, Exh. 33, Dkt. No. 192 at 3 ("Each Common Share shall be entitled to one vote on any matter required or permitted to be voted on or approved by the holders of Common Shares.") with Third Amended Bye-Laws at 7 ("[E]ach outstanding Series A Preferred Share shall be entitled to cast the number of votes equal to the number of whole Common Shares into which the Series A preferred Shares are convertible as of the record date for determining Members entitled to vote on such matter.").)

Reading these facts together, the record undisputedly shows (1) Geoffrey Chaiken owned only common shares with standard voting rights prior to June 2016, (2) all common shares were inferior to Series A Preferred Shares prior to June 2016, (3) Blink did not issue any Series A Preferred Shares until June 2015, and (4) Karsch was repaid in May 2015 pursuant to Note Agreement's prepayment clause. This interpretation would mean that, even if the Side Letter, instead of the Note Agreement, governed conversion, no

triggering event occurred under the Side Letter prior to the prepayment and thus Karsch's debt never converted to equity.

Because conversion was never triggered, Karsch's debt remained debt at the time of repayment. Defendants never owed Karsch equity, and they did not breach either agreement by failing to convert his Note to equity. Karsch may be unhappy that Defendants exercised their contractual right to prepay the Note (see Note Agreement at 2), but remorse over agreed upon contractual terms does not provide a basis for a breach-of-contract claim. No reasonable jury could reach a different conclusion and rule in Karsch's favor on the breach-of-contract claims. Therefore, on the record before it the Court finds that there is no genuine dispute as to any material fact regarding the alleged breach, and Defendants are entitled to judgment as a matter of law on Karsch's contract claims. Defendants' motion for summary judgment on Karsch's breach-of-contract claims is GRANTED.[4]

C.    FRAUD

Defendants also moved to dismiss Karsch's claims for securities fraud, common law fraud, fraudulent inducement and misrepresentation, and fraudulent concealment (together, the "Fraud Claims"), which comprise all remaining claims. After

---

[4] Because there was no breach of contract, the issue of Geoffrey and Matthew Chaiken's personal liability is moot.

the parties' initial exchange of pre-motion letters, this
Court ordered Karsch to show cause why these claims should
not be dismissed. (See Show Cause Order.) In the
Reconsideration Order, the Court asked the parties to
"further brief whether there is an appropriate basis" to grant
Defendants' motion for summary judgment on the Fraud Claims.
(See Reconsideration Order at 12.) The Fraud Claims all share
a common factual basis: Karsch claims that Defendants made
materially false representations and failed to disclose
material information prior to Karsch's investment in Blink.
(See, e.g., Complaint ¶¶ 385, 398, 414, 426, 457.)

    1.   Legal Standard

Under New York law, a plaintiff alleging fraud must
establish "(1) a material misrepresentation or omission of
fact (2) made by [a] defendant with knowledge of its falsity
(3) and intent to defraud; (4) reasonable reliance on the
part of the plaintiff; and (5) resulting damage to the
plaintiff." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo
Sec., LLC, 13 F.4th 247, 259 (2d Cir. 2021) (modification in
original) (quoting Crigger v. Fahnestock & Co., 443 F.3d 230,
234 (2d Cir. 2006)). "At the summary judgment stage, a
plaintiff must offer enough evidence to allow a reasonable
jury to find by clear and convincing evidence that *each* of
the elements is met." Id. (emphasis added).

The New York Court of Appeals has noted that "a fraud claim requires the plaintiff to have relied upon a misrepresentation by a defendant to his or her detriment." Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 493 (N.Y. 2016). In other words, the misrepresentation -- and not any innocuous reason -- must have caused the plaintiff's injury. See Aviles v. S&P Glob., Inc., 380 F. Supp. 3d 221, 281 (S.D.N.Y. 2019) ("Even if an investor pleads that it 'would not have invested *but for* [a given] misrepresentation,' it cannot recover on a fraud claim if it 'lost [its] money for *wholly unrelated reasons* (say, the market crashing).'" (modifications in original) (quoting Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd., 978 N.Y.S.2d 615, 620 (Sup. Ct. 2013))). This element is often referred to as the "loss causation" requirement. See id.

Further, when a plaintiff alleges both breach of contract and fraud arising essentially from the same facts, the Court must consider whether the claims are improperly duplicative. The Second Circuit has held that "a plaintiff is not allowed to 'dress up' a breach-of-contract claim as a fraud claim, [but] a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract." Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994).

For a fraud claim to stand on its own, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Petedge, Inc. v. Garg, 234 F. Supp. 3d 466, 492 (S.D.N.Y. 2017) (quoting Bridgestone/Firestone v. Recovery Credit Servs., 98 F.3d 13, 20 (2d Cir. 1996)).

Finally, the elements of a claim for securities fraud under Section 10(b) of the Exchange Act ("Section 10(b)"), 15 U.S.C. Section 78j et seq., and Rule 10b-5, 17 C.F.R. 240.10b-5, are the same as those required to prove common law fraud under New York law, with an additional requirement that the fraud occurred in connection with the sale of securities. See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc., No. 11 Civ. 1638, 2012 WL 612358, at *6 (S.D.N.Y. Feb. 23, 2012); see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (stating that a plaintiff alleging securities fraud in violation of Section 10(b) must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance upon the misrepresentation or
omission; (5) economic loss; and (6) loss causation.").

    2.  <u>Analysis</u>

In the Reconsideration Order, the Court noted that
Karsch suggested the alleged misrepresentations and omissions
were collateral to the contract and supported the Fraud Claims
independent of the breach-of-contract claim. However, after
full briefing and examination of the record, the Court finds
it unnecessary to determine whether the Fraud Claims are
duplicative of the breach-of-contract claims because the
record cannot support a finding that Karsch established all
elements of fraud. Namely, the record lacks any genuine
dispute of fact about whether Karsch suffered any injury or
loss from the alleged fraud.

Karsch's alleged injury, as pled in connection with the
Fraud Claims, is that he suffered "damages, including through
the loss of bargained-for equity ownership in Blink Health."
(Complaint ¶¶ 406, 424, 432.) This alleged injury raises two
issues. First, as the Court discussed above, Karsch did not
bargain for equity ownership in Blink. His bargain was
contingent on certain events occurring and triggering his
Note's conversion to equity, and none of those specific events
occurred prior to Defendants' exercising their bargained-for
right to prepay the debt.

Second, and perhaps more significantly, under New York law, a fraud plaintiff's injury "must be the direct, immediate, and proximate result of the misrepresentation," Kregos v. Assoc. Press, 3 F.3d 656, 665 (2d Cir. 1993), and damages can be recovered only for "what they lost because of the fraud, not . . . what they might have gained." Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1373 (N.Y. 1996). An injury cannot support a claim of fraud if it is entirely speculative, and Karsch's purported injury is just that. He is asking the Court -- and eventually, the jury -- to predict what would have happened if (1) he signed a different contract that did not contain a prepayment clause, (2) he negotiated for the direct purchase of common shares rather than the Note, or (3) his debt had converted to equity under the Note Agreement. That sort of abstract harm, based on could-have-been contingencies, does not provide the requisite injury to satisfy the final element of a fraud claim. See Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000) ("A fraud verdict may not rest on allegations of speculative or remote injury to the plaintiff.").

Additionally, because the Court has already determined that the underlying contracts allowed Defendants to prepay the Note at the time they did, Karsch is essentially arguing that absent the alleged misrepresentations, he would have

negotiated for a different agreement. But "the loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation." Lama Holding Co., 668 N.E.2d at 1373.

Finally, the Court notes this alleged "loss of equity ownership in Blink" is the same injury Karsch claims resulted from the alleged breach-of-contract. Karsch argued that the contracts required Defendants to convert his Note to equity, and they breached the agreements by failing to do so. Karsch now tries to take a second bite at the apple by also arguing he missed out on equity ownership because Defendants committed fraud in getting him to sign the agreements -- the same agreements that he thought unquestionably provided him with equity in Blink. So, even if the Court found the record could plausibly support a finding of fraud, the Court would have serious doubt whether the Fraud Claims were not duplicative of the breach-of-contract claim. See ADYB Engineered for Life, Inc. v. Edan Admin. Servs., No. 19 Civ. 7800, 2021 WL 1177532, at *21 (S.D.N.Y. Mar. 29, 2021) ("New York courts have held that a fraud claim is duplicative where it arises from the same facts and alleges the same damages as the breach-of-contract claim and merely adds conclusory allegations that the defendant made a promise to perform obligations under the contract while harboring a concealed

intent not to perform that obligation." (quotations omitted)).

Karsch has not provided proof that a reasonable jury could find, by clear and convincing evidence, that he suffered a direct, immediate, and proximate injury as a result of any alleged fraud grounded on misrepresentations by Defendants. On the record before it, the Court finds that there is no genuine dispute of material fact regarding the injury Karsch purportedly suffered. Because an injury is a required element of fraud, Defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment on Karsch's Fraud Claims is GRANTED.

Because summary judgment is granted on Karsch's claim for securities fraud, the Court will also grant summary judgment on his claim brought pursuant to Section 20(a) of the Exchange Act, since liability under that provision requires a primary violation of the securities laws. See Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 457 n.1 (2d Cir. 2019).

## ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendants Blink Health Ltd., Geoffrey Chaiken, and Matthew Chaiken for summary judgment (Dkt. No. 156) on the claims brought by plaintiff Michael

Karsch in this action is **GRANTED**. The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**

Dated:      March 24, 2022
            New York, New York

                                                    _____
                                                       Victor Marrero
                                                         U.S.D.J.